CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED

JUN 0 9 2014

JULIA C. DUDLEY, CLERK
BY:
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA

Civil Action No. *7:14cv00296*

*NKM*

### TRUDY ELIANA MUÑOZ RUEDA,

Petitioner,

v.

### HAROLD W. CLARKE, Director,
### Virginia Department of Corrections,

Respondent.

———————————

## INITIAL PETITION FOR A WRIT OF HABEAS CORPUS
## SUBJECT TO AMENDMENT

———————————

**Matthew L. Engle, Virginia Bar No. 46833**
THE INNOCENCE PROJECT AT UVA SCHOOL OF LAW
**580 Massie Road**
**Charlottesville, Virginia 22903**
**(434) 924-2912**
**(434) 924-4166 (facsimile)**

**Jonathan P. Sheldon, Virginia Bar No. 66726**
SHELDON, FLOOD & HAYWOOD, PLC
**10621 Jones Street, Suite 301-A**
**Fairfax, Virginia 22030**
**(703) 691-8410**
**(703) 251-0757 (facsimile)**

## TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................... i

TABLE OF AUTHORITIES.............................................................................. iv

STATEMENT OF FACTS................................................................................. 2

PROCEDURAL HISTORY ............................................................................... 5

SUMMARY OF THE ARGUMENT ................................................................. 6

STANDARDS OF REVIEW ............................................................................ 14

      A.  Section 2254 ..................................................................................... 15

          1.  Claims That the State Court Did Not Address Although
          They Were Properly Presented ................................................. 15

          2.  Claims That the State Court Found Defaulted ..................... 16

          3.  Claims That the State Court Adjudicated and Denied
          On the Merits ........................................................................... 17

      B.  Standards For Holding an Evidentiary Hearing................................ 20

      C.  State Court Findings of Fact ............................................................ 24

CLAIMS FOR RELIEF................................................................................... 32

I.  INEFFECTIVE ASSISTANCE OF COUNSEL.......................................... 32

      **Claim 1**:  Trial counsel provided ineffective assistance by failing
      to present testimony from Dr. Patrick Barnes regarding the actual
      cause of Noah Whitmer's symptoms................................................. 33

          The AEDPA does not bar relief on this claim ........................... 37

      **Claim 2**:  Trial counsel provided ineffective assistance by failing
      to request a continuance ................................................................. 40

          The AEDPA does not bar relief on this claim ........................... 43

      **Claim 3**:  Trial counsel provided ineffective assistance by failing
      to review Noah Whitmer's medical records ....................................... 45

The AEDPA does not bar relief on this claim ............................................. 52

**Claim 4**:  Trial counsel provided ineffective assistance by failing
to challenge Joslyn Waldron's false report that Ms. Muñoz had
confessed to shaking Noah Whitmer ........................................................ 54

   The AEDPA does not bar relief on this claim ............................................. 58

**Claim 5**:  Trial counsel provided ineffective assistance by failing
to challenge the integrity of the treating physicians' medical investigation
into the cause of Noah Whitmer's symptoms ....................................... 60

   The AEDPA does not bar relief on this claim ............................................. 64

**Claim 6**:  Trial counsel provided ineffective assistance by failing
to present testimony from lay witnesses regarding Noah Whitmer's illness ........ 65

   The AEDPA does not bar relief on this claim ............................................. 67

**Claim 7**:  Trial counsel provided ineffective assistance by failing
to call available character witnesses on Ms. Muñoz's behalf ............................ 68

   The AEDPA does not bar relief on this claim ............................................. 71

**Claim 8**:  Trial counsel provided ineffective assistance by failing
to obtain a copy of Ms. Muñoz's call to 911 ........................................... 71

   The AEDPA does not bar relief on this claim ............................................. 74

**Claim 9**:  Trial counsel provided ineffective assistance by failing
to object to an incorrect jury instruction ................................................. 75

   The AEDPA does not bar relief on this claim ............................................. 78

II. PROSECUTORIAL MISCONDUCT ....................................................... 78

   **Claim 10:**  The Commonwealth failed to disclose the 911 recording ................. 80

      The AEDPA does not bar relief on this claim ............................................. 81

   **Claim 11:**  The Commonwealth presented false evidence and argument
   regarding Noah Whitmer's health .......................................................... 81

      The AEDPA does not bar relief on this claim ............................................. 85

III. CUMULATIVE PREJUDICE .............................................................. 86

**Claim 12:** The cumulative effect of trial counsels' errors and the Commonwealth's misconduct undermines confidence in the jury's verdict........ 86

The AEDPA does not bar relief on this claim .......................................... 87

CONCLUSION ........................................................................................................ 88

CERTIFICATE OF SERVICE ................................................................................ 90

VERIFICATION ...................................................................................................... 91

# TABLE OF AUTHORITIES

**STATE CASES**

*Atkins v. Commonwealth*, 439 S.E.2d 409, 247 Va. 160 (1999) ............................................77

*Barlow v. Commonwealth*, 297 S.E.2d 645, 224 Va. 338 (1982) .................................................69

*Gardner v. Commonwealth*, __ S.E.2d __, 2014 WL 2534837 (Va. June 5, 2014) .....................69

*Green v. Young*, 571 S.E.2d 135, 264 Va. 604 (2002) ................................................................77

*Morris v. Commonwealth*, 636 S.E.2d 436, 272 Va. 732 (2006) ...............................................76

*Morrisette v. Warden*, 613 S.E.2d 551, 270 Va. 188 (2005).......................................................78

*Powell v. Commonwealth*, 552 S.E.2d 344, 261 Va. 512 (2001) ...............................................77

*See, e.g., State v. Edmunds*, 746 N.W.2d 590 (Wisc. App. 2008)...............................................12

*Slayton v. Parrigan*, 205 S.E.2d 680, 215 Va. 27 (1974)...........................................................85

*Workman v. Commonwealth,* 636 S.E.2d 368, 272 Va. 633 (2006)............................................79

*Zirkle v. Commonwealth*, 55 S.E.2d 24, 189 Va. 862 (1949)......................................................69

**STATUTES**

28 U.S.C. § 2244 .........................................................................................................................6

28 U.S.C. § 2254 ...................................................................................................................passim

28 U.S.C. § 2261 .......................................................................................................................14

Va. Code § 18.2-371.........................................................................................................5, 75, 77, 78

Va. Code § 18.2-371.1 ..................................................................................................................5

Va. Code § 40.1-103 .....................................................................................................................5

**RULES**

Va. R. Evid. 2:404 ......................................................................................................................69

**TREATISES**

ABA Standards for Criminal Defense § 4-4.1....................................................................46

Caffey J., The whiplash shaken infant syndrome: manual shaking by the extremities with whiplash-induced intracranial and intraocular bleeding, linked with residual permanent brain damage and mental retardation, 54 Pediatrics at 401 (1974) ....................................................7

Crown Prosecution Service, Non-Accidental Head Injury Cases (NAHI, formerly referred to as Shaken Baby Syndrome), Prosecution Approach (Mar. 24, 2011) ...........................................10

Donohue, Evidence-Based Medicine and Shaken Baby Syndrome Part 1: Literature Review, 1966-1998, 24 AM. J. FORENSIC MED. PATH. 239, 241 (2003) ...........................................8

Goudge, INQUIRY INTO PEDIATRIC FORENSIC PATHOLOGY IN ONTARIO- REPORT, at 528 (2008)...................................................................................................................10

Lantz, Junk Science and Glass Houses, 114 PEDIATRICS 330 (2004).......................................11

Matshes, Retinal and Optic Nerve Sheath Hemorrhages Are Not Pathognomonic of Abusive Head Injury, 16 PROC. OF THE AMERICAN ACADEMY OF FORENSIC SCIENCES 272 (2010) .......................................................................................................................11

Randy Hertz & James S. Liebman, FEDERAL HABEAS CORPUS PRACTICE AND PROCEDURE (4th ed. 2001) ...................................................................................................................25

Squier, The "Shaken Baby" Syndrome: Pathology and Mechanisms, ACTA NEUROPATHOL. 1, 3 (2011) ...............................................................................................................11

Tuerkheimer, The Next Innocence Project: Shaken Baby Syndrome and the Criminal Courts, 87 WASH. U .L. REV. 1, 10-11 (2009) ................................................................................10, 11

**FEDERAL CASES**

*Ake v. Oklahoma*, 470 U.S. 68 (1985) .....................................................................................16

*Baker v. Corcoran*, 220 F.3d 276 (4th Cir. 2000) ....................................................................15

*Banks v. Dretke*, 540 U.S. 668 (2004) .....................................................................................79

*Boone v. Paderick*, 541 F.2d 447 (4th Cir. 1976)..............................................................79, 82

*Boyce v. Braxton*, No. 3:05-CV-558 (E.D. Va. Mar. 19, 2013) ....................................................81

*Brady v. Maryland*, 373 U.S. 83 (1963) ............................................................................passim

*Breightner v. Chesney*, 301 F. Supp. 2d 354 (M.D. Pa. 2004)................................................26, 28

*Coleman v. Thompson*, 501 U.S. 722 (1991) ........................................................ 16, 85

*Edgington v. United States*, 164 U.S. 361 (1896) ........................................................ 71

*Elmore v. Ozmint*, 661 F.3d 783 (4th Cir. 2011) ............................................ 36, 45, 53

*Ford v. Georgia*, 498 U.S. 411 (1991) ........................................................................ 16

*Gersten v. Senkowski*, 299 F. Supp. 2d 84 (E.D.N.Y. 2004) ...................................... 36

*Giglio v. United States*, 405 U.S. 150 (1972) .................................................. 79, 81, 85

*Harrington v. Richter*, __ U.S. __, __, 131 S.Ct. 770 (2011) ...................................... 36

*Holder v. United States*, 2006 WL 1728133 (W.D. Okla. 2006) ................................ 36

*Hyman v. Aiken*, 824 F.2d 1405 (4th Cir. 1987) .................................... 46, 50, 53, 54

*James v. Kentucky*, 466 U.S. 341 (1984) ............................................................ 16, 85

*Keeney v. Tamayo-Reyes*,  504 U.S. 1 (1992) .......................................................... 23

*Kyles v. Whitley*, 514 U.S. 519 (1995) .............................................. 33, 79, 80

*Lambert v. Blackwell,* 387 F.3d 210 (3d Cir. 2004) .................................................. 27

*Martini v. Hendricks*, 348 F.3d 360 (3rd Cir. 2003) ................................................ 31

*Michelson v. United States*, 335 U.S. 469 (1948) .................................................... 71

*Miller-El v. Cockrell*, 537 U.S. 322 (2003) .............................................. 25, 31, 65

*Moise v. Schultz*, 2004 WL 2202665 (E.D.N.Y., Sep 29, 2004) (unreported) .............................. 31

*Moore v. Reynolds*, 153 F.3d 1086 (10th Cir. 1998) .................................................. 88

*Murray v. Carrier*, 477 U.S. 478 (1986) .................................................................. 17

*Napue v. Illinois*, 360 U.S. 264 (1959) .............................................. 79, 82, 85, 86

*O'Sullivan v. Boerckel*, 526 U.S. 838 (1999) ............................................................ 15

*People v. Richard R.*, 31 Misc. 3d 1212(A) (Westchester County Court, N.Y. 2011) ................ 36

*Quinn v. Hayes*, 234 F.3d 837 (4th Cir. 2000) .......................................................... 19

*Schlup v. Delo*, 513 U.S. 298 (1995) ...................................................................17, 85

*Smith v. Digmon*, 434 U.S. 332 (1978)........................................................................15

*Stevens v. Horn*, 318 F.Supp.2d 592 (W.D. Pa. 2004) ................................................31

*Strickland v. Washington*, 466 U.S. 668 (1984) ....................................................passim

*Taylor v. Maddox*, 366 F.3d 992 (9th Cir. 2004) ...........................................26, 30, 31

*Townsend v. Sain*, 372 U.S. 293 (1963) ............................................................22, 23, 24

*U.S. v. White*, 238 F.3d 537 (4th Cir. 2001) .........................................................79, 82

*United States v. Bagley*, 473 U.S. 667 (1985) ..................................................32, 79, 81

*United States v. Russell*, 34 Fed. Appx. 927 (4th Cir. 2002) (unpublished) ................88

*Wainwright v. Sykes*, 433 U.S. 72 (1977) ...................................................................16

*Weeks v. Angelone*, 176 F.3d 249 (4th Cir. 1999)........................................................15

*Wiggins v. Smith*, 539 U.S. 510 (2002) .......................................................................32

*Williams v. Taylor*, 529 U.S. 362 (2000).............................................................passim

*Williams v. Taylor*, 529 U.S. 420 (2000)..............................................................21, 23

*Wilson v. Ozmint*, 352 F.3d 847 (4th Cir. 2004).........................................................26

*Winston v. Kelly*, 592 F.3d 535 (4th Cir. 2010)..........................................................53

*Winston v. Pearson*, 683 F.3d 489 (4th Cir. 2012)................................................passim

*Wright v. West*, 505 U.S. 277 (1992).........................................................................19

*Zafiro v. United States*, 506 U.S. 534 (1993) .............................................................77

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA

TRUDY ELIANA MUÑOZ RUEDA, )
     **Petitioner,** )
        )
  **v.**       )  **Civil Action No.** _____
        )
        )
**HAROLD W. CLARKE, Director,** )
**Virginia Department of Corrections,** )
    **Respondent.** )

## PETITION FOR A WRIT OF
## HABEAS CORPUS SUBJECT TO AMENDMENT

Trudy Eliana Muñoz Rueda (hereinafter "Ms. Muñoz"), an innocent woman now in the custody of the Commonwealth of Virginia, hereby petitions this Court to grant a writ of habeas corpus under authority of 28 U.S.C. § 2254. Ms. Muñoz asserts that she is being detained in violation of the Constitution or laws or treaties of the United States, as more fully set forth below.

Because of the cumulative nature of the alleged errors or the prejudice flowing therefrom, Ms. Muñoz intends that each paragraph or subparagraph of this petition or any amendment thereto be deemed to incorporate by reference every other paragraph or subparagraph of this petition or any amendment thereto. Ms. Muñoz also incorporates herein by specific reference all motions filed or to be filed in this Court in this cause. Ms. Muñoz further incorporates herein by specific reference the complete record from the trial and direct appeal of this case and the complete record from the state habeas corpus proceedings.

The taking of evidence is necessary to the proper and fair resolution of some of Ms. Muñoz's claims. Accordingly, the Court should allow Ms. Muñoz to develop and present

1

testimony in support of this petition.  The documents in the appendix to this petition are offered

as evidence to the extent they are admissible.  Regardless of their admissibility, the documents in

the appendix constitute a proffer or forecast of the evidence that Ms. Muñoz would present at an

evidentiary hearing.

## STATEMENT OF FACTS

Ms. Muñoz is innocent.  On April 20, 2009, she was caring for five children at her home

daycare center in Alexandria, Virginia.  Five-month old Noah Whitmer had enrolled in her day

care nearly five weeks earlier.  Tr. 1/11/2010 at 118.[1]  Witnesses had observed that Noah had

been unusually fussy throughout the day and during the preceding week prior to April 20.  App.

25 at ¶ 8;[2] App. 13 at ¶ 9; Tr. 1/20/2010 at 103.  Even Noah's mother was aware of his recent

discontent, and believed that a recent switch to solid food might have been the cause (Tr.

1/20/2010 at 103); however, both Ms. Muñoz and a second care-taker, Eva Valle, noted that

Noah was not inclined to drink formula that day, either.  Tr. 1/20/2010 at 87.  Additionally, Valle

had observed that Noah's bowel movements were abnormal and off-color.  App. 13 at ¶ 8.

On April 20, Ms. Munoz attempted to comfort Noah in every way she knew; she fed him

(Tr. 1/20/2010 at 88); she changed his diaper (Tr. 1/20/2010 at 90); she played games with him

(Tr. 1/20/2010 at 92); she helped him exercise (Tr. 1/20/2010 at 94); she sang to him (Tr.

1/20/2010 at 95); she gave him a pacifier (Tr. 1/20/2010 at 99); she encouraged him to nap (Tr.

1/20/2010 at 108-09).  These efforts helped temporarily, but each time he would soon become

fussy again.  Tr. 1/20/2010 at 88-103.  Between 1:00 P.M. and 2:15P.M., shortly after Ms.

---

[1] Citations to "Tr." refer to the trial transcript, which is in the state court record.  Although she has not included the trial transcript in her appendix to this petition, Ms. Muñoz will provide a copy to the Court upon request.

[2] Citations to "App." refer to the appendix filed with this petition.

Muñoz began feeding Noah another bottle, she suddenly felt that one of his arms had gone limp. Tr. 1/20/2010 at 114.  Concerned that he was having difficulty swallowing the formula, Ms. Muñoz cradled Noah on her shoulder and patted him on the back. Tr. 1/20/2010 at 115.  As she was holding him, she felt his body curl into a "little ball," so she moved him to the changing table and tried to move his arms. Tr. 1/20/2010 at 115.  Once she saw that Noah's chest was not moving, she placed him on the floor and began performing CPR, simultaneously calling 911 for assistance. Tr. 1/20/2010 at 116.  The dispatcher stayed on the phone with her, instructing her to perform CPR and to remove Noah's clothes. Tr. 1/20/2010 at 118.  Noah then began vomiting milk through his nose and mouth. Tr. 1/20/2010 at 119.  When the EMTs arrived, Ms. Muñoz advised them of the situation, telling them that Noah appeared to have choked on milk. Tr. 1/12/2010 at 22.  Noah was quickly transported to INOVA-Fairfax hospital.

Later that day, the police interviewed Ms. Muñoz in her home. Tr. 1/12/2010 at 200. This interview lasted approximately two hours and was recorded, with Ms. Muñoz's consent. Tr. 1/12/2010 at 201-02.  During that interview, Ms. Muñoz consistently denied doing anything to harm Noah, but explained that he went limp as she was trying to give him a bottle. Tr. 1/12/2010 at 200-01.  Ms. Muñoz did not hesitate to allow this interview to be recorded. Tr. 1/12/2010 at 206.

The following day, April 21, Ms. Muñoz was again interviewed in her home, this time by Joslyn Waldron, a Child Protective Services social worker who investigates cases of child abuse. Tr. 1/12/2010 at 150-51.  Also present was a police officer, Nancy Cottrell. Tr. 1/12/2010 at 152.  Waldron testified that Ms. Muñoz refused to allow her to record the interview (a highly dubious claim given Ms. Muñoz's willingness to have the prior police interview recorded). Tr. 1/12/2010 at 155.  At any rate, Waldron testified that during this interview, Ms. Muñoz told her

3

essentially the same story that she had told police the day before and denied that she had harmed Noah. Tr. 1/12/2010 at 160-61. During the interview, Waldron received a call from INOVA-Fairfax hospital describing Noah's symptoms. Tr. 1/12/2010 at 161. Waldron explained Noah's symptoms to Ms. Muñoz, told Ms. Muñoz that these symptoms were consistent with shaking, and emphasized the importance of knowing the truth about what happened to Noah. Tr. 1/12/2010 at 161. Waldron claimed that Ms. Muñoz responded by stating that she had picked Noah up, held him with one hand under his butt and another hand on the back of his neck, shook him, and "moved him hard." Tr. 1/12/2010 at 162. Waldron also provided a visual demonstration of the way Ms. Muñoz reported handling Noah. Tr. 1/12/2010 at 162.

In her conversations with INOVA-Fairfax Hospital, Waldron characterized Ms. Muñoz's statement as a confession to having shaken Noah. See *infra* at Claims 3, 4, 5. Based upon Waldron's false report of a confession, healthcare professionals at INOVA-Fairfax Hospital cursorily concluded that Ms. Muñoz had intentionally injured Noah. Noah's medical records are rife with erroneous reports that Ms. Muñoz confessed to shaking Noah. Pet. Ex. A;[3] *see also infra* at Claim 5. Based upon this alleged confession, Noah's treating physicians accepted that Ms. Muñoz had abused Noah, and never seriously investigated other potential and likely causes of his symptoms. Instead, the treating physicians all testified that Noah's symptoms were the result of Shaken Baby Syndrome (hereinafter "SBS"). These doctors essentially testified that the triad of symptoms exhibited by Noah—subdural hematoma (bleeding in the brain), retinal hemorrhages (bleeding in the eyes), and cerebral edema (accumulation of water in the brain)—

---

[3] Petitioner's Exhibit A was submitted to the state court on a CD-ROM. It contained approximately 1,000 pages in PDF format of Noah Whitmer's medical records as provided to defense counsel by the Commonwealth. Citations to "Pet. Ex. A" refer to this CD, which is included in the state habeas record. Due to the volume of these records and privacy concerns regarding Noah Whitmer's medical records, undersigned counsel did not include this exhibit in the federal appendix. Counsel will provide it to this Court upon request.

could only be explained by abusive trauma. As explained more fully below, this medical testimony has been thoroughly discredited, and substantial evidence was available to prove Ms. Muñoz's innocence.

### PROCEDURAL HISTORY

Ms. Muñoz's convictions are the result of a failure of the adversarial process. Her defense attorneys, Guillermo Uriarte and James Kearney, had never previously tried a felony case of this magnitude; Kearney concedes that they provided constitutionally ineffective representation in numerous ways. App. 7-8 at ¶ 6. Despite the fact that defense counsel admits that Ms. Muñoz did not receive effective representation, the state courts summarily denied Ms. Muñoz's habeas petition without taking any evidence.

On July 20, 2009, Ms. Muñoz was indicted for child abuse or neglect (Va. Code § 40.1-103) and willful or negligent cruelty or injury to a child (Va. Code § 18.2-371.1 (A)) in Fairfax County, Virginia. The Commonwealth's theory of the case was that Noah Whitmer suffered severe intracranial injuries when Ms. Muñoz violently shook him. The Commonwealth's evidence focused on SBS, a highly controversial medical hypothesis, which posits that abusive trauma can be inferred from the aforementioned triad of symptoms. On January 21, 2010, a jury found Ms. Muñoz guilty of both counts. The trial court imposed six years and six months and fine of $12,500 for the child abuse or neglect charge, and four years for the willful or negligent cruelty or injury to a child charge, to be served consecutively.

Ms. Muñoz's direct appeals in state court were concluded on November 14, 2011. The criminal judgment became final when her time for filing a petition for certiorari to the United States Supreme Court expired on February 13, 2012. On behalf of Ms. Muñoz, undersigned *pro bono* counsel filed a petition for a writ of habeas corpus in the Circuit Court of Fairfax County

on November 14, 2012.  Without conducting an evidentiary hearing, the circuit court granted

summary dismissal on September 11, 2013.  Ms. Muñoz filed a Petition for Appeal in the

Supreme Court of Virginia on December 11, 2013.  The Supreme Court of Virginia refused the

appeal on March 11, 2014.  Ms. Muñoz files the instant petition for a writ of habeas corpus

within the one-year statute of limitations codified at 28 U.S.C. § 2244(d).

## SUMMARY OF THE ARGUMENT

So-called Shaken Baby Syndrome is a controversial scientific hypothesis that has yet to

be validated.  It masquerades as a medical diagnosis, but has no precise criteria and no known

rate of error.  In reality, it is a hypothesis about one possible explanation for the triad of

symptoms: subdural hematoma, retinal hemorrhages, and cerebral edema.  It is a discredited

supposition of how these symptoms might be produced that is now known to be at odds with

biomechanical science, pediatric neurology, and ophthalmology.

The SBS hypothesis was first raised in a 1971 article by Dr. A. Norman Guthkelch, a

pediatric neurosurgeon.  Dr. Guthkelch cited a 1968 whiplash study involving adult rhesus

monkeys and also discussed two patients of his that had subdural hematomas yet no sign of head

trauma.  In one of Dr. Guthkelch's cases, the mother said she had shaken her infant when he was

having a coughing fit and she feared that he was choking; in the other, the infant had grip marks

and the mother said that she "might have" shaken him when he cried at night.  App. 145-47.

From these cases, Dr. Guthkelch hypothesized that infants might sustain whiplash-type injuries,

including subdural hematoma, as a result of being violently shaken.  This was the genesis of the

SBS theory.

In 1972 and 1974, famed pediatric radiologist and textbook author John Caffey published

two articles about the potential dangers of shaking infants.  In the first article, Dr. Caffey

6

collected examples of what he deemed "convincing" cases of children who had suffered brain injury as a result of shaking, most of which came from a Newsweek article about a nurse who had confessed to abusing children in her care. *See* John Caffey, The Boys Jeered Her, Newsweek, 1956. In the second article, Dr. Caffey cited the 1968 Ommaya study for the proposition that shaking infants could cause subdural hemorrhage. He also speculated that such shaking could damage capillaries within the retina, because he had observed retinal hemorrhages in children he suspected had been abused. *See* Caffey J., The whiplash shaken infant syndrome: manual shaking by the extremities with whiplash-induced intracranial and intraocular bleeding, linked with residual permanent brain damage and mental retardation, 54 PEDIATRICS 401 (1974). Although he admitted that his data set was "meager" and "manifestly incomplete," Dr. Caffey broadly concluded that the evidence "indicates that manual whiplash shaking of infants is a common primary type of trauma in the so-called battered infant syndrome. It appears to be the major cause in these infants who suffer from subdural hematomas and intraocular bleedings." *Id.* at 402.[4] Dr. Caffey ended his article by calling for a "nationwide educational campaign" that he said could be summarized by the following stanza:

> Guard well your baby's precious head,
> Shake, jerk and slap it never,
> Lest you bruise his brain and twist his mind,
> Or whiplash him dead forever.

*Id.* at 403.

---

[4] In a passage that perhaps should have caused Dr. Caffey pause but which only later would be recognized as somewhat chilling, Dr. Caffey noted that children who presented with subdural hematoma and no external evidence of trauma—children that he assumed had been shaken—often had histories of vomiting, hyperirritability, infection, stupor, birth trauma, fever, bulging fontanel, anemia, enlarged head, and abnormal ocular fundi. Caffey, 54 PEDIATRICS at 400. It is now well accepted that these symptoms are associated with several non-traumatic neurological conditions that mimic the intracranial conditions supposedly caused by SBS.

From this hypothesizing and manifestly incomplete research, the SBS hypothesis rapidly gained "acceptance and enormously widespread popularity, with no real investigation or even question as to its scientific validity." App. 163. In the 1980s and 1990s, dozens of articles that merely presumed the existence and validity of the SBS hypothesis filled the medical literature, and physicians (particularly pediatricians and ER doctors) were trained to "diagnose" SBS based on the triad of findings.

But, in about 1999, the medical community embraced what is called the Evidence-Based Medicine (EBM) movement, which sought to ensure that medical practice was based on the best available medical and scientific evidence, as opposed to over reliance on anecdote and historic practice. After some physicians began to question whether the SBS hypothesis met scientific standards, Dr. Mark Donohoe, in a 2003 article, compiled and reviewed the SBS literature through 1998. He concluded that "there was inadequate scientific evidence to come to a firm conclusion on most aspects of causation, diagnosis, treatment, or any other matter pertaining to SBS." Donohue, Evidence-Based Medicine and Shaken Baby Syndrome Part 1: Literature Review, 1966-1998, 24 AM. J. FORENSIC MED. PATH. 239, 241 (2003). Dr. Donohoe concluded that "there was an urgent need for properly controlled, prospective trials into SBS, using a variety of controls. Without published and replicated studies of that type, the commonly held opinion that the finding of SDH [subdural hematoma] and RH [retinal hemorrhage] in an infant was strong evidence of SBS was unsustainable, at least from the medical literature." *Id.*

In 2006, Dr. Jan Leestma, a neuropathologist at the Children's Memorial Hospital at Northwestern University, lamented that the medical community's immediate acceptance of SBS had resulted in a lack of studies into other potential causes of the triad of symptoms, even while SBS itself remained unproven:

8

> It should be apparent that from virtually every perspective many flaws exist in the theory that shaking is causative. No case studies have ever been undertaken to prove even a partial list of possible confounding variables/phenomena, such as the presence of intracranial cysts or fluid collections, hydrocephalus, congenital and inherited diseases, infection, coagulation disorders and venous thrombosis ... or recent or remote head trauma.

App. 149-50. Echoing Dr. Leestma's call for greater consideration and investigation into other conditions that mimic the SBS findings, Dr. Patrick Barnes compiled and published a lengthy paper that included a five-page summary of known non-traumatic causes that can mimic the triad of so-called SBS findings. App. 41-62.

While almost no one in the scientific mainstream questioned SBS's existence and reliability in 2000, today questioning SBS is mainstream.[5] The debate about SBS is particularly

---

[5] *See, e.g.*, Szalavitz, The Shaky Science of Shaken Baby Syndrome, TIME (Healthland) (online, Jan. 17, 2012); Bazelon, Shaken-Baby Syndrome Faces New Questions in Court, N.Y. TIMES (Dec. 2, 2011); Hansen, Unsettling Science, ABA. J. (Dec. 2011); Gabaeff, Challenging the Pathophysiologic Connection Between Subdural Hematoma, Retinal Hemorrhage and Shaken Baby Syndrome, 12 W. J. EMER. MED. 144 (2011) ("It appears that SBS does not stand up to an evidence-based analysis."); Miller, et al. Overrepresentation of Males in Traumatic Brain Injury of Infancy and in Infants with Macrocephaly: Further Evidence that Questions the Existence of the Shaken Baby Syndrome, 31 AM. J. FORENSIC 7 MED. PATH. 165, 169 (2010) ("Several recent observations have converged to raise serious questions about SBS and whether shaking alone can cause thetriad ... How could such a diagnosis based on such flimsy evidence and with such far-reaching implications become so entrenched in pediatric and legal medicine?"); Talbert, Shaken Baby Syndrome: Does It Exist?, 72 MED. HYPOTHESES 131 (2009); Anderson, Does Shaken Baby Syndrome Really Exist?, DISCOVER (Dec. 2, 2008); Gena, Comment, Shaken Baby Syndrome: Medical Uncertainty Casts Doubt on Convictions, 2007 WIS. L. REV. 701, 710 ("Today, there is no consensus among medical professionals as to whether the symptoms that have traditionally been attributed to SBS are necessarily indicative of shaking."); Leestma, "Shaken Baby Syndrome": Do Confessions by Alleged Perpetrators Validate the Concept, 11 J. AM. PHYS. AND SURGEONS 14, 15-16 (2006) ("It should be apparent that from virtually every perspective many flaws exist in the theory that shaking is causative."); Uscinski, Shaken Baby Syndrome: An Odyssey, 9 J. AM. PHYS. AND 20 SURGEONS 76 (2004) (SBS is "a widely proclaimed yet still hypothetical supposition"); Lyons, Note, Shaken Baby Syndrome: A Questionable Scientific Syndrome and A Dangerous Legal Concept, 2003 UTAH L. REV. 1109 ("Shaken baby syndrome ... quite possibly does not exist."); V. DiMaio, et al., FORENSIC PATHOLOGY 362 (2d ed. 2001) ("[We] have grave reservations as to the existence of SBS.*"); see also Wisconsin v. Edmunds*, 746 N.W.2d 590, 596 (Wis. Ct. App. 2008) ("a significant and legitimate debate in the medical community has developed in the

controversial in cases such as this one where there is no outward or radiographic evidence of abuse (e.g., bruises, grip marks, crush injuries, focal lesions on the brain, or broken or fractured bones). Yet medical experts entrenched in the old dogma continue to claim they can diagnose abuse from the triad alone. See, e.g., App. 64 (Findley, et al., Shaken Baby Syndrome, Abusive Head Trauma, and Actual Innocence: Getting It Right, _ HOUSTON J. HEALTH POLICY_ (2012) ("We now know .... it is no longer valid to reason backwards from the triad to a diagnosis of trauma or abuse."); Tuerkheimer, The Next Innocence Project: Shaken Baby Syndrome and the Criminal Courts, 87 WASH. U .L. REV. 1, 10-11 (2009) ("As a categorical matter, the science of SBS can no longer support a finding of proof beyond a reasonable doubt in triad-only cases"); Goudge, INQUIRY INTO PEDIATRIC FORENSIC PATHOLOGY IN ONTARIO-REPORT, at 528 (2008) ("[T]he predominant view is no longer that the triad on its own is diagnostic of SBS."); Crown Prosecution Service, Non-Accidental Head Injury Cases (NAHI, formerly referred to as Shaken Baby Syndrome), Prosecution Approach (Mar. 24, 2011) ("it is unlikely that a charge for a homicide ... could be justified where the only evidence available is the triad of pathological features").

Indeed, ongoing medical research in the last decade has disproven virtually every hypothesis in support of the existence of SBS. Today, as a result of improved imaging techniques and subsequent research, the list of diseases and conditions known to cause the same findings previously attributed to violent shaking is long and growing. See, e.g., App. 152-60 (Lloyd, et al., Biomechanical Evaluation of Head Kinematics During Infant Shaking Versus Pediatric Activities of Daily Living, 2 J. FORENSIC BIOMECHANICS 1, 7 (2011) (setting forth a long list of known mimics for the SBS symptoms)); App. 89 ("By 2006, it was widely

───────────────────────────────────────────────

past ten years over whether infants can be fatally injured through shaking alone").

recognized by supporters of the [SBS] hypothesis that there are many 'mimics' of [SBS], including accidental causes and a variety of illnesses and medical conditions, ranging from birth trauma to childhood stroke."); Squier, The "Shaken Baby" Syndrome: Pathology and Mechanisms, ACTA NEUROPATHOL. 1, 3 (2011) ("The differential diagnosis of a baby with the triad is wide ...."). In other words, we now know that many other medical conditions and non-abusive events can cause the triad of clinical findings previously believed (without scientific validation) to be unique markers of abuse, while there is tremendous debate and uncertainty about whether those findings can even be caused by shaking.

Research and studies appear to confirm that all the fundamental assumptions about how shaking causes the triad were wrong. In short, "the scientific underpinnings of SBS have crumbled." Tuerkheimer, *supra*, at 11. The theory that shaking causes retinal injury by causing capillaries to swell and burst, which was presented to the jury by the Commonwealth's experts in this case (Tr. 1121/2010 at 133-36), has been thoroughly discredited. Studies have confirmed that retinal hemorrhages are not caused by shaking, but instead are a secondary consequence that occurs as a result of intracranial bleeding or pressure in a wide variety of non-traumatic and accidental circumstances. See, e.g., App. 98-99 (citing multiple sources for proposition that retinal hemorrhages are not directly caused by shaking); Lantz, Junk Science and Glass Houses, 114 PEDIATRICS 330 (2004) (stating that the "vested dogma" that the trauma of shaking causes retinal hemorrhages "is a faith-based assumption, not a scientific fact."); Matshes, Retinal and Optic Nerve Sheath Hemorrhages Are Not Pathognomonic of Abusive Head Injury, 16 PROC. OF THE AMERICAN ACADEMY OF FORENSIC SCIENCES 272 (2010) (revealing that retinal hemorrhages are commonly found in natural and accidental deaths, and stating "[f]or many years, the dogma of pediatric forensic pathology was 'retinal and optic nerve sheath

hemorrhages are pathognomonic of abusive head injury,' including shaken baby syndrome. Growing controversy surrounding the existence of SBS led to questioning of that dogma."). Those who still support the SBS diagnosis do so even though it has been shown that the premises for the diagnosis have been proven false or, at the very least, have been cast in substantial doubt.

These ongoing developments in the medical and legal communities establish that convictions based upon the SBS hypothesis are highly suspect. SBS convictions across the country (and the world) are being overturned because of the faulty nature of the "scientific" expert testimony underlying them. Conclusions of abuse based merely on the triad of symptoms without any further external signs of trauma (such as grip marks, bruises, or broken bones) are unable to withstand scrutiny. As of March 2013, at least eighteen SBS convictions have been vacated or commuted in the United States. Former experts who provided testimony, courts, and the medical community are slowly realizing that the "science" underpinning these convictions was never adequately established and does not exist in the absence of evidence of external trauma. *See, e.g., State v. Edmunds*, 746 N.W.2d 590, 596 (Wisc. App. 2008) ("Doubt has increased in the medical community 'over whether infants can be fatally injured through shaking alone.'").

In this case, post-conviction investigation uncovered a wealth of evidence undermining the Commonwealth's case against Ms. Muñoz, and proving that Noah's symptoms were most likely non-traumatic in nature. But due to a combination of ineffective representation by defense counsel and withheld exculpatory evidence, the jurors who convicted Ms. Muñoz never heard this critical information. In light of this compelling evidence—all of which was available to defense counsel or in the possession of the Commonwealth—this Court should have no confidence in the outcome of Ms. Muñoz's trial.

Defense counsels' failures can be roughly grouped into two categories.  First, defense counsel failed to undermine the Commonwealth's case.  Specifically, defense counsel failed to present evidence that, in reaching their "diagnosis" of SBS, the treating physicians relied on social worker Joslyn Waldron's false report that Ms. Muñoz had confessed to shaking Noah.  In fact, defense counsel could have proven that Ms. Muñoz never confessed to shaking Noah.  Instead of conducting differential diagnoses and eliminating possible non-traumatic causes of Noah's symptoms, his medical team at INOVA-Fairfax simply accepted Waldron's false report that Ms. Muñoz had confessed.  This misinformation was then transmitted to the jury through the medical witnesses under the guise of a diagnosis, even as Waldron took the stand and walked back her claim that Ms. Muñoz had confessed to shaking Noah.

Counsels' failure to show the jury the extent to which Waldron's false report of a confession tainted the medical testimony was a direct result of their failure to review Noah's medical records carefully and thoroughly.  In fact, those records—spanning over 1000 pages—were not provided to defense counsel until December 16, 2009, less than a month before trial.  The records, which included Noah's CT and MRI scans, were the single most important piece of evidence in this case but were not provided to the defense experts until December 29, 2009 (Dr. Barnes), January 4, 2010 (Dr. Gardner), and January 6 (Dr. Thibault).  Trial commenced *five days later*.  Trial counsel have admitted that they had insufficient time to review the medical records adequately, yet failed to request a continuance so that they and their experts could review and understand the significance of this information.

For the same reason, defense counsel was unable to rebut the Commonwealth's false assertion that prior to April 20, 2009, Noah Whitmer was a perfectly healthy child.  In fact, Noah's medical files were replete with information suggesting that Noah was sick prior to April

13

20, but the jury never heard this information due to trial counsels' failure to review his records carefully. Evidence that Noah was unwell prior to April 20 would have been relevant to presenting an alternate explanation for his symptoms to the jury. This was the second category of ineffective representation: trial counsel failed to present the jury with the most plausible non-traumatic explanations for Noah's symptoms. Once he had time to review the medical records, Dr. Patrick Barnes, a pre-eminent pediatric neuroradiologist who has testified for both the prosecution and defense in SBS cases, would have been able to provide the jury with his firm medical opinion that Noah's symptoms were actually the result of a series of strokes caused by a thrombosed (clotted) vein in Noah's brain. In fact, Dr. Barnes was so convinced that Noah's symptoms were not the result of abuse that he offered to travel to Virginia from California and provide pro bono expert services to the defense team. *See infra* at Claim 1. However, the jury never got to hear this testimony because trial counsel failed to secure Dr. Barnes's presence at trial and failed to obtain a continuance so that they could present this critical medical testimony.

These were not the only constitutional errors that occurred at Ms. Muñoz's trial. However, standing alone, they are more than sufficient to undermine confidence in her convictions. At a minimum, the Court should permit discovery, factual development, and an evidentiary hearing in this case to enable Ms. Muñoz to prove her innocence and establish the unfairness of her trial.

## STANDARDS OF REVIEW

Chapter 154 of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") does not apply to Ms. Muñoz's case because Virginia does not qualify as an "opt-in" jurisdiction under 28 U.S.C. § 2261. Consequently, this petition is governed by Chapter 153.

**A.**     **Section 2254(d)**

There are three different ways claims in § 2254 proceedings are assessed, depending on the disposition of the claim in state court, i.e., claims that the state court adjudicated and denied on the merits; claims that are "defaulted;" and claims that the applicant properly presented to the state court but which the state court simply did not address, or addressed in a non-qualifying manner.

**1.**     **Claims That the State Court Did Not Address Although They Were Properly Presented**

If a claim was presented to, but *not* addressed by the state court, then §2254(d), by its express terms, does not apply and the federal court's review of the claim is *de novo*. In *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999), the Court explained that in order to satisfy the habeas corpus exhaustion requirement, a petitioner must give the state's highest court an opportunity to resolve each of his federal constitutional claims. It is not necessary for exhaustion that the state court avail itself of the opportunity to review these claims. *Smith v. Digmon*, 434 U.S. 332, 333 (1978) (federal claim is exhausted if presented to state's highest court, even if state court chooses not to address merits). If the state court does not address the merits of a properly presented claim, federal review is *de novo*. *Weeks v. Angelone*, 176 F.3d 249, 258 (4th Cir. 1999) ("When a petitioner has properly presented a claim to the state court but the state court has not adjudicated the claim on the merits, however, our review . . . [under AEDPA] is *de novo*"), *aff'd*, 528 U.S. 225 (2000). If the petitioner has properly presented a claim and the state court, exercising its ordinary discretion, declines to address the merits of that claim, the claim is exhausted and is ripe for *de novo* federal review on the merits. *See, e.g., Baker v. Corcoran*, 220 F.3d 276, 291 (4th Cir. 2000), *cert. denied*, 531 U.S. 1193 (2001) (claims presented for the first

time in a motion to re-open state post-conviction proceedings are properly exhausted, even when the state court denies the motion to re-open).

### 2.      Claims that the State Court Found Defaulted

If a claim was decided by the state court on state procedural grounds, but not on the merits, then §2254(d), by its own express terms, does not govern the federal court's review of the claim. In this circumstance, assuming the petitioner can overcome the state court's procedural ruling, *e.g.*, by demonstrating that the procedural rule applied by the state court was not clearly established, or was not consistently or regularly applied, or was not independent from the federal constitutional merits, federal review is *de novo*. Even if a claim was properly defaulted, a petitioner can obtain *de novo* review here by showing cause and prejudice or a miscarriage of justice, merits review by the federal court is *de novo*.

Any purported default by the state court must rest on adequate and independent state law grounds. To be "adequate," the state procedural rule must be firmly established and regularly followed. *James v. Kentucky*, 466 U.S. 341, 348-49 (1984); *Ford v. Georgia*, 498 U.S. 411 (1991). To be "independent," a state procedural rule must not be interwoven with federal issues. In *Ake v. Oklahoma*, 470 U.S. 68 (1985), for example, the Court held that a state procedural rule was not independent when the state "made application of the procedural bar depend on an antecedent ruling on federal law." *Id.* at 74-75.

This Court can address the merits of any procedurally defaulted claims if the petitioner can show cause for the default and resulting prejudice. *Wainwright v. Sykes*, 433 U.S. 72 (1977). Cause generally means that there was some objective factor external to the defense that made compliance with a state procedural rule impracticable. *Coleman v. Thompson*, 501 U.S. 722, 753 (1991). Attorney error that constitutes ineffective assistance of counsel is cause, *id.* at 753-54,

16

and Ms. Muñoz asks this Court to reach the merits of any procedurally defaulted claims because

of the ineffective assistance of his counsel at trial or on direct appeal.

Federal courts also can reach the merits of a procedurally defaulted claim if the petitioner

can show a fundamental miscarriage of justice. *Murray v. Carrier,* 477 U.S. 478, 488 (1986).

Generally, a miscarriage of justice means that the defendant is actually innocent of the capital

crime, *Schlup v. Delo*, 513 U.S. 298 (1995). In this case, Ms. Muñoz is prepared to prove her

actual innocence at an evidentiary hearing and asks this Court to reach the merits of any

procedurally defaulted claims under *Schlup*.

### 3. Claims That the State Court Adjudicated and Denied on the Merits

If the claim *was* decided on the merits, then §2254(d) *may* apply, depending on the nature

of the state court's decision. Under 28 U.S.C. § 2254(d), as amended by AEDPA:

> (d) An application for a writ of habeas corpus on behalf of a person in custody
> pursuant to the judgment of a State court shall not be granted with respect to any
> claim that was adjudicated on the merits in State court proceedings unless the
> adjudication of the claim –
> (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the Supreme
> Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination
> of the facts in light of the evidence presented in the State court proceeding.

Thus, a federal court seeking to grant relief to a state prisoner's meritorious § 2254 claim must

properly consult § 2254(d) to examine whether there are any limitations placed on the federal

court's ability to grant relief. *See Williams (Terry) v. Taylor*, 529 U.S. 362, 399 (2000) (AEDPA

"placed a new restriction on the power of federal courts to grant writs of habeas corpus").

In Part II of Justice O'Connor's opinion in *Terry Williams*, a majority of the Court

defined the terms in § 2254(d)(1). In Parts III and IV of Justice Stevens' opinion in *Terry*

*Williams*, a majority of the Court demonstrated the correct manner of applying these definitions

to the facts of an ineffective assistance claim to determine whether a federal court can grant relief

on a claim adjudicated on the merits in state court proceedings.  Summarizing the definitions of

the major terms in § 2254(d)(1), the Court said:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the
> state court arrives at a conclusion opposite to that reached by this Court on a
> question of law or if the state court decides a case differently than this Court has
> on a set of materially indistinguishable facts.   Under the "unreasonable
> application" clause, a federal habeas court may grant the writ if the state court
> identifies the correct governing legal principle from this Court's decisions but
> unreasonably applies that principle to the facts of the prisoner's case. . . .  [T]he
> phrase "clearly established Federal law, as determined by the Supreme Court of
> the United States" . . . refers to the holdings, as opposed to the dicta, of this
> Court's decisions as of the time of the relevant state-court decision.

*Terry Williams*, 529 U.S. at 412-13 (opinion of the Court by O'Connor, J.).

A state court's decision is contrary to Supreme Court precedent if, for example, the state

court assesses prejudice under a "preponderance of the evidence" standard when the Supreme

Court has prescribed a "reasonable probability" standard. *Id.* at 405-06.  It is less clear when a

state court's decision involves an unreasonable application of Supreme Court precedent.  The

Court made clear that the word "unreasonable" does not mean the same as "incorrect," *id.* at 410,

and an application of law that is wrong may not always be unreasonable.  On the other hand, the

word "unreasonable" as used in § 2254(d)(1) does not have a specially onerous or unusual

meaning.  "[U]nreasonable . . . is a common term in the legal world and, accordingly, federal

judges are familiar with its meaning." *Id.*

The concept of the correct governing legal principle, which is central to both the

"contrary to" and "unreasonable application of" terms in § 2254(d)(1), also is relevant to the

concept of "clearly established" federal law.  "For the 'clearly established' prong to apply, the

relevant Supreme Court precedent need not be directly on point, but must provide a 'governing

legal principle' and articulate specific considerations for the lower court to follow when applying

the precedent." *Quinn v. Hayes*, 234 F.3d 837, 844 (4th Cir. 2000), *cert. denied*, 532 U.S. 1024 (2001).[6] "A state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases." *Williams*, 529 U.S. at 405.

Using a framework of these definitions, the Court explained how § 2254(d)(1) applied to the relief the Court had determined to grant based on the claims alleged in Terry Williams' case, and found that § 2254(d) imposed no limitation on the Court's authority to grant such relief. First, it held that *Strickland v. Washington*, 466 U.S. 668 (1984), represents clearly established federal law on questions of ineffective assistance of counsel. "That the *Strickland* test 'of necessity requires a case-by-case examination of the evidence,' *Wright* [*v. West*], 505 U.S. 277, 308 (1992) (Kennedy, J., concurring), obviates neither the clarity of the rule nor the extent to which the rule must be seen as 'established' by this Court." *Terry Williams*, 529 U.S. at 391 (opinion of the Court by Stevens, J.). Second, the Court emphasized that *Strickland* alone sets out the standard for determining prejudice in the ordinary case where counsel's deficient performance deprives the defendant of a right to which he is entitled. Because the Supreme

---

[6] Reliance on "clearly established Federal law as determined by the Supreme Court of the United States" does not render lower federal court decisions irrelevant in federal habeas proceedings. Rather, they remain useful (and accepted) in the task of identifying the content and scope of rules clearly established by the Supreme Court. *See, e.g.*, *Tran v. Lindsey*, 212 F.3d 1143, 1154 (9th Cir.), *cert. denied*, 121 S.Ct. 340 (2000) ("there is still a role for circuit law in habeas cases: we still look to our own law for its persuasive authority in applying Supreme Court law; however, only the Supreme Court's holdings are binding on the state courts and only those holdings need be 'reasonably' applied"); *Richardson v. Bowersox*, 188 F.3d 973, 978 (8th Cir. 1999), *cert. denied*, 529 U.S. 1113 (2000) ("In determining whether a state court's decision involved an unreasonable application of clearly established federal law, it is appropriate to refer to decisions of the inferior federal courts in factually similar cases"); *Matteo v. Superintendent, SCI Albion*, 171 F.3d 877 (3rd Cir.) (*en banc*), *cert. denied*, 528 U.S. 824, 890 (1999) ("in certain cases it may be appropriate to consider the decisions of inferior federal courts as helpful amplifications of Supreme Court precedent").

19

Court of Virginia relied in some part on a prejudice standard other than *Strickland*, it rendered a decision that was "contrary to" clearly established federal law. *Id.* at 391-94.

The Supreme Court also concluded that in Williams's case the state court's decision involved an "unreasonable application" of federal law, for two reasons. First, the Supreme Court of Virginia employed in part the wrong legal standard. Second, even to the extent it purported to apply the correct *Strickland* standard, it did so unreasonably because it failed to consider the totality of the available mitigation evidence. *Id.* at 397-98. Specifically, the state supreme court "failed to evaluate the totality of the available mitigation evidence--both that adduced at trial, and the evidence adduced in the habeas proceeding[.]" *Id.* at 398. Neither did the Court find it reasonable for the state court to consider Williams's mitigation evidence only to the extent that it might rebut the aggravating factor of future dangerousness; the state court was unreasonable in failing to consider whether, despite a finding of future dangerousness, the jury might have exercised its unfettered discretion to sentence Williams to life imprisonment. "Mitigating evidence unrelated to dangerousness may alter the jury's selection of penalty, even if it does not undermine or rebut the prosecution's death-eligibility case. The Virginia Supreme Court did not entertain that possibility." *Id.* at 398.

### B.   Standards for Holding an Evidentiary Hearing

Federal courts must apply a two-step test to a habeas corpus petitioner's request for an evidentiary hearing. The first step is to decide whether the court is *permitted* to conduct an evidentiary hearing. If yes, the second step is to decide whether the hearing is *mandatory* or *discretionary*.

The first step is determined by applying 28 U.S.C. § 2254(e)(2), which provides as follows:

20

(e)(2)  If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that –

    (A)  the claim relies on –

        (i)  a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

        (ii)  a factual predicate that could not have been previously discovered through the exercise of due diligence; and

    (B)  the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

In *Williams [Michael] v. Taylor*, 529 U.S. 420 (2000), the Court interpreted the opening clause of § 2254(e)(2).  It held that an applicant "has failed to develop the factual basis of a claim in State court proceedings" — and hence may obtain an evidentiary hearing only if he satisfies subsections (2)(A) and (2)(B) — if he was on notice of the existence of evidence and its possible materiality, but he did not attempt to investigate or present that evidence in more than a cursory manner.  *Id.* at 439-40.  If, on the other hand, the applicant was not on notice, or if his attempts to investigate were thwarted by the conduct of another or by happenstance, then the non-development of the facts is not attributable to the applicant and he is not subject to the remaining limitations in subsections (2)(A) and (2)(B).  *Id.* at 432, 443.

Put simply, "a failure to develop the factual basis of a claim is not established unless there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel."[7]  *Id.* at 432.  "Diligence for purposes of the opening clause depends upon whether the

---

[7] Factual nondevelopment by the prisoner's counsel ordinarily is attributed to the prisoner because "[s]o long as a defendant is represented by counsel whose performance is not constitutionally ineffective under the standard established in *Strickland v. Washington*, *supra*, we discern no inequity in requiring him to bear the risk of attorney error." *Murray v. Carrier*, 477

prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court; it does not depend . . . upon whether those efforts could have been successful." *Id.* at 435. It "require[s] in the usual case that the prisoner, at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law." *Id.* at 437. Ms. Muñoz asserts that within the meaning of § 2254(e)(2), she was diligent in all her efforts to investigate and pursue claims in state court. Consequently, an evidentiary hearing is permitted under the statute.

Once the court concludes that an evidentiary hearing is permitted under § 2254(e)(2), the second step of its inquiry is to determine whether that hearing is mandatory or merely discretionary. *See generally* Habeas Rule 8 (directing federal court to determine whether an evidentiary hearing is required, and giving court discretion to "make such disposition of the petition as justice shall require" if a hearing is not required). This second step is governed by *Townsend v. Sain*, 372 U.S. 293 (1963). In *Townsend*, the Court held that "where an applicant for a writ of habeas corpus alleges facts which, if proved, would entitle him to relief, the federal court to which the application is made has the power to receive evidence and try the facts anew." *Id.* at 312. Turning to considerations that, in certain cases, might make the exercise of this power mandatory, the Court further held that:

---

U.S. 478, 488 (1986). This does not mean, however, that counsel's lack of diligence can be charged to the petitioner in all cases. Where trial counsel has rendered ineffective assistance, "[t]he Sixth Amendment itself requires that responsibility for the default be imputed to the State, which may not 'conduc[t] trials at which persons who face incarceration must defend themselves without adequate legal assistance.'" *Id.* (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 344 (1980)). In such circumstances, counsel's "error must be seen as an external factor, *i.e.*, 'imputed to the State.'" *Coleman v. Thompson*, 501 U.S. 722, 754 (1991). This means that if trial counsel rendered ineffective assistance in violation of the Sixth Amendment and counsel's deficient performance included the nondevelopment of facts, then counsel's lack of diligence is an external impediment that is imputed to the state, and the petitioner cannot be charged with having failed to develop the facts within the meaning of § 2254(e)(2).

22

> Where the facts are in dispute, the federal court in habeas corpus must hold an evidentiary hearing if the habeas applicant did not receive a full and fair evidentiary hearing in a state court, either at the time of the trial or in a collateral proceeding. In other words a federal evidentiary hearing is required unless the state-court trier of fact has after a full hearing reliably found the relevant facts.

*Id.* at 312-13. Without attempting to particularize all the occasions where an evidentiary hearing would be required, the Court enumerated six clear circumstances in which an evidentiary hearing is mandatory:

> [A] federal court must grant an evidentiary hearing to a habeas applicant under the following circumstances: If (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing.

*Id.* at 313.

In *Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992), the Court modified *Townsend*'s fifth circumstance. It held that if the state court held an evidentiary hearing and the petitioner failed to develop the material facts adequately at that hearing, a federal evidentiary hearing (i.e., a second hearing) is not mandatory unless the petitioner first shows cause and prejudice for his failure to develop the facts at the hearing in state court. *Michael Williams* makes clear that even for claims that might be governed by *Townsend*'s fifth circumstance, *Keeney*'s gatekeeping test is satisfied in all cases for which a hearing is permitted under § 2254(e)(2). *Keeney*'s "threshold standard of diligence is codified in § 2254(e)(2)'s opening clause." *Michael Williams*, 529 U.S. at 421, 434. Because Congress "raised the bar" and made the opening clause of § 2254(e)(2) even "more stringent" than what *Keeney* required, *id.* at 433, a petitioner whose non-development of the facts survives § 2254(e)(2) necessarily survives *Keeney* as well.

Where a genuine issue of material fact is in dispute, an evidentiary hearing is mandatory under *Townsend* if

> (i) an evidentiary hearing on the claim is permitted under § 2254(e)(2),
>
> (ii) the claim alleges facts that, if proved, would entitle the petitioner to relief, and
>
> (iii) the claim comes within one of *Townsend*'s six circumstances.

For claims that meet the first two of these criteria but do not come within a *Townsend* circumstance, an evidentiary hearing is discretionary.

### C.    State Court Findings of Fact

Two provisions of federal habeas law are concerned with aspects of state court factual findings and their effects in federal habeas corpus proceedings:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(2).

> (e)(1)  In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1).

The application and interplay of §§ 2254(d)(2) and (e)(1) understandably has led to much confusion among courts and practitioners.  On the one hand, subsection (e)(1) says state court factual findings "shall be presumed to be correct" absent a showing to the contrary by "clear and convincing evidence."  On the other hand, subsection (d)(2) commands federal courts to assess

24

the reasonableness of state court factual determinations "in light of the evidence presented in the State court proceeding" — that is, to look *beneath* the state court's factual *conclusions* to determine whether those conclusions are reasonable in light of the evidence that was before the state court. *See, e.g.*, 2 Randy Hertz & James S. Liebman, FEDERAL HABEAS CORPUS PRACTICE AND PROCEDURE § 20.2(c) (4th ed. 2001) ("On first reading, section 2254(d)(2)'s provision for habeas corpus *relief* . . . appears to be contradicted by section 2254(e)(1)'s attachment of a strong, typically *relief barring*, presumption of correctness to (apparently any) 'determination of a factual issue made by a State court.'") (emphasis in the original).

These apparently contradictory provisions give rise to two points of tension.  First, how can a federal court presume a state court's factual *conclusion* to be correct under § 2254(e)(1) while simultaneously looking *beneath* that conclusion to check the quality of the state court's work in *reaching* that conclusion under § 2254(d)(2)?  Second, if an applicant can meet his burden of rebutting the presumption of correctness under § 2254(e)(1), how can a federal court take that rebuttal evidence into account when, in applying § 2254(d)(2), the court is limited to considering only the evidence presented in the State court proceeding?

In *Miller-El v. Cockrell*, 537 U.S. 322 (2003), the Supreme Court made clear that § 2254(d)(2) and § 2254(e)(1) are separate provisions that cannot be combined into a single analysis. Section 2254(e)(1) provides the rule for evaluating a state court's findings of fact, while § 2254(d)(2) provides the rule for assessing a state court's ultimate decision of whether to grant habeas relief:

> It was incorrect for the Court of Appeals, when looking at the merits, to merge the independent requirements of §§ 2254(d)(2) and (e)(1). AEDPA does not require petitioner to prove that a decision is objectively unreasonable by clear and convincing evidence. The clear and convincing evidence standard is found in § 2254(e)(1), but that subsection pertains only to state-court determinations of factual issues, rather than decisions. Subsection (d)(2) contains the unreasonable

requirement and applies to the granting of habeas relief rather than to the granting of a COA.

*Miller El* at 341-42. This distinction, although simple to state, does little to resolve the points of tension. In cases that appear to implicate both §§ 2254(d)(2) and (e)(1), courts have proposed inconsistent procedures. *Breightner v. Chesney*, 301 F. Supp. 2d 354 (M.D. Pa. 2004), for example, contains an extensive review of both the language of the statute and the manner in which other courts have attempted to apply these two provisions. *See id.* at 362-68. In *Breightner*, the district court concluded that the two statutory provisions cannot be reconciled and that depending on the circumstances, courts must apply either subsection (e)(1) or (d)(2), but not both. As that court explained

> Because subsection (e)(1) facially places no limit on its application, the presumption of correctness arguably applies to the habeas court's review of claims brought under subsections (d)(1) and (d)(2).

> Doing so, however, seems to result in a merger of analyses under the two subsections, an outcome inconsistent with the independent purpose of each provision.

*Breightner*, 301 F.Supp.2d at 360. The Ninth Circuit agrees. *See Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004). There is little guidance from the Fourth Circuit on this issue. While the Fourth Circuit discusses the application of both provisions in its opinion in *Wilson v. Ozmint*, 352 F.3d 847, 858-59 (4th Cir. 2004), the opinion sheds little light on the manner in which the two provisions are to be applied appropriately, nor the order in which the federal court should address each provision.

As the Third Circuit recently recognized, "a comprehensive interpretation of AEDPA's factual review scheme has yet to emerge from the federal courts. Specifically, the relationship between the standards enunciated in § 2254(d)(2) and § 2254(e)(1) remains unclear." *Lambert v.*

26

*Blackwell*, 387 F.3d 210 (3d Cir. 2004).  In *Lambert*, the Court agreed, however, that the two

provisions are independent and apply under different circumstances:

> In fact, the language of 2254(d)(2) and 2254(e)(1) implies an important
> distinction:  2254(d)(2)'s reasonableness determination turns on a consideration
> of the totality of the "evidence presented in the state-court proceeding," while
> 2254(e)(1) contemplates a challenge to the state court's individual factual
> determinations, including a challenge based wholly or in part on evidence outside
> the state trial record.

*Lambert*, 387 F.3d at 235.

The potential confusion is heightened where the adjudication of the claim (which is to be

review under 2254(d)(2)) is based in large part, if not entirely, upon a single factual finding

(which is to be reviewed under 2254(e)(1)).  While it is clear that the two provisions cannot be

conflated to require the petitioner to show that the state court determination is unreasonable by

clear and convincing evidence, the appropriate interplay of the two provisions is far from clear.

For instance, if both provisions are to be applied, the order in which the federal court

should address the provisions is questionable.  Consider the scenario if the Court addresses the

provisions of 2254(d) first:  If a petitioner demonstrates that the state court determination was

unreasonable under 2254(d)(2) – because the factual finding upon which the state court decision

rested was unreasonable in light of the evidence presented in state court – it cannot be the case

that the federal court, in conducting its de novo review, can subsequently presume correct the

very fact upon which the unreasonable determination was made.

If the inquiry is to be conducted in the reverse order, and the petitioner first demonstrates

that the relevant factual finding ["Fact A" hereinafter] is not worthy of any presumption of

correctness because the state court ignored additional relevant and dispositive facts, then the

petitioner would invariably be able to demonstrate that he satisfies the requirements of

2254(d)(2), so long as the determination of the claim was based upon Fact A.  That is, if a

petitioner can demonstrate by clear and convincing evidence that a factual finding upon which the state court decision is based is not correct – and this demonstration is made without the introduction of new evidence in federal court – then the petitioner would invariably be able to demonstrate that the determination based upon such a factual finding was unreasonable.  Hence, an inquiry conducted in this manner essentially requires a petitioner to show that the state court determination was unreasonable by clear and convincing evidence.  This requirement is contrary to the Supreme Court's holding in *Miller-El*.  "Whether the petitioner has rebutted the presumption of correctness of subsection (e)(1) would become the dispositive inquiry in claims premised under both subsections (d)(1) and (d)(2).  As the statute clearly prescribes two different avenues for relief, it seems incongruous that they merge as one in certain situations."  *Breightner*, 301 F.Supp.2d at 360-61.

Ms. Muñoz submits that the most logical application of the two provisions is as follows:

a. **Where a state court fact-finding was made after an inadequate opportunity for factual development or presentation in state court**, the federal court must look to 2254(e)(1) first and determine whether, after further factual development in federal court, the petitioner succeeds in overcoming the presumption of correctness.  If so, the federal court must assess the expanded, more accurate merits of petitioner's claim without reference to 2254(d).  This is because once additional factual evidence has been presented in federal court, the "claim" in a sense is no longer the same "claim" that was presented in state court, and 2254(d)(2) directs the federal court to scrutinize what the state court did *with the evidence before it*.  If the state court prevented the development and presentation of particular facts, and a petitioner is permitted to expand the factual universe underlying the claim in federal court, the state court claim is effectively

28

transformed into another claim by the federal court.  Hence, because this new claim was never presented in state court, the federal court cannot and should not scrutinize the claim under 2254(d)(2).

If the petitioner cannot rebut the state court findings through the presentation of new evidence in federal court, then the petitioner may resort to the provision of 2254(d)(2).  If he can demonstrate that the state court decision involved an unreasonable determination of the facts in light of the state court record, then the federal court is not barred from granting relief.  However, in adjudicating de novo the petitioner's questions of law and mixed questions of fact and law, the federal court will presume correct those purely factual findings that petitioner was unable to rebut with clear and convincing evidence presented for the first time in federal court.

In this case, the state court denied Ms. Muñoz's requests for discovery and an evidentiary hearing.  Instead, the state court arbitrarily and improperly credited the Respondent's evidence over the Ms. Muñoz's, even in ruling on the Respondent's Motion to Dismiss (in which posture the facts alleged by Ms. Muñoz should have been presumed correct).  Thus, the state court did not employ a reasonable fact-finding process.  If this Court concludes that Ms. Muñoz has alleged facts that, if true, entitle her to relief, then she is entitled to an evidentiary hearing and section 2254(d) will not limit this Court's ability to grant relief.

**b.**      **Where a state court factual finding was made after adequate opportunity for factual development and presentation in state court (and no further evidence is presented in federal court)**, the federal court must look to 2254(d) first and determine whether the state court's decision rests on factual determinations that are

inconsistent with, or unsupported by, the evidence presented to the state court.  For

instance, the federal court should determine whether the state court ignored evidence

supporting petitioner's contentions or whether the state court reached conclusions based

on inferences not supported by the record evidence.  *Taylor*, 366 F.3d at 999.  If

petitioner can successfully demonstrate that the state court opinion resulted from an

unreasonable determination of the facts in light of the evidence presented in state court,

then the federal court is not precluded from granting relief.  Where the state court

decision survives this review, that is, where a petitioner does not successfully

demonstrate that the state court decision was unreasonable in light of the state court

record, then "the state court's findings are dressed in a presumption of correctness, which

then helps steel them against any challenge based on *extrinsic evidence, i.e., evidence*

*presented for the first time in federal court.*"  *Taylor*, 366 F.3d at 1000 (emphasis added).

Thus, 2254(e)(1) is only to be applied where a petitioner lodges an extrinsic challenge to

the factual findings rendered by the state court.  *Id.*  As the Ninth Circuit explained

> Significantly, the presumption of correctness and the clear-and-convincing
> standard of proof only come into play once the state court's fact-findings
> survive any intrinsic challenge; they do not apply to a challenge that is
> governed by the deference implicit in the 'unreasonable application'
> standard of section 2254(d)(2).

*Id.*

Thus, once a petitioner establishes that the federal court is permitted to grant relief

under 2254(d)(2), Section 2254(e)(1) has no further role in the de novo adjudication of

the claim.

If this Court disagrees with Ms. Muñoz on this point, then it should apply

2254(e)(1) in a manner consistent with the federal district court's decision in *Moise v.*

*Schultz*, 2004 WL 2202665 (E.D.N.Y., Sep 29, 2004) (unreported).  In *Moise*, the court

determined that the 2254(e)(1) analysis requires the reviewing court to undertake a

careful examination of the state court record:

> [F]ederal courts conducting review under § 2254(e)(1) still examine the
> state record to find support for the state court's factual determinations.  In
> the recent decision of *Martini v. Hendricks*, 348 F.3d 360 (3rd Cir. 2003),
> the Third Circuit applied § 2254(e)(1)'s presumption of correctness to the
> petitioner's *Witherspoon* challenge to the trial court's finding of bias.  The
> *Martini* court instructed that to determine whether a petitioner has
> overcome § 2254(e)(1)'s presumption of correctness "it is crucial to
> examine the transcript in detail."  Id. at 364.  It ultimately concluded that
> the voir dire transcript did not reveal clear and convincing evidence that
> the trial court's factual finding was incorrect, but it reached that
> conclusion only after reviewing the lengthy questioning of the potential
> juror, Valdyka, who vacillated repeatedly about whether he could vote to
> impose the death penalty.  Id. at 364-68.  Yet, even with the thorough
> questioning and all of Valdyka's equivocal responses, the *Martini* court
> still considered the petitioner's claim that he had overcome § 2254(e)(1)'s
> presumption of correctness to be a "close and difficult" one.  *Id.* at 362.
>  Martini also highlights that, while a judge may rely on an assessment of
> the potential juror's demeanor to determine bias, even under AEDPA's
> standards of review there must be some actual support reflected in the
> record to support the conclusion that the potential juror would not be able
> to set aside his or her bias against the death penalty and apply the law as
> instructed by the trial court.  *Id.*

*Stevens v. Horn*, 318 F.Supp.2d 592, 601-02 (W.D. Pa. 2004).

Of particular importance, the Supreme Court noted in *Miller-El* that a state court's

fact-finding process is undermined when the state court has before it, yet apparently

ignores, evidence that supports the petitioner's claim.  See *Miller-El*, 537 U.S. at 346

("Our concerns are amplified by the fact that the state court also had before it, and

apparently ignored, testimony demonstrating that the Dallas County District Attorney's

Office had, by its own admission, used this process to manipulate the racial composition

of the jury in the past"); *Taylor v. Maddox*, 366 F.3d at 1001.  Thus, deference to factual

determinations made by state courts "does not imply abandonment or abdication of

judicial review." *Miller-El*, 537 U.S. at 340. "Deference does not by definition preclude relief." *Id; see also Wiggins v. Smith*, 539 U.S. 510, 519 (2002) (rejecting state court's factual determination under 2254(e)(1) and (d)(2)).

## CLAIMS FOR RELIEF

### I.   INEFFECTIVE ASSISTANCE OF COUNSEL

Ms. Muñoz's Sixth, Eighth, and Fourteenth Amendment rights to the effective assistance of counsel were violated in the manner described below. The Court should assess the cumulative nature of the deficiencies in counsel's performance and measure of prejudice resulting therefrom. This Court's analysis of these claims should be governed by the two-part test established in *Strickland*, 466 U.S. at 687, and explicated in *Terry Williams*, 529 U.S. at 362. First, the petitioner must show that "in light of all the circumstances, the identified acts or omissions [by counsel] were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Second, the petitioner ordinarily must demonstrate prejudice by showing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

The Court in *Strickland* defined a "reasonable probability" as "a probability sufficient to undermine confidence in the outcome." *Id.* The constitutional test for prejudice under *Strickland* is the same as the test for materiality under *United States v. Bagley*, 473 U.S. 667, 678-82 (1985):

> [A] showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence *would have* resulted ultimately in the defendant's acquittal (whether based on the presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant). . . . *Bagley*'s touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence,

but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.

*Kyles v. Whitley*, 514 U.S. 419, 434 (1995).  Viewed de novo, and "considered collectively, not item-by-item," (*id.* at 436), as the constitution requires, the outcome of Ms. Muñoz's case is not worthy of confidence.

Terry Williams illustrates the manner in which the *Strickland* framework applies to a set of facts.  Although *Strickland* says that "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *id.* at 689, *Terry Williams* makes clear that counsel's performance need not be outrageously bad to fall below the Sixth Amendment threshold.  *Williams*, 562 U.S. at 397.  The facts concerning the performance of defense counsel in *Terry Williams*, for example, were not exceptional.  *Id.* at 369-71.  Yet all nine Justices in that case agreed with the district court that the deficiencies in counsel's performance fell below the Sixth Amendment threshold of competence when counsel failed to develop, prepare, and present additional mitigation evidence.  *Id.* at 395, 400.  Six Justices agreed with the district court that if the jury had heard this evidence in addition to what was presented at trial, there was a reasonable probability the jury would have reached a different result and would not have sentenced Williams to death.  *Id.* at 395.

Individually and cumulatively, counsel's failures were unreasonable and Ms. Muñoz was prejudiced by counsel's performance.  *Strickland*, 466 U.S. at 690, 694; *Kyles*, 514 U.S. at 436.

## CLAIM 1

### TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE BY FAILING TO PRESENT TESTIMONY FROM DR. PATRICK BARNES REGARDING THE ACTUAL CAUSE OF NOAH WHITMER'S SYMPTOMS.

Dr. Patrick Barnes is an expert pediatric neuroradiologist who is currently the Chief of the Section of Pediatric Neuroradiology and Co-Director of the Pediatric MRI and CT Center at

the Lucile Packard Children's Hospital and Stanford University Medical Center in Palo Alto, California. App. 182 at ¶ 1. As a pre-eminent pediatric radiologist, Dr. Barnes is uniquely qualified to interpret the MRI and CT scans that were at the crux of the Commonwealth's case against Ms. Muñoz. He is also an extremely compelling expert witness, having testified for both the prosecution and defense in SBS cases throughout the country.

In this case, defense counsel provided Noah Whitmer's brains scans to Dr. Barnes on December 29, 2009, *less than two weeks before trial began*. App. 182 at ¶ 2. Dr. Barnes promptly reviewed Noah Whitmer's medical file, and by January 4, 2010, had made notes for defense counsel based upon his review of the brain scans. *Id.* Based upon what he saw in those scans, Dr. Barnes was convinced that Noah Whitmer's symptoms were non-traumatic in origin. In fact, Dr. Barnes was so convinced of Ms. Muñoz's innocence that he offered to fly from California to Virginia and testify on her behalf *pro bono*. *Id.* However, Dr. Barnes was unable to fly to Virginia the following week to testify, so in order to assist he needed defense counsel to seek a continuance. App. 187 at ¶ 19 (Affidavit of Barnes); App. 8-9 at ¶¶ 10-11 (Affidavit of Kearney); App. 176-77 at ¶¶ 10-16 (Affidavit of Uriarte). Inexplicably, *defense counsel never even requested a continuance in order to secure Dr. Barnes's testimony*. App. 8-9 at ¶¶ 10-11; App. 176-77 at ¶¶ 10-16. Counsel's failure to seek a continuance so that Dr. Barnes could testify was not the result of a reasoned strategic decision. *See* App. 177 at ¶¶ 14-15 (although he intended to use Dr. Barnes as a witness up until the week of trial, Uriarte "never considered" seeking a continuance); *see also* App. 8-9 at ¶¶ 10-11. Moreover, because Ms. Muñoz had been released on bond and was not held in custody pre-trial, she would have readily agreed to a continuance had her attorneys consulted her about that possibility. App. 23 at ¶ 5.

Trial counsels' failure to request more time to permit Dr. Barnes to testify deprived the jury of the opportunity to hear one of the nation's leading pediatric neuroradiologists explain why Noah Whitmer's brain scans revealed that his symptoms were not caused by abuse. Dr. Barnes would have provided expert testimony connecting the imaging of Noah's head to other facts in the medical records and providing a reasonable alternative to the Commonwealth's theory of the case. After reviewing the medical records, Dr. Barnes determined that on April 20, 2009, Noah Whitmer suffered at least one latent cortical venous thrombosis—in layman's terms, a blood clot in the brain—that caused a series of strokes. App. 183 at ¶ 5; App. 325-26 at ¶¶ 4-5. Dr. Barnes could have explained to the jury that these thromboses were very serious and capable of causing all of the symptoms observed in Noah on April 20, 2009.[8] In Dr. Barnes's opinion, the retinal hemorrhage and subdural hematoma were the direct result of the venous thrombosis. App. 325 at ¶ 4; App. 183-85 at ¶¶ 3, 12.

The existence of a thrombosed vein in Noah's brain is not disputed. Two of the Commonwealth's own experts, Drs. Futterman and Muller, confirmed that the venous thrombosis was visible on Noah Whitmer's brain scans. Tr. 1/13/2010 at 50; Tr. 1/20/2010 at 261. However, unlike the Commonwealth's experts, who simply reached the tautological conclusion that shaking must have caused this thrombosis because there was a reported confession to shaking, Dr. Barnes could have testified that infection is a common trigger for

_____

[8] Dr. Barnes states that this is particularly likely where there are preexisting conditions such as a re-bleed from an injury during the birthing process. App. 183 at ¶ 5. Another of the defense's experts, Dr. Ronald Uscinski, posited birth injury a likely pre-existing condition leading to Noah's symptoms on April 20, 2009. App. 170-71 at ¶ 14; App. 183 at ¶ 5. Where this condition does not heal on its own, it is a preexisting condition that can by re-triggered by a venous thrombosis, a fact that Dr. Barnes would have corroborated. App. 170-71 at ¶ 14; *see also* App. 183 at ¶ 5. Thus, contrary to the lower court's opinion that testimony from Drs. Uscinski and Barnes would have been contradictory (App. 402-03), their opinions were actually complementary.

cortical venous thrombosis in infants, particularly if they have a pre-existing condition that has previously caused limited bleeding in the brain, *and that shaking is never a cause of venous thrombosis*. App. 183-84 at ¶¶ 4, 7.

The testimony of Dr. Barnes could have also emphasized the circular presumption on the part of Noah Whitmer's treating physicians that "because there was a subdural hematoma and retinal hemorrhaging, there must have been a violent shaking;" Dr. Barnes would have testified that he has "never seen a case where shaking—however violent—caused a venous thrombosis" and that "[t]here has to be impact trauma to cause a venous thrombosis," or a "non-traumatic trigger[]," "and here there is no physical evidence on Noah Whtimer's head or body to suggest impact." App. 183-84 at ¶¶ 3, 7. Looking back on the medical records, Dr. Barnes has pointed out that there were "powerful indications that Noah Whitmer had an infection when he was admitted to INOVA-Fairfax and that this infection, not trauma, caused the venous thrombosis that is visible on Noah's scans." App, 184 at ¶ 11.

In determining whether counsel's representation of a criminal defendant was ineffective, a reviewing court "must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Harrington v. Richter*, ___ U.S. ___, ___, 131 S.Ct. 770, 787 (2011) (quoting *Strickland*, 466 U.S. at 689). However, as discussed recently by the Fourth Circuit, "deference to the decisions of counsel is not limitless." *Winston v. Pearson*, 683 F.3d 489, 504 (4th Cir. 2012) (citing *Elmore v. Ozmint*, 661 F.3d 783, 858 (4th Cir. 2011)). Indeed, courts have recognized that the failure to call expert witnesses can constitute ineffective assistance of counsel. *See, e.g. Gersten v. Senkowski*, 299 F. Supp. 2d 84, 103-104 (E.D.N.Y. 2004); *Holder v. United States*, 2006 WL 1728133, at *7 (W.D. Okla. 2006); *People v. Richard R.*, 31 Misc. 3d 1212(A), at *3 (Westchester County Court, N.Y. 2011) (noting

"courts have held that a defense counsel's failure to call an expert or experts, if available, as witnesses in the defense case . . . will oftentimes, in and of itself, amount to a lack of meaningful representation").

**The AEDPA does not bar relief on this claim.**

      In denying relief on this claim, the state court stated:

> As mentioned already there's a problem with presenting conflicting testimony of expert witnesses, in this case Dr. Uscinski's and Dr. Barnes' opinions relative to the significant of the venous cortical thrombosis. In contrast the Commonwealth presented consistent testimony through its expert that the injuries were caused by shaking the child. Moreover, Dr. Barnes' opinion does not explain the other injuries that were present. Thus Munoz-Rueda [*sic*] has failed to demonstrate that counsel's performance was deficient or that there is a reasonable probability that but for counsel's alleged errors the result of the proceeding would have been different.

App. 402-03. This adjudication is contrary to, and an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court, including *Strickland* and its progeny. § 2254(d)(1). Moreover, in at least two ways, the state court's adjudication of this claim resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. § 2254(d)(2).

      First, the state court unreasonably found that "Dr. Barnes's opinion does not explain the other injuries that were present." App. 403. By "other injuries," the state court appeared to be referring to "the left paracortical contusion and injury to corpus callosum." App. 400. Essentially, these injuries (if they existed) would be deep tissue bruising in Noah Whitmer's brain. Evidence about these alleged injuries came from Dr. William Hauda, a pediatric emergency physician and a member of the "Pediatric Forensic Assessment and Consultation Team" at INOVA-Fairfax Hospital. App. 264-81; Tr. 1/13/10 at 94-95, 98. During state habeas proceedings, Dr. Hauda submitted a lengthy affidavit disputing the affidavit of Dr. Barnes. In

his post-conviction affidavit, Dr. Hauda opined that these injuries could not have been caused by the venous thrombosis, and therefore must have been the result of shaking and abuse. App. 269-70 . It was unreasonable for the state court to accept Dr. Hauda's assertion that Dr. Barnes's opinion did not explain these injuries, particularly without conducting an evidentiary hearing.

The existence or non-existence of these brain contusions was a factual dispute between the parties in state habeas proceedings. Dr. Hauda claimed that these injuries were visible on Noah Whitmer's MRI scans. App. 268. Dr. Barnes, who also reviewed the MRI scans, "dispute[d] that these were injuries at all." App. 325-26 at ¶ 4. Dr. Barnes stated: "What Dr. Hauda concludes are injuries are most likely strokes, which are a known mimic for, and are often mistaken as, deep brain injuries." *Id.* This is a critical factual dispute. Even Dr. Hauda concedes that, but for these deep brain injuries, "non-accidental trauma was a plausible explanation for [Noah's] findings *but certainly not the only explanation.*" App. 277 (emphasis added). According to Dr. Hauda, "[f]urther evaluation in the hospital identified additional intracranial findings such as cortical contusions and injury to the corpus callosum which validated this initial diagnostic possibility." App. 277-78. Thus, Dr. Hauda would be forced to concede that if these so-called contusions and injury were actually strokes as Dr. Barnes believed, then non-accidental trauma would still be merely a "plausible explanation" and a "diagnostic possibility," rather than a reliable medical diagnosis.

It was unreasonable for the state court to credit Dr. Hauda's interpretation of the scans and discredit Dr. Barnes's interpretation, particular in the absence of any live testimony from the experts. Dr. Barnes is a renowned pediatric neuroradiologist. His training and expertise is specifically in the interpretation of brain scans. Dr. Hauda, on the other hand, is an emergency room physician and so-called "child abuse expert," with no particular expertise in interpreting

38

MRI brain scans.  Moreover, Dr. Barnes's opinion was confirmed by the trial testimony of the

Commonwealth's own expert radiologist, Dr. Christian Muller, who testified that he saw

abnormal results in Noah's MRI that were consistent with a stroke, and that the stroke "fits with

that thrombus cortical vein."  Tr. 1/20/2010 at 261.  Thus, both of the radiologists in this case

agreed that there was evidence of stroke, yet the state court unreasonably found that Noah

Whitmer's MRI revealed deep tissue injuries that could only have been cause by trauma, based

upon the unqualified testimony of an emergency room physician.[9]

Second, the state court unreasonably found that defense counsel was not ineffective for

failing to present testimony from Dr. Barnes because his testimony would allegedly have

conflicted with another defense expert, Dr. Ronald Uscinski, with respect to the significance of

the thrombosed vein in Noah Whitmer's brain.  App. 402-03.  However, neither Dr. Barnes nor

Dr. Uscinski believed that their testimony would have been in conflict; in fact, Dr. Uscinski—

who did testify—urged trial counsel to use Dr. Barnes as a witness:

> In a case such as this, where CT and MRI scans were central to both the
> Commonwealth's case and to a valid defense, the assistance of a neuroradiologist
> such as Dr. Patrick Barnes was essential.  . . . [A] neuroradiologist would be
> helpful and at times critical in adding the further dimension of nonsurgical
> findings and interpretations as further evidence of nontraumatic (such as
> infections and vascular) etiologies other than SBS, including cortical or
> sinovenous thrombosis, the latter especially when aggravated by such factors as
> infection or dehydration.  I do not know why Dr. Barnes did not testify at trial.

App. 170 at ¶ 13.  Dr. Uscinski confirms that Dr. Barnes's testimony "might have differed from

yet at the same time synergized with the evidence I identified in this case."  App. 170-71 at ¶ 14.

---

[9] This was not the only area of factual dispute between Dr. Hauda and Dr. Barnes.  Dr. Hauda
described the thrombosed vein in Noah;s brain as a "single small vein thrombose."  App. 269.
Dr. Barnes, who is a neuroradiologist, "vigourously dispute[d Dr. Hauda's] mischaracterization"
of the thrombosed vein.  App. 325 at ¶ 3.  In fact, Dr. Barnes states that Noah's thrombosed vein
was "quite large, easily visible on his brain scans, and was capable of causing tremendous
damage."  *Id.*

Similarly, Dr. Barnes viewed his testimony as consistent with Dr. Uscinski's. Dr. Barnes opined in his affidavit that Noah's venous thrombosis (which the Commonwealth's experts also observed) caused the subdural hematoma and retinal hemorrhage. App. 183 at ¶ 3. He also noted that recent research "explains how preexisting collections from birth can have new hemorrhaging from a venous thrombosis. This is essentially what Dr. Ronald Uscinski testified happened in this case." *Id.* at ¶ 5. Thus, far from being contradictory, the testimony of Drs. Uscinski and Barnes would have been complimentary. Certainly, neither trial counsel ever suggested that inconsistency with another expert was a strategic reason not to call Dr. Barnes. To the contrary, both trial attorneys stated in their post-conviction affidavits that they intended to use Dr. Barnes at trial, and that the only reason they did not do so was because of a scheduling problem. App. 8 at ¶ 10; App. 177 at ¶ 14. In fact, the opinions of Dr. Barnes and Dr. Uscinski are in perfect harmony, and neither believes that trauma is the correct explanation for Noah Whitmer's condition.

## CLAIM 2

### TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE BY FAILING TO REQUEST A CONTINUANCE.

Due to the dearth of direct evidence that Ms. Muñoz harmed Noah, the Commonwealth based its case primarily on the circumstantial inferences of its medical experts. Uriarte knew that the medical testimony would be the crux of the case, so he contacted James Kearney, a civil litigation attorney with experience examining expert witnesses in personal injury cases, to assist with the expert testimony in Ms. Muñoz's case. App. 7 at ¶ 2. Thus, Uriarte understood the importance of presenting medical testimony to the jury that could rebut the prosecution experts' conclusion that Noah's symptoms had been caused by abuse. However, upon receiving Noah's medical records less than a month before trial, Uriarte and Kearney unreasonably failed to seek a

40

continuance to enable them to review those records thoroughly and to work with the defense experts to form a coherent defense.

The Commonwealth did not send the defense attorneys the complete medical records file, which was in excess of 1,000 pages, until December 16, 2009. Pet. Ex. A at 1. This medical file included the bulk of the medical records, as well as the CT and MRI scans, which were critically important to the defense's medical theories. Pet. Ex. A; App. 176 at ¶ 10. Uriarte admits that he did not review the records comprehensively, but rather forwarded the records to his experts and relied on them to determine what was relevant. App. 176-77 at ¶¶ 10, 13. Uriarte sent the records to Dr. Barnes on December 23, 2009. Pet. Ex. A at 5. Dr. Barnes did not receive the CT and MRI scans, which provided the main source for his conclusion that Noah suffered from a series of strokes as a result of venous thrombosis, until December 29, 2009. App. 182-83 at ¶ 2. Uriarte did not mail these medical records to Dr. Gardner or Dr. Thibault until January 4 and January 6, respectively.

This short window of time prevented Kearney, Uriarte, and the defense experts from conducting a meaningful review of the records, from which they would have found that there were many signs that Noah was ill prior to April 20, 2009 (as is further explained *infra* at Claim 3). Further, the defense's failure to seek a continuance also prevented Uriarte and Kearney from finding ways to connect the facts in Noah's medical records, such as his fever, to testimony from lay witnesses about Noah's fussiness the week before. App. 177 at ¶¶ 15, 16. In fact, as discussed in Claim 1, *supra*, the failure to seek a continuance completely prevented Dr. Barnes from testifying. A continuance would have allowed Dr. Barnes to testify and would have made the defense's case significantly stronger.

Trial counsels' failure to seek a continuance was not the result of a strategic decision. In fact, the defense attorneys never even considered the possibility of requesting a continuance. App. 8-9 at ¶ 11; App. 177 at ¶ 15. Kearney, who was a civil litigation attorney and not accustomed to the continuance practice of criminal courts, stated "At the time, I did not understand that we had a strong basis for a continuance in light of the fact that the Commonwealth provided over 1,000 pages of medical records less than one month before our trial date." App. 176-77 at ¶ 11. Now, Kearney recognizes, "[w]e almost certainly could have gotten a continuance, and more time was critical in order to present testimony from our experts and Dr. Barnes that there were alternate medical explanations for Noah Whitmer's injuries that did not involve trauma." App. 176-77 at ¶ 11. Uriarte confirms, "I never considered asking for a continuance of the trial date. I had no reason not to ask for one, and, it obviously would have been helpful to give both Kearney and our experts sufficient time to review the evidence, research, prepare and communicate their theory to us." App. 177 at ¶ 15. Uriate explained that he felt "rushed into trial" and that their "preparation in the weeks after discovery was provided was frantic." App. 177 at ¶ 15. Moreover, because Ms. Muñoz was released on bond, she would have readily agreed to a continuance had her attorneys consulted her about that possibility. App. 23 at ¶ 5.

In *Cardwell v. Netherland*, 971 F. Supp. 997 (E.D. Va. 1997), the United States District Court for the Eastern District of Virginia analyzed whether attorneys provided ineffective assistance of counsel when they failed to seek a continuance upon learning that their mental health expert would have insufficient time to evaluate the defendant before his trial. Analyzing this claim under the *Strickland* standard, the court found that trial counsel's performance fell below an objective standard of reasonableness. The court emphasized that, "[t]his failure is not

absolved by the strong presumption of correctness afforded tactical decisions. It is not the product of any tactical decisions." *Cardwell*, 971 F. Supp. at 1016. Similarly, Uriarte's and Kearney's performance fell below an objective standard of reasonableness and was not the product of any tactical decision. As a result of their failure to seek a continuance, the defense attorneys provided ineffective assistance in preparing for and in defending in Muñoz's case. Had they sought more time to prepare for trial, there is a reasonable probability that the outcome of Ms. Muñoz's trial would have been different. *Strickland*, 466 U.S. at 693-94.

**The AEDPA does not bar relief on this claim.**

In denying relief on this claim, the state court found (1) that defense counsel were experienced and "knew how to obtain a continuance when necessary," (2) that in light of three prior continuances that had been granted in the case, it would be "less likely" that another would have been granted if defense counsel had requested one, and (3) counsel "had sufficient time to review the medical records in this case." App. 398-99. This adjudication is contrary to, and an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court, including *Strickland* and its progeny. § 2254(d)(1). The state court's adjudication of this claim also resulted in a decision that was based upon unreasonable determinations of the facts in light of the evidence presented in the state court proceeding. § 2254(d)(2).

Each of the state court's conclusions is unreasonable. First, nobody disputes that trial counsel "knew how to obtain a continuance." The question is whether or not trial counsel's performance fell below an objective standard of reasonableness when they failed to request one. The fact of the matter is that Kearney, who had virtually no experience in criminal litigation, failed to understand that the Commonwealth's extremely late disclosure of Noah Whitmer's

medical records provided a strong basis for a continuance.  App. 8-9 at ¶ 11.  And Uriarte provided a sworn statement saying that he simply "never considered" asking for one.  App. 177 at ¶ 15.  In a case in which lead trial counsel describes his review of the medical records as "frantic" and "rushed" (App. 177 at ¶ 15), in which the defense medical experts received the voluminous medical records and MRI and CT scans *less than two weeks before trial*, and in which one of those witnesses was unavailable to testify due to a scheduling problem, any reasonably competent defense counsel would have considered requested for a continuance and understood that a strong basis existed for obtaining one.  Thus, counsels' performance fell below an objective standard of reasonableness, and the state court's holding to the contrary was itself unreasonable.

Second and third, the state court's holdings that it was "less likely" that a continuance would have been granted due to the fact that three prior continuances had been granted, and that defense counsel had "sufficient time" to review the medical records in this case, were also unreasonable.  This is obvious from looking at the timing of and reasons for the first three continuances.  The first continuance—which rescheduled a trial date that was set for less than one month after the grand jury returned its true bills—was requested by both parties because the Commonwealth had not yet obtained Noah Whitmer's medical records from the hospitals.  App. 297-99.  The defense then requested one continuance, from October 26 to December 7, 2009, because an expert witness was not available.  *Id.*  The Commonwealth requested the third continuance, from December 7, 2009, until January 11, 2010, because an "essential witness" was unavailable on the scheduled trial date.  *Id.*[10]

_____

[10] The calendar control form granting the third continuance on the Commonwealth's motion incorrectly states "Defendant has had 2 prior continuances for its expert witness."  App 299.  As the earlier form states, only one continuance was due to the unavailability of a defense expert.

It appears that the Commonwealth had at least some of the medical records as early as September of 2009, when INOVA-Alexandria hospital provided Noah Whitmer's birth records to his mother at her request. *See* Pet. Ex. A at 10. Thus, the Commonwealth's experts had at least several months to review those files (much longer, in reality, since the Commonwealth's experts were the same treating physicians who had generated and maintained those files). It is virtually guaranteed that defense counsel could have obtained additional time for their medical experts to review the file in light of the fact that the Commonwealth provided them to the defense less than one month before trial. Moreover, the unavailability of Dr. Barnes for the January 11, 2010, trial date provided a strong second basis for a continuance.

Furthermore, as discussed more fully below in Claim 3, defense counsel clearly did not have sufficient time to review the files based upon the significant exculpatory information they overlooked in those files. The failure to seek a continuance prejudiced Ms. Muñoz in at least two ways: it deprived her of the critical testimony of Dr. Barnes (*see supra* at Claim 1), and it prevented her counsel and experts from conducting a through review of the most important evidence in the case (*see infra* at Claim 3).

## CLAIM 3

### TRIAL COUNSEL PROVIDE INEFFECTIVE ASSISTANCE BY FAILING TO REVIEW NOAH WHITMER'S MEDICAL RECORDS.

As discussed recently by the Fourth Circuit, "deference to the decisions of counsel is not limitless. Attorneys have a duty to investigate their client's case so as to enable them to make professional decisions that merit distinction as 'informed legal choices.'" *Winston*, 683 F.3d at 504 (citing *Elmore*, 661 F.3d at 858). This comports with Standard 4-4.1 of the American Bar

---

The first continuance, which came at the request of both parties, was due to the fact that the Commonwealth had not yet obtained the medical records. *Id.*

Association's Standards for Criminal Defense, which mandates that "[d]efense counsel should conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to the merits of the case . . . ." ABA Standards for Criminal Defense § 4-4.1.

Failure to conduct a prompt investigation, or failure to adequately review records in a case, indicates an attorney is operating outside the "wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Specifically, a failure to review discovery documents provided in a case shows deficient performance on the part of trial counsel. *Winston*, 683 F.3d at 505. As noted in *Winston*, trial counsel is obligated "to be familiar with readily available documents necessary to an understanding of [the client's] case." *Id.* at 505 (quoting *Hyman v. Aiken*, 824 F.2d 1405, 1416 (4th Cir. 1987)). Failure to review records readily available to trial counsel prevents them from making an informed legal decision, and as in both *Winston* and *Hyman*, "counsel's 'lack of preparation and research cannot be considered the result of deliberate, informed trial strategy.'" *Id.* at 505 (quoting *Hyman*, 824 F.2d at 1416).

Counsel in this case received Noah Whitmer's medical records from the Commonwealth's Attorney a little under a month before trial. Pet. Ex. A at 1. While there were over 1000 pages of medical records, neither Uriarte nor Kearney asked for a continuance (itself a demonstration of ineffective assistance of counsel, as discussed *supra* at Claim 2). By their own admission, neither Uriarte nor Kearney conducted a meaningful review of the medical records provided by the Commonwealth, instead hoping that the medical experts would provide the defense theory for them. App. 176 at ¶ 10. The fact that neither of them carefully read the medical records is glaringly apparent, as neither counsel mentioned signs of an infection, prior head trauma, or pertinent family history, either at trial or to their consulting experts. This failure to review the key evidence in the case constitutes ineffective assistance of counsel, as

46

contemplated under *Strickland*, and prejudiced Ms. Muñoz because it meant her attorneys could not present compelling alternate explanations for Noah's symptoms to the jury and could not cross-examine the Commonwealth's experts on questionable aspects of their testimony. This failure to provide an alternate explanation to the jurors created the misimpression that trauma, and only trauma, could have produced the dramatic symptoms that Noah exhibited. This prejudice is further discussed below.

Had defense counsel carefully reviewed the medical records in this case, they would have discovered the following relevant information:

      ***a.***      ***Noah had an infection and was likely dehydrated***

Signs that Noah Whitmer had an infection were rampant throughout his medical records. Shortly after being admitted to the hospital at 5:30 P.M. on April 20, 2009, Noah's fever was first recorded and ultimately rose to 101.3° by 11:00 P.M. that evening. Pet. Ex. A at 907-14. This fever persisted through the next two days, even when measured axillary (under the arm), and into April 23 when measured rectally. *Id.* at 907-32. Noah's fever returned on April 25 and persisted throughout April 30, ranging up as high as 102.3°. *Id.* at 947-95.

Additionally, at various times, the doctors at INOVA-Fairfax treated Noah for infection. Within hours of admission, INOVA-Fairfax ran blood cultures, urine cultures, and sputum cultures. *Id.* at 237-39, 907-14. Early in his stay, the hospital also started Noah on a broad-spectrum antibiotic, ceftriaxone (though this medication was discontinued shortly after starting, presumably due to the doctor's conclusory diagnosis of SBS). *Id.* at 530, 620. Further, at least one doctor at the hospital was concerned about the possibility of meningitis: a progress note from Susan Mabrouk dated April 21 at 7:36 A.M. indicated that they should "consider meningitis,"

and recommended continuing the antibiotics and performing a lumbar puncture[11] as soon as Noah was extubated and stabilized. *Id.* at 524. Further, doctors prescribed antibiotics on at least two other occasions during Noah's hospitalization, on April 28 and May 2. *Id.* at 650, 658-59. Further testing was also ordered throughout his stay, as sputum and blood cultures were done on April 26 and April 28, and a nasal swab taken on May 1 to test for influenza. *Id.* at 236-238.

The sputum cultures taken from Noah indicated that he did have an infection. A culture taken on April 21 led to findings of a "heavy growth of staphylococcus aureus and streptococcus pneumoniae." *Id.* at 369. A later sputum culture collected on April 26 showed "moderate growth of streptococcus pneumoniae" and "light growth of staphylococcus aureus." *Id.* at 713. Finally, on April 28, testing of a sputum culture resulted in "moderate growth of staphylococcus aureus" and "moderate growth of streptococcus pneumonia." *Id.* at 712.

Noah also had difficulty breathing; secretions from his lungs required suction throughout much of his stay at the hospital, which can also be a sign of infection. Nurses' notes throughout Noah's hospital stay show his difficulty breathing, noting at different times "stridor" (a high-pitched wheezing sound) and "rhonchi" (coarse rattling sound caused by secretions in the bronchi). *Id.* at 837, 921, 929, 937, 961, 977. Further, the medical records indicate that Noah required frequent suctioning of clear/white/tan secretions of moderate to thick viscosity throughout much of his hospitalization. *Id.* at 907-995. Finally, imaging of Noah's chest showed "hazy bilateral pulmonary opacities," indicative of "patchy atelectasis or infiltrate"; perihilar markings/opacities; and "diffuse interstitial abnormality." *Id.* at 213, 216, 217, 223.

Because of trial counsel's failure to review the medical records, they failed to connect the information in these records with anecdotal evidence indicating Noah had an infection prior to

---

[11] A lumbar puncture is the only way to test for meningitis. App. 185 at ¶ 13.

his admission to the hospital.  Notably, Dr. Hulver, a witness for the Commonwealth, remarked

that when she saw Noah for his four-month check-up shortly before April 20, his parents

reported he had been wheezing when he breathed.  Tr. 1/21/2010 at 78.  Additionally, two

potential witnesses, Renata Ames and Eva Valle, noted Noah appeared ill in the week before he

was hospitalized, commenting that he "cried a lot and seemed troubled" and "was very cranky."

App. 26 at ¶ 8; App. 13 at ¶ 9.  Particularly, Renata stated that Noah would "cry, and I would

give him a toy, and he wouldn't want to play, so I'd give him another toy, and he wouldn't want

to play with that one, either.  There was nothing I could do to stop him from crying. . . . Noah's

behavior the week before this happened was very unusual for him.  Normally, he was a very

playful and happy baby." App. 13 at ¶ 9.[12]  Ms. Muñoz also testified at trial that Noah was

cranky in the week before April 20, and was cranky throughout the day of April 20.  Tr.

1/20/2010 at 99. 103, 107.  Additionally, Ms. Muñoz noted that Noah had not been drinking as

much formula as he typically did.  Tr. 1/20/2010 at 87.

      As noted by Dr. Barnes, infants with infection often present as simply fussy, or not eating

well, or not acting as they have in the past.  App. 183-84 at ¶ 7.  Taken together, the above

information is very significant, because it demonstrates that Noah had an infection and may have

been dehydrated upon admission to INOVA-Fairfax.  App. 184-85 at ¶ 9, 11.  As Dr. Barnes

explains, infection and dehydration can be triggers for venous thrombosis, which is essentially a

clot, or thrombosis, in a vein.  App. 184 at ¶ 9.  Testimony at trial indicated that Noah did indeed

have a thrombosed vein, a finding supported by both Dr. Barnes and Noah's medical records.

Tr. 1/20/2010 at 261; App. 183 at ¶ 3; Pet. Ex. A at 439-40.  Specifically, a report detailing

Noah's MRI related that "[t]here is what appears to be a thrombosed cortical vein at the ventral

---

[12] Trial counsel's failure to call Renata Ames and Eva Valle as witnesses was another instance of
ineffective representation. *See infra* at Claim 6.

left parietal convexity." Pet. Ex. A at 439.  According to Dr. Barnes, Noah's imaging indicates that he suffered numerous small strokes in different areas of the brain, a result consistent with what one would expect to see from a cortical vein thrombosis.  App. 183 at ¶ 5.  In summary, infection is a common precursor to cortical vein thrombosis, which can (and in Noah's case, likely did) cause bleeding in his brain.

Since both the treating physicians and the defense's experts agreed that a cortical vein thrombosis was found in Noah's imaging, it was important for trial counsel to focus on explaining the significance of that and the potential non-abuse causes of the venous thrombosis. For this reason, failure to call Dr. Barnes as an expert witness was itself ineffective assistance of counsel (see Claim 1 *supra*).  However, because trial counsel did not review the medical records, they were unaware of the medical evidence supporting alternate non-abuse causes of the venous thrombosis, such as an infection.  As stated above, "counsel's 'lack of preparation and research cannot be considered the result of deliberate, informed trial strategy.'"  *Winston*, 683 F.3d at 505 (quoting *Hyman*, 824 F.2d at 1416).  Here, the jury had little evidence on which to understand one of the strongest alternative explanations of Noah's symptoms: that Noah suffered from an infection, which caused a cortical vein thrombosis to form, essentially causing a stroke or a series of strokes.  Further, the failure of trial counsel to review the medical records prevented them from securing the necessary medical experts (see Claim 1, *supra*).  These failures were cumulatively prejudicial, because they left the jury with no reasonable alternative to the Commonwealth's theory of the case.

### b.    *Noah had pre-existing head trauma.*

Upon admission to the hospital, Noah's parents related two injuries: that a wooden plaque had fallen off a wall approximately 10 days earlier, apparently striking Noah in the head, and that

he had a small right forehead bruise acquired during the prior week.[13]  Pet. Ex. A at 527.  This

fact is significant, according to Dr. Barnes, because earlier accidental trauma can provide a pre-

existing condition, increasing the chances that something (such as infection or dehydration) will

trigger a venous thrombosis.  App. 185-85 at ¶¶ 14-15.  As both Drs. Barnes and Uscinski noted,

blood collections left in the head following the routine trauma associated with birth can likewise

create a pre-existing condition that can be aggravated by infection, dehydration, or other causes.

App. 183. at ¶ 5; App. 170-71 at ¶ 14.  Failing to review the medical records left the defense

attorneys unable to present this evidence to the jury.  With this information, particularly in

combination with the testimony of Dr. Barnes and the information about Noah's infection, there

is not just a reasonable possibility, but a significant one, that the outcome of the proceeding

would have been different.

   *c.*  ***Noah had a family medical history that was unexplored.***

   Additionally, Noah's medical records indicate several potentially notable aspects of his

family history.  Specifically, Noah's paternal grandfather experienced febrile seizures as an

infant, had paternal cousins who suffered from muscular dystrophy, and a maternal relation who

died at eight years old of a chromosomal abnormality (type unspecified).  Pet. Ex. A at 85.  A

full investigation of each of these pieces of Noah's medical history was necessary to make a

comprehensive and accurate differential diagnosis.  App. 186 at ¶ 18.  INOVA-Fairfax simply

failed to pursue any such differential diagnosis, instead immediately jumping to the diagnosis of

SBS based on reports of law enforcement.  Had this information been discovered by defense

counsel during a review of the medical records, they could have cross-examined the doctors from

---

[13] The cause of the bruise was unknown: Noah's parents suggest it occurred at the daycare (Pet. Ex. A at 527) and the Commonwealth suggested Noah had bumped his head on a sofa (Tr. 1/20/2010 at 132), while Ms. Muñoz testified she was unaware of what caused the bruise.  Tr. 1/20/2010 at 132.

INOVA-Fairfax about whether they had any reasonable basis for not considering these factors in their differential diagnosis. This could have helped discredit the doctors, who provided the substantive evidence against Ms. Muñoz.  Considered with the other missed information discussed above, there is a significant probability that Ms. Muñoz would not have been wrongfully convicted.

**The AEDP does not bar relief on this claim.**

The state court's adjudication of this claim was contrary to, and an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court, including *Strickland* and its progeny.  § 2254(d)(1).  The state court's adjudication of this claim also resulted in a decision that was based upon unreasonable determinations of the facts in light of the evidence presented in the state court proceeding.  § 2254(d)(2).

First, the state court found that "[t]here was no evidence presented that counsel did not review the medical records."  App. 399.  This is an unreasonable determination of the facts in light of counsels' affidavits.  Uriarte stated in his affidavit that he felt "rushed" into trial and described his preparation following the Commonwealth's late disclosure of the medical records as "frantic."  App. 177 at ¶ 15.  He also admitted that he

> did not thoroughly review Noah's medical records for other possible explanations for his symptoms.  Given the late disclosure of Noah's medical records by the Commonwealth, my review of them was rushed.  I simply did not have a lot of time to review them in detail.  I primarily relied on our experts to review the medical records and alert me to any important information in them.

App. 178 at ¶ 22.  Kearney also provided a sworn statement that "[d]ue to the late disclosure of Noah Whitmer's medical records, I was unable to review the medical records in the level of detail to which I am accustomed in a civil case."  App. 333 at ¶ 4.  He also admitted to overlooking evidence in the medical records that a plaque had fallen on the child's head ten days

before the incidence, and many of the indications in those records that Noah had been suffering

from an infection before he fell ill.  App. 333 at ¶¶ 2-4.  Thus, the state court's finding was

unreasonable.

Second, the state court unreasonably found that there "is no credible evidence that Noah

suffered from any infection prior to this incident."  App. 400.  In fact, the medical records were

replete with such evidence, *see supra* at pages 47-50, but the jury never heard it due to counsels'

ineffectiveness.

Third, as previously discussed, the state court unreasonably found that Ms. Muñoz "has

presented conflicting testimony through her experts as to the significance of the thrombosis

cortical vein."  App. 400.  However, the actual experts aver that their opinions did not conflict at

all.  *See supra* at pages 39-40.

Lastly, the state court's adjudication of this claim was contrary to, and an unreasonably

application of, clearly established federal law.  § 2254(d)(1).  The state court held that it was

"appropriate" for counsel to have "rel[ied] on the expertise of their expert who testified that they

had reviewed the medical records."  App. 400.  However, at a bare minimum, the *Strickland*

standard required the defense attorney, not merely an expert, to conduct a thorough review of the

records in the case.  *See Winston*, 683 F.3d at 504 (citing *Elmore*, 661 F.3d at 858); see also

*Hyman*, 824 F.2d at 1416 (stating that counsel has a duty "to be familiar with readily available

documents necessary to an understanding of their client's case" and that "[c]ounsel's lack of

preparation and research cannot be considered the result of deliberate, informed trial strategy").

Because it is the attorney's responsibility to know the facts of the case, blind reliance on an

expert does not absolve the attorney of his constitutional obligation to review the files in a case.

*See Winston v. Kelly*, 592 F.3d 535, 541-42 (4th Cir. 2010) (noting that defense counsel "relied

primarily, if not solely, on the advice" of an expert in preparing for mitigation at sentencing,

"were almost completely dependent on [the expert's] analysis," and "relied on [the expert] to

thoroughly review the records and tell [counsel] what [they] needed to know"); *see also Winston*,

683 F.3d at 504 (noting that "[b]y neglecting to review [defendant's] school records and instead

relying on [an expert] to ascertain their import, counsel abdicated their responsibility" to be

"familiar with readily available documents necessary to an understanding of [defendant's] case")

(citing *Hyman*, 824 F.2d at 1416).

### CLAIM 4

**TRIAL COUNSEL PROVIDED INEFFECTIVE ASSITANCE
BY FAILING TO CHALLENGE JOSLYN WALDRON'S FALSE REPORT
THAT MS. MUÑOZ HAD CONFESSED TO SHAKING NOAH WHITMER.**

Joslyn Waldron, a Child Protective Services worker testified that she and Detective

Cottrell interviewed Ms. Muñoz on April 21, 2009.  Tr. 1/12/2010 at 152.  Waldron explained

that when they arrived at the house around noon, Ms. Muñoz, her 5-year-old daughter, and Eva

Valle were present.  Tr. 1/12/2010 at 152.  Ms. Muñoz gave Waldron and Cottrell a tour of the

daycare for about 15 to 20 minutes and then the three went upstairs where Waldron and Cottrell

interviewed Ms. Muñoz.  Tr. 1/12/2010 at 154.  Waldron testified that Eva and Ms. Muñoz's

daughter went downstairs during the interview.  Tr. 1/12/2010 at 155.  Waldron stated that she

began the interview by asking Ms. Muñoz for permission to record the interview but she

declined.[14]  Tr. 1/12/2010 at 155.  Waldron first questioned Ms. Muñoz in detail about the events

of April 20 and Ms. Muñoz repeatedly denied that she had shaken Noah.  Tr. 1/12/2010 at 156-

58.

---

[14] This testimony is highly dubious because Ms. Muñoz had readily agreed to a recorded
interview with law enforcement on the previous day.  Tr. 1/12/2010 at 206.

During the interview, around 1:15 P.M., Dr. Hauda called and explained that Noah had blood on his brain and his injuries were consistent with shaking. Tr. 1/12/2010 at 161. At this point, Waldron explained to Ms. Muñoz that it was important that the doctors know the truth in order to treat Noah. Tr. 1/12/2010 at 161. According to Waldron, Ms. Muñoz then stated that she moved Noah "hard." Tr. 1/12/2010 at 162. Waldron testified that when Ms. Muñoz was asked to clarify, "[S]he said that she imagined that she shook him about three times . . . . And she said that she had one hand under his butt and she had one hand on the base of his neck . . . ." Tr. 1/12/2010 at 162. Waldron reiterated, "She believes she shook him three times, she said that when she shook him, she said something. She said she wasn't exactly sure what she said, but it was either, 'Why are you crying?' or 'Why won't you stop crying?'" Tr. 1/12/2010 at 162-63. Waldron explained that the interview concluded when Ms. Muñoz's husband, Hernani Ames, came home from work. Tr. 1/12/2010 at 163-64. Waldron and Cottrell explained to Ames what Ms. Muñoz had said and then left the home. Tr. 1/12/2010 at 164.

Despite this clearly damaging testimony, the defense failed to cross-examine Waldron effectively or rebut her testimony regarding Ms. Muñoz's alleged confession. The defense attorneys focused their cross examination on whether the Spanish word that Ms. Muñoz supposedly used to say "to shake" could also be used to mean "to jiggle." Tr. 1/12/2010 at 186. However, the defense never questioned Waldron about Ms. Muñoz's demonstration of her actions. Even based on the testimony of the prosecution's experts, Noah's injuries would have required "vigorous" or "violent shaking." Tr. 1/13/2010 at 72-73. However, Waldron's explanation that Ms. Muñoz had one hand under his butt and one hand on the base of his neck is certainly not describing vigorous or violent shaking. Regardless of the verb Ms. Muñoz supposedly used to describe her actions, her demonstration did not indicate shaking. The defense

55

the movement of the doll she had demonstrated to them before Ames arrived home.  App. 16 at ¶ 5.  Describing Ms. Muñoz's actions, Ames says that she had one hand under the doll's bottom and one behind its back, "the way anyone would hold a baby to calm" it down.  App. 16 at ¶ 5.  As Ms. Muñoz demonstrated this movement, Ames recalls that either Waldron or Cottrell cried: "See? That's shaking, that's shaking!"  App. 16 at ¶ 6.  Ames remembers that he was "surprised when [they] said 'that's shaking,' because Trudy clearly was not shaking the doll.  She was bouncing the doll gently in a soothing way."  App. 16 at ¶ 6.

Second, the defense failed to call Eva Valle, who overheard the interview and would have further challenged Waldron's report that Ms. Muñoz had made some sort of confession to her.  As Waldron noted in her own testimony, Valle was in the basement as Waldron and Cottrell interviewed Ms. Muñoz.  Tr. 1/12/2010 at 155.  Valle explained that she overheard the interview and consequently, she could have testified to the accusatory nature of the interview.  App. 26 at ¶ 9.  Valle recalled that Waldron kept probing Ms. Muñoz about what she did to Noah and accusing her of hurting the baby.  App. 26 at ¶ 9.  Valle asserted, "Trudy never accepted that she did anything to harm the baby."  App. 26 at ¶ 11.  Also, Valle stated that Ms. Muñoz was never asked about recording the interview and thus could have refuted Waldron's claim that Ms. Muñoz would not give permission and cast doubt upon Waldron's truthfulness.  App. 26 at ¶ 13.

Despite the fact that Uriarte considered eliciting testimony from Ames regarding the length of Waldron's and Cottrell's interview with Ms. Muñoz, he did not think of asking Ames about his witnessing of Ms. Muñoz's actions and Waldron's and Cottrell's reaction: "that's shaking!"  App. 178 at ¶ 21.  Similarly, Kearney confirms that it was an oversight not to question Ames about Waldron's interview in order to impeach her testimony.  App. 9 at ¶ 15.  Uriarte

provided ineffective assistance in defending Ms. Muñoz by failing to realize the importance of rebutting Waldron's false report that Ms. Muñoz had admitted to shaking Noah.

Similarly, the defense attorneys were ineffective in failing to call Valle to testify as to Waldron's interrogation of Ms. Muñoz. Although Uriarte affirmed that he wanted to call Valle to testify about the interrogation, he stated that he deferred to Kearney. App. 178 at ¶ 19. Kearney, however, stated that he did not know that Valle had overheard the interrogation. App. 9 at ¶ 12. Kearney further stated, "I believed then and now that it was of the utmost importance to undermine Ms. Waldron's credibility as a witness. If I had known that Ms. Valle had overheard Trudy's interview with Ms. Waldron and could testify that Trudy never admitted wrongdoing despite significant pressure from Ms. Waldron and the police officer to do so, I would have supported putting Ms. Valle on the stand as a witness." App. 9 at ¶ 12. The defense attorneys' failure to communicate regarding the potential testimony of Valle was itself ineffective, and led directly to the wrongful conviction that occurred in this case.

Had the defense attorneys presented this information to the jury to challenge Waldron's testimony and ultimate conclusion that Muñoz had admitted to shaking Noah, there is a reasonable probability that the outcome of Muñoz's trial would have been different. *Strickland*, 466 U.S. at 693-94. Waldron's testimony was unquestionably highly damaging as it was the only direct evidence that Ms. Muñoz did anything that could have harmed Noah. Even more critically, her false report to the treating physicians that Ms. Muñoz had confessed to shaking Noah obviously biased the conclusions of the doctors.

**The AEDPA does not bar relief on this claim.**

In denying relief on this claim, the state court opined that Waldron was adequately cross-examined at trial, stating that Ms. Muñoz

> fails to establish that more comprehensive cross-examination would have resulted in Waldron changing her unequivocal, uncontradicted testimony. She failed to provide the court with any evidence of an answer that would have changed her testimony in court or that there is a reasonable probability that but for counsel's alleged errors the result of the proceeding would have been different.

App. 403. In reaching this conclusion, the state court improperly focused solely upon whether Waldron's testimony would have changed. This is an incorrect legal standard, and the state court's adjudication of this claim resulted in a decision that was contrary to, and an unreasonable application of, *Strickland* and its progeny. § 2254(d)(1). The correct prejudice analysis would focus not upon whether Waldron's testimony would have changed, but whether there is a reasonable probability of a different outcome had counsel conducted the cross-examination. In this case, there is such a reasonable probability. Confronting Waldron with the fact that she falsely informed the medical personnel that Ms. Muñoz had confessed was a win-win proposition for defense counsel. If Waldron denied making that statement, then counsel could show that the Noah's medical records were replete with false reports of a confession. If Waldron admitted that she reported a confession, then counsel could have illustrated that Ms. Muñoz's demonstration was no such thing, and that her handling of Noah could not possibly have caused the symptoms that were attributed to abuse. In further support of this argument, counsel could have called both Ames and Valle to undermine Waldron's credibility.

For this reason, the state court's adjudication of this claim was also based upon unreasonable factual determinations. § 2254(d)(2). With respect to using Ames and Valle as witnesses, the state court opined that "neither of these potential witnesses were actually present during the interview." Ap. 404. This finding is contradicted not only by the sworn statements of Ames (App. 15-16 at ¶ 4) and Valle (App. 26 at ¶ 9), but also by the trial testimony of Waldron. Tr. 1/12/2010 at 152, 177. Moreover, the state court unreasonably held that the testimony of

Ames and Valle would likely have been inadmissible as hearsay.  App. 404.  This holding is

absurd; such statements obviously would not have been offered to prove the truth of the matter

asserted.  Ames's testimony would have shown that Waldron and Cottrell were

mischaracterizing Ms. Muñoz's demonstration as "shaking."  And Valle's testimony would have

directly contradicted Waldron's false testimony that Ms. Muñoz (a) admitted to harming Noah

and (b) refused to permit her interrogation to be recorded.

**CLAIM 5**

**TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE BY FAILING TO
CHALLENGE THE INTEGRITY OF THE TREATING PHYSICIANS' MEDICAL
INVESTIGATION INTO THE CAUSE OF NOAH WHITMER'S SYMPTOMS.**

Defense counsel failed to attack the integrity of the abuse "diagnosis" by presenting

evidence that Noah Whitmer's treating physicians at INOVA-Fairfax presumed from the

moment he arrived that his symptoms were the result of abuse, and then deferred completely to

Waldron's false report that Ms. Muñoz had confessed to shaking Noah Whitmer.  One of the

treating physicians, Dr. Dawn Thornton testified at trial, a "child this age who has blood on the

brain is typically an abuse case until proven otherwise."  Tr. 1/11/2010 at 184.  Tragically, in this

case, none of the treating physicians made any effort to disprove this assumption.

Noah entered the emergency room at 3:19 P.M. on April 20, 2009.  Pet. Ex. A at 1006.

Within the hour, a CT scan of Noah's head was ordered at 3:44 P.M. and performed at 3:55 P.M.

*Id.* at 227.  The CT scan revealed "findings . . . suspicious for a subdural hematoma," which was

promptly communicated to Dr. Thornton in the emergency room. *Id.* at 227.  By 4:41 P.M.,

INOVA-Fairfax doctors had decided that there would be a CPS investigation to look into abuse.

*Id.* at 1014.  The primary diagnosis, recorded at 5:42 P.M. is for "subdural hemorrhage –

traumatic," despite the complete lack of evidence that any trauma had occurred.  *Id.* at 1014.

60

Notes from a hospital social worker entered at 6:03 P.M. on April 20 indicate that the case was referred to CPS at the request of Dr. Thornton, and that the hospital was coordinating with police officers to investigate the case. *Id.* at 509. By 7:18 P.M. that evening, Dr. Thornton discussed the case with a homicide detective. *Id.* at 1014. This indicates that the doctors at INOVA-Fairfax hospital wasted no time in deciding that Noah had been the victim of abuse; a decision that Noah had suffered a traumatic injury was decided within two and a half hours of his arrival. In the eyes of the INOVA-Fairfax staff, Ms. Muñoz was presumed guilty from the moment Noah arrived at the hospital.

Noah was next transferred to the PICU, where resident notes dated April 21 at 12:25 P.M. indicate a diagnosis of "nonaccidental trauma—shaking or shaking impact most likely given [subdural hematoma with retinal hemorrhages]." *Id.* at 527. Further, the chart notes the "need to exclude other occult trauma [with] bone survey." *Id.* Tellingly, no notes suggest the need to exclude other possible causes of subdural hematoma and retinal hemorrhaging. At the same time, despite indicators of an infection, the records indicate that "no additional labs [are] required at the time." *Id.*

By 7:46 A.M. on April 22, any chance Ms. Muñoz might have had that the INOVA-Fairfax doctors would consider differential diagnoses was thrown out the window when CPS worker Joslyn Waldron reported to the doctors that a "confession [was obtained] from baby sitter who shook baby." *Id.* at 530. This is the same chart that notes the seemingly simultaneous decision to discontinue the antibiotics prescribed to Noah. *Id.* at 530. This was the point at which Dr. Hauda, INOVA-Fairfax's child abuse specialist, was consulted. *Id.* In the eyes of the medical professionals as well as law enforcement, Ms. Muñoz was a child abuser, and no further inquiry was necessary.

Once Waldron falsely reported to the hospital that she had obtained a confession from Ms. Muñoz, the treating physicians never again investigated the possibility that Noah's symptoms might have had some medical explanation; instead, the physicians simply accepted the accusation of abuse as a proven fact. For example, on April 22, 2009, a PICU Resident Progress Note indicates, "CPS called from ED, homicide detective involved (confession from baby sitter who shook baby). . ." Pet. Ex. A at 530. The same statement appears repeatedly on the PICU Resident Progress Notes in the days to follow, April 23-29, 2009. *See* Pet. Ex. A at 538, 545, 550, 555, 559, 567-68. Additionally, the PICU Resident Transfer Summary dated April 30, 2009, stated "[h]omicide detective was involved on DOA. CPS called from the ED and Police investigation obtained confession from babysitter who shook the baby. Dr. Hauda (child abuse team) was consulted 4/21 and recommended repeat skeletal survey on May 1st (inpatient or outpatient). Social work involved. Skeletal survey on 4/22 was negative for fracture. . . . " Pet. Ex. A at 575.

Thus, once Waldron reported to the hospital that Ms. Muñoz had confessed to shaking, Noah Whitmer's doctors ceased the search for alternative possible medical contributions. A Consultation Report from April 29, 2009 mentions Noah's assessment as a "4-month-old boy previously healthy, presenting 04/20/2009 with seizures, nonaccidental trauma, status epilecticus. . ." Pet. Ex. A at 71. A later Consultation Report on May 1, 2009 states "[t]his is essentially a 5-month-old little boy who was admitted to the hospital with a nonaccidental injury." Pet. Ex. A at 73.

Reasonably effective defense counsel would have attacked the haste and the bias reflected in the INOVA-Fairfax physicians' conclusion that Ms. Muñoz had abused Noah Whitmer. At trial, however, defense counsel completely failed to cross-examine Noah's treating

physicians about the foregoing statements from the medical records and the circular nature of their medical investigation.  The medical records demonstrate clearly that, in coming to the determination of SBS, the doctors first requested Child Protective Services investigate, received a statement from Waldron that the baby was shaken, and from that point forward presumed that the abnormalities visible in Noah's CT and MRI scans and eyes were the result of shaking, ignoring any evidence that his symptoms could have other non-traumatic causes.  This is not a reasonable scientific methodology.  As Dr. Barnes states, the medical records presented "powerful indications that Noah Whitmer had an infection when he was admitted to INOVA-Fairfax," (App. 184 at ¶ 11), and other "relevant areas of inquiry that should have been investigated by the treating physicians," but "[b]ecause the treating physicians presumed abuse, they failed to do any further investigation and ignored some very obvious relevant pieces of information."  App. 185-86 at ¶ 15.  Dr. Barnes further points out that Noah presented with "bleeding in the brain but no external signs of injury," and that these types of cases "are complex and involve many factors."  App. 186 at ¶ 18.  He concludes that, in such cases, "[i]t is critically important for treating medical professionals to consider all explanations and develop differential diagnoses.  That never happened in this case.  Instead, all of the treating physicians simply assumed trauma and stopped looking for alternative explanations."  App. 186 at ¶ 18.

If defense counsel had brought to light the way in which Noah Whitmer's treating physicians failed to pursue differential diagnoses for his symptoms once Waldron had reported that Noah's babysitter had shaken him, there is reason to believe the jurors would have seen that the treating physicians' conclusion that Ms. Muñoz shook Noah Whitmer was not based on science, but on unreliable and incredible law enforcement reports, and would have found a reasonable doubt in the Commonwealth's case.

**The AEDPA does not bar relief on this claim.**

The state court's adjudication of this claim was almost entirely devoid of analysis. Without citing any evidence whatsoever, the state court simply opined that "[t]here is ample testimony from doctors who were treating Noah on that day that they considered many of the alternative causes presented by defense counsel," and that "[t]here was no evidence proffered that would tend to show that the doctors jumped to any conclusions or discounted any causes until reviewed." App. 405. The state court failed entirely to address the substance of Ms. Muñoz's claim—that her defense lawyers were ineffective for failing to present evidence of haste and bias in impeaching the treating physicians' testimony that Noah's symptoms proved that he had been abused. Because the state court failed to address these claims, the provisions of section 2254(d) do not bar relief on this claim, and the Court should review them *de novo*. In this absence of this impeachment, Ms. Muñoz's jurors were left with the impression that abuse was a medically-determined fact. In reality, these conclusions were based upon the exaggeration, if not outright fabrication, of Waldron.

Nonetheless, if the Court determines that AEDPA should be applied to this claim, the adjudication was contrary to, and an unreasonable application of, clearly established federal law (§ 2254(d)(1)) and was also based upon unreasonable determinations of fact in light of the evidence presented to the state court. § 2254(d)(2). The state court completely ignored the many references to Ms. Muñoz's alleged confession in the medical records. Moreover, by failing to grant an evidentiary hearing, the state court prevented Ms. Muñoz from proving how effectively these doctors' opinions could have been impeached by counsel who had carefully reviewed the medical records. This is a clear example of a state court employing an unreasonable fact-finding

process by simply ignoring evidence that supports the petitioner's claim.  See *Miller-El*, 537 U.S. at 346.

## CLAIM 6

### TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE BY FAILING TO PRESENT TESTIMONY FROM LAY WITNESSES REGARDING NOAH WHITMER'S ILLNESS.

In addition to failing to present medical evidence about Noah's infection, dehydration, and medical history, defense counsel also failed to present evidence from lay witnesses Renata Ames and Eva Valle that would have established that Noah was unwell before April 20, 2009. Uriarte never asked Renata Ames, Ms. Muñoz's daughter who was 14-years-old when her mother was arrested, about her personal interactions with Noah Whitmer.  App. 178 at ¶ 20; App. 12-13 at ¶¶ 1, 10.  However, Renata stated that she usually played with the other children at the daycare, including Noah, when she would arrive home after school.  App. 13 at ¶ 9.  Renata remembers that she had played with Noah the week before April 20, 2009, and she remembered him being unusually irritable and cranky: "He would cry, and I would give him a toy, and he wouldn't want to play, so I'd give him another toy, and he wouldn't want to play with that one, either.  There was nothing I could do to stop him from crying. . . Nothing really calmed him down. . . [his] behavior the week before this happened was very unusual for him.  Normally, he was a very playful and happy baby."  App. 13 at ¶ 9.  Although this information is obviously relevant to Noah's health, Uriarte never questioned Renata about her interactions with him prior to April 20, 2009.  App. 13 at ¶ 10; App. 178 at ¶ 20.

Valle also had recognized the change in Noah's demeanor the week before April 20, 2009.  App. 26 at ¶ 8.  That week, Valle stated that she noticed that Noah "cried a lot and seemed troubled," and that when she changed his diaper one time, she noticed "his poop was abundant

65

and green." App. 26 at ¶ 8.  Valle maintained that she had discussed these changes in Noah's

behavior and his diaper with Ms. Muñoz.  App. 26 at ¶ 8.  Although Uriarte had discussed these

details about Noah with Valle, he did not think of calling her to present such evidence to the jury.

App. 178 at ¶ 23.

     Uriarte was ineffective in presenting these prior consistent statements at trial.  At trial

Ms. Muñoz testified that Noah was fussy the week before.  Tr. 1/20/2010 at 103.  However,

considering that the defense had failed to present expert testimony that connected Noah's scans

to evidence of a fever and infectious growth in the lungs, there was no reason for the jury to

connect his fussiness to his medical state.  Had the defense emphasized Noah's change in

condition the week before April 20, 2009, the evidence may have raised a reasonable doubt in

the jury's mind that violent shaking is what caused the bleeding in his brain.

     The prejudicial effect of counsels' failure to call these witnesses is starkly illustrated by

comparison to Noah's medical records.  A Review of Systems conducted upon Noah's admission

to the hospital reports that there had been no fever, no fussiness, no cough, no vomiting, and no

stool changes noted.  Pet. Ex. A at 1013.  Every one of these reports of Noah's health could and

should have been rebutted by defense counsel.  It is well-documented that Noah was very

feverish; within hours of his admission to the hospital, his temperature was recorded at 101.3

degrees, where it remained for days, ultimately reaching a temperature of 102.3 degrees.  Pet.

Ex. A at 907-14; 947-95.  Noah also had a cough and serious respiratory problems.  Sputum

cultures revealed moderate to heavy growths of staph and streptococcus pneumonia infections.

Pet. Ex. A at 369, 712-13.  Nurses' notes throughout Noah's hospital stay show his difficulty

breathing, noting at different times "stridor" (a high-pitched wheezing sound) and "rhonchi"

(coarse rattling sound caused by secretions in the bronchi).  Pet. Ex. A at 837, 921, 929, 937,

961, 977.[16]  Further, the medical records indicate that Noah required frequent suctioning of clear/white/tan secretions of moderate to thick viscosity throughout much of his hospitalization. Pet. Ex. at 907-995.  Finally, imaging of Noah's chest showed "hazy bilateral pulmonary opacities," indicative of "patchy atelectasis or infiltrate"; perihilar markings/opacities; and "diffuse interstitial abnormality." Pet. Ex. A at 213, 216, 217, 223.  Noah also suffered from vomiting.  In fact, the episode that led to his admission to INOVA-Fairfax began when he started regurgitating milk.  Tr. 1/20/2010 at 119.

Renata Ames and Eva Valle could have confirmed that the other two negative symptoms noted upon his admission to INOVA-Fairfax were also false.  According to Renata Ames, Noah was unusually fussy for almost a week before he became ill.  And according to Valle, he exhibited stool changes.  This information was critically important to rebutting the prosecutor's incorrect characterization of Noah as a perfectly healthy child.  Had the jury understood all of the symptoms Noah had been exhibiting before he collapsed, there is a reasonable probability that they would have rejected the argument that his symptoms could only be cause by abuse.

**The AEDPA does not bar relief on this claim.**

The state court adjudication of this claim resulted in a decision that was contrary to, and an unreasonable application of, *Strickland* and its progeny, and was based upon an unreasonable determination of the facts in light of the state court record.  § 2254(d).  The state court suggested that defense counsel might have had strategic reasons for not calling Valle and Renata Ames as witnesses.  However, neither defense lawyer suggested that they had made a strategic decision not to use these witnesses.  As discussed previously, with respect to Valle, Urairte stated that he

_____

[16] This is confirmed by Noah's mother, who reported in a post-conviction affidavit that he sometimes sounded as if he had fluid on his lungs or was wheezing, to the extent that she reported these problems at his four-month check-up, less than a month before he fell ill while in Ms. Muñoz's care.  App. 261 at ¶ 3.

intended to use her as a witness, but deferred to Kearney.  App. 178 at ¶ 19.  For his part, Kearney states that it "did not occur to me that we could use Ms. Valle as a means to impeach Ms. Waldron's testimony," and that "I wish this had occurred to me." App. 9 a ¶ 12.  Failure to recognize the value of a witness's testimony does not constitute a reasonable strategic decision.

With respect to Renata Ames, the state court decision was even less reasonable.  The state court opined that "it was not unreasonable to not call the daughter for the reason she gives in her affidavit, namely that she would not have been a good witness and would cry under the pressure on the stand." App. 402.  This is an entirely unreasonable manipulation of the facts.  In her affidavit, Renata stated only "[m]y dad told me that I was going to testify, but I think they decided not to have me testify because I might break down and cry." App. 13 at ¶ 10.  Contrary to the state court order, no person involved in this case has ever suggested that Renata Ames "would not have been a good witness." In fact, Uriarte stated that the *only* reason he considered calling Renata was because "I believed that they jury would find her to be a sympathetic witness." App. 178 at ¶ 20.  Unfortunately, Uriarte failed to realize the importance of Renata's potential testimony, because he "never asked her about her interactions with Noah prior to April 20, 2009." App. 178 at ¶ 20.  For his part, Kearney confirms that he does not recall any strategic reason for not calling her, and that he would have supported using her had he realized that she had favorable information about Noah behaving oddly in the week before he became ill.  App. 9 at ¶ 13.

## CLAIM 7

### TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE
### BY FAILING TO CALL CHARACTER WITNESSES ON MS. MUÑOZ'S BEHALF.

Despite speaking with (and, in some instances, subpoenaing) parents who gave glowing accounts of Ms. Muñoz's competence as a daycare provider and naturally gentle nature with

children, defense counsel called only one such parent, Michelle Shirey, as a character witness. Tr. 1/14/2010 at 135-36. Uriarte was solely responsible for contacting parents under Ms. Muñoz's care and subpoenaing them, and he had no strategic reason for failing to call additional character witnesses. App. 179 at ¶ 25. Further, the one witness who was called, Shirey, was contacted only a week before trial and was never prepared to take the stand. App. 32 at ¶ 5.

The Supreme Court of Virginia has recently vacated a child abuse conviction where the trial court refused to allow the defendant to question character witnesses "about his reputation in the community for being a good caretaker of children and for not being sexually assaultive or abusive toward them." *Gardner v. Commonwealth*, __ S.E.2d __, 2014 WL 2534837 (Va. June 5, 2014) at *1. In *Gardner*, the Supreme Court of Virginia went on to state:

> We have repeatedly stated that a defendant is not limited solely to reputation evidence regarding truthfulness, but may offer evidence to prove good character for any trait relevant in the case. *See Barlow v. Commonwealth*, 224 Va. 338, 340, 297 S.E.2d 645, 646 (1982); *Zirkle* [*v. Commonwealth*], 189 Va. [862,] 871, 55 S.E.2d [24,] 29 [(1949)]; *see also* Va. R. Evid. 2:404(a)(1) (permitting character evidence in the form of "[e]vidence of a pertinent character trait of the accused offered by the accused"). Character is used as a synonym for reputation. *Zirkle*, 189 Va. at 871, 55 S.E.2d at 29. "A person on trial for a criminal offense has the right to introduce evidence of his good character, on the theory that it is improbable that a person who bears a good reputation would be likely to commit the crime charged against him." *Id.*

*Id.* at __, 2014 WL 2534837 at *3.

Defense counsel was ineffective because they failed to present further character evidence by calling additional available parents willing to testify on Ms. Muñoz's behalf. While the jury may have disbelieved one character witness, the cumulative effect of numerous parents who worked closely with Ms. Muñoz and entrusted their children to her could easily have introduced reasonable doubt into the juror's mind.

For example, Shruti Dewan, the mother of Sia Dewan (a child under Ms. Muñoz's care), remarked that she personally interviewed over twenty other day care providers before settling on Trudy because "she was so soft spoken, gentle, and her house was so clean." App. 38 at ¶ 2. Ms. Dewan noted that she still finds the charges against Ms. Muñoz "unbelievable," indicating she does not believe "Trudy would have done anything that could have harmed a child in her care." App. 38 at ¶ 4. Further, Ms. Dewan could have testified that Ms. Muñoz was visibly upset later that day when she came to pick up Sia. App. 38-39 at ¶ 5. Likewise important was the testimony of Ms. Dewan's husband, Rahul Dewan, who noted that he found Ms. Muñoz "to be a very sweet lady." App. 35 at ¶ 3. Mr. Dewan also commented that he found the charges "unbelievable," and remarked that he and his wife considered quite a few other providers before settling on Ms. Muñoz. App. 35 at ¶ 2, 4. Both of the Dewans affirmatively noted that they would have been willing at the time of trial to testify regarding Ms. Muñoz's character, and would still be willing to speak on her behalf even to this day. App. 39 at ¶ 6; App. 35 at ¶ 6.

Uriarte utilized only one character witnesses, when a number of others were ready, able, and willing to testify. In this same vein, trial counsel also should have introduced photographic evidence of the immaculate child care facility Ms. Muñoz maintained in her home, as an example of the care she took to provide the children in her care with a safe, clean, fun, and stimulating environment. *See* App. 255-59. While the singular testimony of one prior client of Ms. Muñoz's might not have been sufficient to instill a reasonable doubt in the minds of the jury, the cumulative effect of several such witnesses could easily have done so.

There was no strategic reason not to call these character witnesses. App. 179 at ¶ 25 (Affidavit of Uriarte) ("All of the parents gave glowing recommendations of Trudy's work with their children, with no exceptions. Nevertheless, I called only one character witness. I had no

70

strategic reason for not calling all of them."). Not calling laudatory character witnesses to

testify, despite the opportunity, was done for no particular reason and was highly prejudicial.

**The AEDPA does not bar relief on this claim.**

The state court's adjudication of this claim resulted in a decision that was contrary to, and

an unreasonable application of, *Strickland* and its progeny, and was based upon unreasonable

determinations of fact in light of the state court record. § 2254(d). The state court expressed the

contradictory opinions that the omitted testimony would "likely also not have been admissible,"

and that "she already had one witness testify to her character." App. 406. However, the recent

*Gardner* opinion from the Supreme Court of Virginia removes any doubt as to the admissibility

of this evidence. And the importance of this testimony to Ms. Muñoz cannot be overstated; the

United States Supreme Court has noted that character is not only relevant, but that "such

testimony alone, in some circumstances, may be enough to raise a reasonable doubt of guilt."

*Michelson v. United States*, 335 U.S. 469, 476 (1948) (citing *Edgington v. United States*, 164

U.S. 361 (1896)).

**CLAIM 8**

**TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE
BY FAILING TO OBTAIN A COPY OF MS. MUÑOZ'S CALL TO 911.**

Standard 4-4.1 of the American Bar Association's Standards for Criminal Defense

mandates that "[d]efense counsel should conduct a prompt investigation of the circumstances of

the case and explore all avenues leading to facts relevant to the merits of the case . . . ." Failure

to conduct such a prompt investigation therefore indicates that an attorney is operating outside

the "wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.

Uriarte recalled that he requested the 911 call numerous times from Assistant

Commonwealth's Attorney Gregory Holt, the prosecutor on the case. App. 176 at ¶ 9. What

71

Uriarte fails to note even now is that it was ultimately his responsibility to move promptly and secure those records if he thought they might be pertinent. Transcripts and recordings of calls to 911 are readily available to defense attorneys (and the general public) via the Virginia Freedom of Information Act. In fact, Fairfax County's 911 call center even posts instructions on obtaining records on its website.[17] For $52.00, Uriarte could have secured a CD with the actual recording of the 911 call. Further, Uriarte clearly believed, as demonstrated by his numerous requests to Holt for the records, that he thought they would be important. App. 176 at ¶ 9. Uriarte's failure to act on his own to secure the records of the 911 call fell below the level of professionally competent assistance necessitated by *Strickland*.

Once Noah stopped breathing, Muñoz laid him down on the table and began doing CPR while simultaneously trying to dial 911. Tr. 1/20/2010 at 116-20; App. 176 at ¶ 9. Upon reaching the dispatcher, she put the call on speakerphone. App. 176 at ¶ 9. The dispatcher was helping Ms. Muñoz count for CPR purposes, while simultaneously trying to calm her down. App. 176 at ¶ 9.

Failure to secure the recording of this 911 call was prejudicial to Ms. Muñoz's case for two reasons. First, the statements made on the call would have bolstered Ms. Muñoz's account of the afternoon of April 20, 2009, particularly by showing the jury that she wanted to help Noah, not injure him. This was particularly important since the jury was required to find Ms. Muñoz's behavior was culpable; the fact that the jury asked the court for a definition of culpability demonstrates the primacy of this missing evidence. Tr. 1/21/2010 at 59; Tr. 1/21/2010 at 15. The recording would also have undermined the testimony from Joslyn Waldron, who interrogated Ms. Muñoz the following day, and falsely informed medical

---

[17] *See* http://www.fairfaxcounty.gov/911/obtaining_records.htm#

personnel that Ms. Muñoz confessed to shaking the baby. Tr. 1/21/2010 at 162-63. As evidenced by the trial transcript, Waldron's testimony regarding Ms. Muñoz's purported "confession" figured prominently in the prosecution's opening statement. Indeed, the purported confession was a capstone of the Commonwealth's case; Holt stressed it in his closing immediately before asking the jury to return a guilty verdict. Tr. 1/11/2010 at 97. A 911 recording of Ms. Muñoz describing what had happened would have been crucial to the jury, demonstrating that Waldron's account was misguided and misleading. Thus there is "reasonable probability that the outcome of the proceeding would have been different if counsel had taken the simple step of obtaining this readily-available evidence. *See Strickland*, 466 U.S. at 693-94.

The second reason the failure to get the 911 call was prejudicial is because the recording would have supported the testimony of the medical experts called by the defense. Dr. Uscinski's testimony focused on the injuries to Noah's brain being the result of oxygen deprivation, rather than intentionally inflicted trauma. Tr. 1/14/2010 at 63, 73, 104, 106-07, 115-17. Additionally, Dr. Gardner suggested that oxygen deprivation might have contributed to the bleeding on Noah's brain. Tr. 1/14/2010 at 172. Since a belief that Noah's brain was deprived of oxygen for an extended period of time was key to Dr. Uscinski's opinion, the 911 recording was crucial to convincing the jury that Dr. Uscinski's opinion was supported by the evidence. Here again, the Commonwealth's closing argument focused heavily on undercutting the testimony of Drs. Uscinski and Gardner. 1/21/2010 at 44-49. Thus there is a reasonable probability that, had the jurors been presented with additional, unbiased evidence indicating the length of time during which Noah was not breathing, they may have come to a different conclusion, as contemplated by *Strickland*.

73

**The AEDPA does not bar relief on this claim.**

       The state court adjudication of this claim resulted in a decision that was contrary to, and an unreasonable application of, *Strickland* and its progeny, and was based upon unreasonable determinations of fact in light of the state court record. § 2254(d). The state court dismissed this claim on only the prejudice prong of *Strickland*, holding that the 911 recording "did not address the real issues in this case, specifically how baby [*sic*] obtained his injuries and not what happened after Noah went limp." App. 407. The state court concluded "[t]here was no evidence that having a tape of the 911 call would have changed the outcome of the case and [Ms. Muñoz's argument fails on that prong alone." App. 407. The state court emphasized that "[t]here is nothing in the record that contradicts [Ms. Muñoz's] testimony that she called 911 and that she attempted CPR with their help." App. 406.

       However, the 911 recording is better evidence than Ms. Muñoz's own recollections for two reasons. First, based on her own trial testimony, Ms. Muñoz did not perfectly remember the call because of her distress. When asked how Noah's body responded to the CPR, she testified, "I really don't remember, but two or three times his body is [*sic*] not respond ...." Tr. 1120/2010 at 119. The recording would have provided direct evidence of what transpired on the call and would have been more accurate than Ms. Muñoz's recollection. Second, the recording would have bolstered Ms. Muñoz's testimony, which the jury obviously rejected in convicting her. Playing the tape would have allowed the jurors to hear the distress and concern in Ms. Muñoz's voice, which may have made them question whether she had the required culpability to injure Noah. Further, the recording would have provided a contemporary account of what happened to Noah in Ms. Muñoz's own words, which the jurors likely would have found more credible than her trial testimony, which they clearly rejected as self-serving. The fact is that, from the moment

he fell ill, Ms. Muñoz acted quickly and bravely to save Noah's life.  Giving the jurors an opportunity to hear her distress and her desire to help Noah would have helped them understand that she did not harm him.

## CLAIM 9

### TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE BY FAILING TO OBJECT TO AN INCORRECT JURY INSTRUCTION.

The defense attorneys failed to object to jury instruction number six, which was an erroneous statement of law.  This failure to object fell below an objective standard of reasonableness.  In jury instruction number three, the jurors were instructed that the crime of child abuse or neglect included three elements.  "The Commonwealth must prove beyond a reasonable doubt each of the following elements of that crime:  (1) That the defendant was a parent, guardian, or other person responsible for the care of Noah Whitmer and; (2) That Noah Whitmer was a child under the age of 18, and; (3) That the defendant, by willful act, caused or permitted serious injury to the life or health of Noah Whitmer."  Ct. File 108.  To clarify what constituted a "willful act" for the third element, jury instruction number six read: "A willful act is one done with a bad purpose, or without justifiable excuse, or without ground for believing it is lawful.  A willful act is intentional, or knowing, or voluntary, as distinguished from accidental. The terms 'bad purpose' or 'without justifiable excuse' require knowledge that the particular conduct will likely result from an injury or illegality."  Ct. File 111.

The Virginia Supreme Court has defined the elements of a willful act as it applies to the child abuse statute, Va. Code § 18.2-371:

> [T]he term "willful," as used in the statute, refers to conduct that "must be knowing or intentional, rather than accidental, and [undertaken] without justifiable excuse, without ground for believing the conduct is lawful, or with a bad purpose. . . . Thus, the term 'willful' . . . contemplates an intentional, purposeful act or omission."  *Commonwealth v. Duncan*, 267 Va. 377, 384-85,

75

593 S.E.2d 210, 214-15 (2004) (citations omitted).  Accord *Barrett*, 268 Va. at
183, 597 S.E.2d at 111.

*Morris v. Commonwealth*, 636 S.E.2d 436, 439, 272 Va. 732, 738 (2006).  Thus, the Virginia

Supreme Court permits the Commonwealth to prove a willful act in one of two ways:

> (1)  The intentional act is undertaken with "a bad purpose;" or
>
> (2)  The intentional act is undertaken without justifiable excuse *and* without ground
> for believing the conduct is lawful.

In this case, however, the erroneous instruction stated the second alternative in the

disjunctive, instead of the conjunctive: "a willful act is one done with a bad purpose *or* without

justifiable excuse *or* without grounds for believing it is lawful."  Thus, the court allowed the jury

to assume that as long as the act was done without justifiable excuse, the act could have been

done without a bad purpose and with grounds to believe it was lawful.  The *Morris* standard,

however, is stated in the conjunctive and indicates that if the act was not done for a bad purpose,

it must be completed both without justifiable excuse *and* without grounds for believing the

conduct is lawful.

Further, the *Morris* standard requires that the conduct "be knowing or intentional, rather

than accidental," yet the court instructed the jury that a willful act is "intentional, or knowing, *or*

*voluntary*, as distinguished from accidental."  Ct. File 111.  This instruction allowed the jury to

find that the act need not be intentional or knowing so long as it was "voluntary."  Thus, the jury

could have concluded that as long as Ms. Muñoz was in control of her actions, she did not have

to act knowingly or intentionally.  However, the Supreme Court of Virginia has not allowed

"knowing or intentional" to be supplanted by "voluntary."

At trial, defense counsel Kearney requested some changes to the child abuse jury

instruction, number three, but never objected to instruction six, which defined the willful act

element. Tr. 1/21/2010 at 282.  For instance, he asked that the court remove the phrases "or neglect" and "or omission" and "or refusal to provide any necessary care for the health of Noah Whitmer." Tr. 1/21/2010 at 282.  The court granted Kearney's motion over the Commonwealth's objection.  However, Kearney never objected to the definition of a "willful act" or to the inclusion of the term "voluntary" in instruction six.  Thus, the incorrect instruction given was exactly what Kearney requested.  Further, Kearney compounded the error in his closing argument by explaining to the jury that the Commonwealth must "prove a willful act was done with a bad purpose or without justifiable excuse *or* without grounds for believing that it is lawful." Tr. 1/21/2010 at 42.

Under *Strickland*, this failure to object to an instruction that clearly misstated the law fell below an objective standard of reasonableness.  Any reasonably competent attorney would have objected to jury instruction six, as it unmistakably fails to track the language of Virginia Code § 18.2-371.  *See Green v. Young*, 571 S.E.2d 135, 138, 264 Va. 604, 609 (2002) (holding that a reasonably competent attorney would have objected to an instruction that was clearly erroneous).

This error prejudiced Ms. Muñoz's defense.  But for this error, the result of the case would have been different.  A reviewing court must presume that juries follow their instructions. *Zafiro v. United States*, 506 U.S. 534, 540 (1993).  Moreover, it is well settled in Virginia that it is "materially vital" to the defendant that juries be properly instructed. *See Atkins v. Commonwealth*, 439 S.E.2d 409, 247 Va. 160, 178 (1999); *Powell v. Commonwealth*, 552 S.E.2d 344, 363, 261 Va. 512, 545 (2001).  In a 2005 case, the Supreme Court of Virginia granted habeas relief where trial counsel was ineffective for failing to object to a verdict form that contained an inaccurate statement of law. *Morrisette v. Warden*, 613 S.E.2d 551, 558, 270 Va.

188, 195-204 (2005).[18]  In this case, not only was the misstatement of law included in the instructions but it was argued to the jury in the defense's own closing.  Based on the erroneous instruction, the jury could have found that Ms. Muñoz satisfied the willful act requirement solely because her act was without justifiable excuse and she acted voluntarily.  As a result, the jury could have found Ms. Muñoz guilty of child abuse without having found that she had either bad purpose or grounds to believe her actions were lawful and without acting having found that she acted either knowingly or intentionally.  This conclusion is not permitted by Virginia Code § 18.2-371.  These errors undermine confidence in the jury's verdict.

**The AEDPA does not bar relief on this claim.**

The state court adjudication of this claim resulted in a decision that was contrary to, and an unreasonable application of, *Strickland* and it progeny, and was based upon unreasonable determinations of fact in light of the state court record.  § 2254(d).  The state court simply asserted that the challenged instruction correctly stated the applicable law.  For the reasons previously stated, this is wrong.

## II.    PROSECUTORIAL MISCONDUCT

The Supreme Court has held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  The elements of a *Brady* violation are that evidence is (1) favorable to the accused, (2) suppressed by the prosecution, and (3) material.  *Banks v. Dretke*, 540 U.S. 668, 691 (2004).  In *Bagley*, 473 U.S. at 676, the Court held that the *Brady* rule also

---

[18] Although *Atkins*, *Powell*, and *Morrisette* involved incorrect verdict forms, the Supreme Court of Virginia in *Atkins* expressly analogized verdict forms to jury instructions.  *Atkins*, 247 Va. at 177-78.

encompasses impeachment evidence.  The failure to disclose favorable evidence constitutes suppression, even if it is known only to the police.  *Kyles*, 514 U.S. at 438; *Brady*, 373 U.S. at 87.

   Evidence is material if it "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 434–35.  Materiality is satisfied if there is a "reasonable probability" that had the evidence been disclosed, the result of the proceedings would have been different.  *Banks*, 540 U.S. at 699.  The inquiry looks not only at the face value of the evidence, but at its value "if disclosed and developed by reasonably competent counsel." *Bagley*, 473 U.S. at 707.  Where the prosecution represents that it has complied with *Brady*, the defense may rely on that representation and cannot be faulted for not uncovering the evidence independently.  *Banks*, 540 U.S. at 693–94.  Materiality must be assessed collectively.  *Kyles*, 514 U.S. at 437 & n.10.  Courts must also consider the possibility that the defense could have used evidence to challenge the "reliability of the investigation" as a whole.  *Id.* at 446; *see also Workman v. Commonwealth,* 636 S.E.2d 368, 272 Va. 633 (2006).

   The Court has also held that the knowing use of false testimony violates due process, even if the prosecution simply allowed such testimony to pass uncorrected.  *Giglio v. United States*, 405 U.S. 150 (1972); *Napue v. Illinois*, 360 U.S. 264 (1959).  The elements of a claim under *Giglio* are (1) that the testimony was false, (2) that the prosecution knew it was false, and (3) that the false testimony was material.  *Id.*  Evidence is material if "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *U.S. v. White*, 238 F.3d 537, 541 (4th Cir. 2001).  The prosecution is deemed to know that testimony is false if the police know it is false.  *Boone v. Paderick*, 541 F.2d 447, 451 (4th Cir. 1976).

79

## CLAIM 10

## THE COMMONWEALTH FAILED TO DISCLOSE THE 911 RECORDING.

In Virginia, Rule 3A:11 requires the Commonwealth to disclose any "written or recorded statements or confessions made by the accused." *see also* Court File at 60 (Discovery and Inspection Order). Further, the Commonwealth bears the burden of supplying all such statements, whether held by the Commonwealth's attorney or an agent (such as a local government agency). Here, the recording of the 911 call contained evidence favorable to Ms. Muñoz as described above. *See supra* at Claim 8. Specifically, evidence contained in the 911 recording was favorable to Ms. Muñoz because it helped bolster her account over that of Waldron's, and because it supported the views of the experts presented by the defendant at trial.

The statement was suppressed by the prosecution. A recording of a 911 call placed by the defendant on behalf of a victim against whom she supposedly committed a crime is surely a "recorded statement[] . . . made by the accused," as contemplated by the Rule. Here, in the Commonwealth's reply to the discovery order issued by the court, the prosecutor did not include the 911 call as a written or recorded statement made by the accused, despite the fact that it clearly fits that literal designation. Nor did the prosecutor disclose the 911 call as exculpatory evidence, as required under *Brady*. Indeed, the prosecutor repeatedly represented that he had no copy of the 911 recording, despite repeated requests from Uriarte. App. 176 at ¶ 9. Whether or not the prosecutor had, in fact, heard the 911 call recording, he had an affirmative obligation to turn over any recorded statements made by the accused to defense counsel. He failed to do so.

Materiality, as stated above, is determined under a "reasonable probability" standard which asks whether, assuming undisclosed evidence had been developed by "reasonably competent counsel," the outcome of the proceeding would have been different. *Kyles*, 514 U.S.

80

at 434–35; *Banks*, 540 U.S. at 699; *Bagley*, 473 U.S. at 707.  Here, the undisclosed evidence is material, as discussed previously.  If counsel were in possession of the 911 recording, Ms. Muñoz's account of April 20, 2009—in which she tried to assist Noah, rather than injure him—would have been greatly strengthened.

**The AEDPA does not bar relief on this claim.**

The state court rejected this claim because it held that Ms. Muñoz was aware that she had made the 911 call and knew what had been said.  App. 409.  This adjudication was contrary to, and an unreasonable application of, clearly established federal law including *Strickland* and its progeny, and was based upon unreasonable determinations of facts in light of the state court record.  § 2254(d).  Simply because a petitioner is aware of the existence of evidence—and even the content of that evidence—does not absolve the prosecution of its duty to make timely *Brady* disclosure.  *See e.g.* Slip Op., *Boyce v. Braxton*, No. 3:05-CV-558 (E.D. Va. Mar. 19, 2013) (vacating capital murder conviction where prosecution failed to disclose polaroid photograph taken of defendant on date of arrest, even though defendant was aware that the photograph had been taken and knew what the photograph showed).

Lastly, the state court held that the same evidence came in through Ms. Muñoz's testimony and Waldron's testimony.  App. 409.  As discussed previously in Claim 8, however, the 911 call itself would have constituted much more persuasive evidence of Ms. Muñoz's innocence than testimony about the call.

**CLAIM 11**

**THE COMMONWEALTH PRESENTED FALSE EVIDENCE AND ARGUMENT REGARDING NOAH WHITMER'S HEALTH.**

The Supreme Court has held that the knowing use of false testimony violates due process, even if the prosecution simply allowed such testimony to pass uncorrected.  *Giglio v. United*

*States*, 405 U.S. 150 (1972); *Napue v. Illinois*, 360 U.S. 264 (1959).  The elements of a claim under *Giglio* are (1) that the testimony was false, (2) that the prosecution knew it was false, and (3) that the false testimony was material.  *Id.*  Evidence is material if "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *White*, 238 F.3d at 541.  The prosecution is deemed to know that testimony is false if the police know it is false. *Boone*, 541 F.2d at 451.

>    a.    **The Commonwealth's Attorney Mislead the Jury in his Opening and Closing Arguments regarding Noah's Health.**

In the present case, the Commonwealth presented both witness testimony and argument that Noah was healthy, in contradiction to the medical records.   While the medical experts represented that Noah was a healthy baby in the time leading up to his admission to the hospital, there is considerable evidence that this was not the case.  Specifically, on the day he was admitted to the Pediatric Intensive Care Unit ("PICU"), doctors did a sputum culture on Noah, which ultimately revealed a "heavy growth of staphylococcus aureus and streptococcus pneumoniae." Pet. Ex. A at 369.  Noah's fever went up and down for days at the hospital, and thick white liquid was suctioned from his lungs. *Id.* at 907-95.  His parents noted that he had been coughing and wheezing in the time leading up to his admission to the hospital. *Id.* at 85; Tr. at 270.  Noah was also anemic.  Pet. Ex. A at 1003.  This evidence contradicts the statements of the Commonwealth's medical experts suggesting that Noah was a healthy child before his admission to the hospital, which in turn bolstered their erroneous claims that his injuries could only be explained by trauma. *See* Tr. at 180, 183, 560, 585.  This is especially important in light of the prosecutor's repeated references to the fact that Noah was otherwise healthy in his opening and closing arguments, describing Noah as "a *perfectly healthy child*" during opening argument. Tr. 1/11/2010 at 92 (emphasis added).  Later, in closing, the prosecutor argued: "April 20, 2009,

82

Noah Whitmer, *a healthy four-and-a-half-month old child* was taken to his day care provider and dropped off by his mother." Tr. 1/21/2010 at 19 (emphasis added).

**b.      The Commonwealth Allowed Medical Experts to Mislead the Jury Regarding Noah's Health Without Correcting the Record.**

Both Dr. William Hauda and Dr. Amy Thornton provided misleading information to Ms. Munoz' jury, and the record was not corrected by the Commonwealth's Attorney.

**i.      Dr. William Hauda**

Dr. Hauda  was asked by the Commonwealth's Attorney: "Now in reviewing the medical records of Noah Whitmer, including the blood tests and bone surveys and scans that were conducted, do those tests or records indicate any underlying disease like leukemia?"  Hauda: "No."  CWA: "Brittle bone disease?"  Hauda: "No."  CWA: "Genetic Predisposition?"  Hauda: "No."  Tr. 1/13/2010 at 152.

As both Dr. Hauda and the Commonwealth's Attorney knew at that time, Noah's father had reported that his own father had had a history of febrile seizures; that his cousins had muscular dystrophy, and that his wife had a relative who had died at age 8 of a "chromosomal abnormality." Pet. Ex. A at 85.  There are no records in the file that suggest that the medical experts did any further testing or investigation after receiving that information, in all likelihood because they had committed to their diagnosis of trauma/SBS after looking at the first CT scan. But to tell the jury that Noah had no genetic predisposition was simply false.

It was also misleading for the Commonwealth to suggest to the jury that because Noah didn't have leukemia or brittle bone disease or a genetic predisposition—the latter of which, in fact, he did have—he wasn't a very sick infant with clear indications of infection, including

fever, white lung secretions that had to be suctioned, irregular breathing before and after his

seizures, repeated fever over many days, and for which he was treated with antibiotics.

ii.     **Dr. Dawn Thornton**

Dr. Thornton was also an expert in emergency medicine and pediatric emergency

medicine.  The prosecutor asked her about Noah's vital signs.  Tr. 1/11/2010 at 180.  Thornton

answered: "When Noah came in, he did not have a fever which was a very important piece of

information." *Id.*  The prosecutor asked a follow-up question regarding fever: "Did the *blood test*

show any infections or electrolyte imbalance or anything else that was unusual at the time?"  Dr.

Thornton answered: "I don't think so." *Id.* at 183.  While it is true that records from the

Emergency Room do not reflect a fever, it is clear from the PICU records that a fever was

detected almost immediately thereafter, that Noah had a fever that came and went repeatedly for

days, and that Noah was treated with both antibiotics to control the infection and fever for days.

The Commonwealth's Attorney was clearly aware of the significance of the fact that

Noah had a serious infection and fever, and he misused these witnesses to eliminate this

weakness in his case.  In fact, the next day the defense recalled Thornton, to ask her questions

about her testimony about the "blood studies" the day before.  Thornton responded that she

didn't remember what she said on the previous day.  Tr. 1/12/2010 at 32.

c.     **The Prosecution Had Many Opportunities to Correct the Record
       and Did Not.**

The prosecution had many opportunities to correct their experts' false testimony

regarding Noah's health and never elected to do so.  In light of the medical records, which the

prosecution had in its possession, the prosecutor certainly knew that any testimony representing

Noah as healthy was false.  In fact, as discussed previously, medical records demonstrate he was

suffering from an infection.  Furthermore, the prosecutor had the duty to correct the false

testimony and he did not. *See Giglio*, 405 U.S. at 150; *Napue*, 360 U.S. at 264. This represents a clear failure on the part of the prosecutor to provide the jury with an accurate account of facts. *Napue*, 360 U.S. at 269.

### d. The mischaracterizations were material.

Finally, the evidence that Noah was not as healthy as represented by the prosecution's witnesses and argument was certainly material. Had the jury known that INOVA-Fairfax doctors both uncovered and then ignored evidence of Noah's infection, they would have been far more likely to accept the suggestions of the defense experts that trauma was not the source of Noah's condition. Accurate information regarding Noah's illness could certainly have affected the jury's verdict. *Napue*, 360 U.S. at 271. The prosecutor obviously thought that representing Noah as healthy pre-admission to the hospital was material to the Commonwealth's case, because he twice referred to Noah as being healthy, describing him "a perfectly healthy child" and "a healthy four-and-a-half-month old child." Tr. 1/11/2010 at 92; Tr. 1/21/2010 at 19.

**The AEDPA does not bar relief on this claim.**

The state court found that these *Brady/Napue* claims were defaulted because they could have been raised at trial and on direct appeal. App. 410 (citing *Slayton v. Parrigan*, 205 S.E.2d 680, 215 Va. 27 (1974)). First, any procedural default is excused by Ms. Muñoz's actual innocence. *Schlup*, 513 U.S. at 298. Second, the *Slayton* bar has not been consistently applied to default claims of prosecutorial misconduct under *Brady* and *Napue*, and therefore is not "adequate" to bar federal review. *James*, 466 U.S. at 348-49. Third, the failure to preserve these issues was itself the result of ineffective assistance of trial and appellate counsel, which constitutes cause and prejudice to excuse the default. *Coleman*, 501 U.S. at 753-54.

To the extent that the state court reached the merits of these claims, its adjudication was contrary to, and an unreasonable application of, *Brady* and *Napue*, and was based upon unreasonable determinations of facts in light of the state court record. § 2254(d). The state court held that there was "no evidence that the statements that Noah had been a healthy baby were false or that the Commonwealth knew that they were false." App. 410. In reaching this conclusion, the state court simply ignored the voluminous evidence of illness that is reflected in Noah's medical records and has already been described in this petition at length. *See supra* at 3. This is not a reasonable determination of facts.

**III.   CUMULATIVE PREJUDICE**

**CLAIM 12**

**THE CUMULATIVE EFFECT OF TRIAL COUNSEL'S ERRORS
AND THE COMMONWEALTH'S MISCONDUCT
UNDERMINES CONFIDENCE IN THE JURY'S VERDICT.**

The factual and legal discussions of claims concerning Ms. Muñoz's constitutional right to effective assistance of counsel and due process are incorporated here by reference. Considered cumulatively, trial counsels' performance, and the resulting prejudice, as well as the withholding of favorable evidence and presentation of false evidence and argument by the Commonwealth, deprived Ms. Muñoz of a reliable trial and require that her convictions be vacated.

Trial counsel's errors and the prosecution's misleading case deprived the jury of a substantial amount of information regarding other explanations for Noah's thrombosis and symptoms. For that reason, the jury bought a ludicrous story: they believed that Ms. Muñoz— who had run a model daycare in her home for seven years, and who was uniformly adored by the families who entrusted their children to her care—had suddenly and without explanation

86

morphed into a vicious child abuser and shaken Noah Whitmer to the point of brain damage (without leaving any external marks or injuries), only to morph instantly back into a concerned caretaker, administering CPR, cooperating fully with paramedics and law enforcement, and making every effort to help Noah. In truth, Ms. Muñoz simply had the misfortune of being alone with Noah when he became very ill and had to be rushed to the hospital. In all likelihood, Ms. Muñoz's presence of mind and careful training saved Noah's life on April 20, 2009. And her behavior once Noah was taken to the hospital was exemplary. Motivated only by a desire to help Noah, she took every opportunity to answer questions and cooperate fully with the investigation. Never concerned about her own potential liability, she answered every question because she wanted the police and medical professionals to have any information that could possibly help the child. Even when law enforcement became accusatory, she steadfastly denied having done anything that could have harmed Noah, but continued to answer every question that was put to her. In return, a Fairfax social worker fabricated a "confession" and Ms. Muñoz was sentenced to more than a decade in prison.

But for the errors of trial counsel and the prosecution's failure to ensure that accurate information was presented to the jury, the result of Ms. Muñoz's trial would certainly have been different. The Court should grant a writ of habeas corpus.

**The AEDPA does not bar relief on this claim.**

The state court adjudication of this claim resulted in a decision that was contrary to, and an unreasonable application of, *Strickland* and its progeny, and was based upon unreasonable determinations of fact in light of the state court record. § 2254(d). The state court's holding with respect to this claim was summary and did not even constitute a proper sentence:

> Having already ruled that the individual claims do not amount to ineffective assistance of counsel and that there was no evidence that the prosecutor

> knowingly mislead [*sic*] the jury with misinformation, or that any of the alleged errors would have affected the outcome of this case this claim is also not supported by the evidence and is dismissed.

App. 411. Essentially, the state court appeared to say that because it found no single claim that created a reasonable probability of a different outcome, the cumulative effect of all alleged errors did not create such a reasonable probability. However, to the extent that the state court's findings did not rule upon the performance prong of *Strickland* with respect to the individual claims, and to the extent that the state court's deficient performance findings were erroneous, the state court was required to assess the reliability of Ms. Muñoz's trial in light of all alleged errors by counsel and misconduct by the Commonwealth in conducting prejudice analysis. *See Strickland*, at 694 ("The defendant must show that there is a reasonable probability that, but for counsel's *unprofessional errors*, the result of the proceeding would have been different.") (emphasis added); *see also Moore v. Reynolds*, 153 F.3d 1086, 1113 (10th Cir. 1998) ("Cumulative error analysis applies where there are two or more actual errors; it does not apply to the cumulative effect of non-errors."); *United States v. Russell*, 34 Fed. Appx. 927, 928 (4th Cir. 2002) (unpublished per curiam) (reversing dismissal of habeas petition because "the district court erred in applying the cumulative error analysis.").

## CONCLUSION

WHEREFORE, Petitioner Trudy Eliana Muñoz Rueda moves this Court to grant her relief as follows:

1. Provide Ms. Muñoz reasonable litigation expenses and leave to engage in discovery so that he may have the opportunity to identify, develop, and adequately present allegations in his petition.

2.      Allow Ms. Muñoz to amend this petition after the provision and use of reasonable litigation expenses and sufficient time to collect, review and analyze records.

3.      Grant Ms. Muñoz's request for an evidentiary hearing, and permit her to present witnesses and testimony as well as argument of counsel.

4.      Set aside Ms. Muñoz's convictions and sentences and bar any further prosecution as a violation of double jeopardy or, in the alternative, grant Ms. Muñoz a new trial on guilt or innocence and/or a new trial on the appropriate penalty.

5.      Grant Ms. Muñoz such other relief to which she may be entitled.

6.      Command the Warden to bring Ms. Muñoz before the Court at a time and place specified, and take such action on the petition for a writ of habeas corpus as the Court deems appropriate.

Respectfully submitted,

_____
Trudy Muñoz Rueda
by counsel

Matthew L. Engle, Va. Bar No. 46833
THE INNOCENCE PROJECT
     AT UVA SCHOOL OF LAW
580 Massie Road
Charlottesville, Virginia 22903
(434) 924-2912
(434) 924-4166 (facsimile)

Jonathan P. Sheldon, Va. Bar No. 66726
SHELDON & FLOOD, PLC
10621 Jones Street, Suite 301
Fairfax, Virginia 22030
(703) 691-8410
(703) 251-0757 (facsimile)

89

## CERTIFICATE OF SERVICE

I hereby certify that on this _9th_ day of June, 2014, a copy of the foregoing PETITION FOR A WRIT OF HABEAS CORPUS was served by first-class mail to:

*Rosemary Bourne*
Office of the Attorney General of Virginia
900 East Main Street
Richmond, Virginia 23219

_____
Trudy Eliana Muñoz Rueda
by counsel

90

## IN THE UNITED STATE DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA

| | | |
|---|---|---|
| **TRUDY ELIANA MUÑOZ RUEDA,** | ) | |
| **Petitioner,** | ) | |
| | ) | |
| v. | ) | Case. No _____ |
| | ) | |
| | ) | |
| **HAROLD W. CLARKE, Director,** | ) | |
| **Virginia Department of Corrections,** | ) | |
| **Respondent.** | ) | |

---

### VERIFICATION OF TRUDY ELIANA MUÑOZ RUEDA

---

    I, Trudy Eliana Muñoz Rueda, pursuant to 28 U.S.C. § 2242 and Rule 2(c) of the Rules

Governing Section 2254 Cases, make the following sworn statement:

    1.  I have reviewed the § 2254 Petition for a Writ of Habeas Corpus to be filed on my behalf.

    2.  The facts stated in the petition are true to the best of my information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

                                     _____

                                     Trudy Eliana Muñoz Rueda

    Signed and sworn before me this 6ᵗʰ day of June, 2014.

                                     _____

                                     Notary Public

My commission expires: __8/31/14__

MATTHEW L. ENGLE
NOTARY
PUBLIC
REG # 316141
MY COMMISSION
EXPIRES
8/31/2014
COMMONWEALTH OF VIRGINIA