STATE OF CALIFORNIA       )
                                    )

CITY OF PALO ALTO          )

### AFFIDAVIT OF PATRICK BARNES, MD

I, Dr. Patrick Barnes, make the following sworn statement:

1. I previously provided an affidavit to post-conviction counsel in the case of *Trudy Munoz Rueda v. Clarke*. At their request, I have reviewed Dr. William E. Hauda's January 25, 2013, Response to Ms. Munoz's habeas petition submitted by the Respondent, and offer the following response.

2. Dr. Hauda's Response makes many incorrect assertions and also mischaracterizes my original affidavit in several significant respects. Primarily, Dr. Hauda appears to dispute my opinions that (1) Noah Whitmer's symptoms were most likely the result of venous thrombosis or multiple venous thromboses and stroke and (2) that the thromboses were most likely the result of infection, pre-existing conditions, and/or other non-traumatic medical conditions.

3. Dr. Hauda appears to concede that Noah Whitmer's brain scans revealed a cortical vein thrombosis. Indeed, this is indisputable, as even the Commonwealth's expert radiologist at trial, Dr. Christian Thomas Mueller, testified that a thrombus cortical vein was visible on Noah's MRI imaging. Dr. Hauda, who is not a radiologist, repeatedly mischaracterizes this finding as a "single small vein thrombosis." I vigorously dispute this mischaracterization. Noah's thrombosed vein was quite large, easily visible on his brain scans, and was capable of causing tremendous damage. Moreover, Dr. Hauda is wrong to assert that this was a single thrombus. In fact, when one venous thrombosis is visible, doctors are trained to anticipate other thromboses. In fact, looking at Noah's MRI images, there are other areas of his brain in which there appear to be thromboses. These may not be easily detectable without conducting a venogram, which will detect blood clots that formerly we might have assumed were simply hemorrhages. Such a venogram was not conducted in this case, so one cannot assume that this is a single thrombosis.

4. Dr. Hauda asserts that Noah's venous thrombosis could not have caused his other symptoms. Specifically, Dr. Hauda points to what he believes to be cortical contusions and an injury to Noah's corpus callosum, and claims that these "injuries" could not have been caused by Noah's venous thrombosis. I dispute that these were injuries at all. As I asserted in my original affidavit, the most likely explanation for Noah's symptoms was a series of strokes caused by venous thrombosis. What Dr. Hauda characterizes as injuries are most likely strokes, which are a known mimic for, and are often mistaken as, deep brain injuries. In many cases in which infants have died, autopsies reveal that what appeared to be contusions and brain injuries were actually strokes. Obviously, in this case there was no autopsy because Noah recovered, so it is impossible to be certain about what these images are revealing.

Nonetheless, Dr. Hauda is interpreting these scans as injuries, but because he is not a radiologist he is not qualified to make this interpretation. Thus, when Dr. Hauda asserts that "no radiologist found multiple areas of ischemic injury to suggest a 'series of strokes,'" he is incorrect. Unlike Dr. Hauda, I am a radiologist, and in my opinion these scans are entirely consistent with a series of strokes. In fact, in my medical opinion, that is exactly what they reveal. Morever, the Commonwealth's expert radiologist at trial, Dr. Mueller, also observed white matter on Noah's scan that is "usually" indicative of "a survey, a low grade ischemic or stroke event."

5. It is not uncommon for strokes to result from venous thrombosis, which Noah indisputably had. When a cortical vein is clotted, the flow of blood out of the brain through the vein is restricted, and blood will back up in the brain causing bleeding, oxygen deprivation, and stroke.

6. Dr. Hauda also asserts that respiratory infection (or any infection other than meningitis) "would not be a medically plausible explanation for a cerebral vein thrombosis." This is not true. Any infection can be a cause of cerebral vein thrombosis. Infections in the body can be viral or bacterial, and may spread through the body when the infective agent circulates in the blood. Moreover, as Dr. Hauda admits, it is impossible to rule out meningitis in Noah's case because no lumbar puncture was performed. There is significant evidence in this case to prove that Noah was infected, including the factors I mentioned in my first affidavit and the recent admission by his mother that at his four month checkup—weeks before this event—she informed his pediatrician that he sounded as though he still had fluid on his lungs and was "wheezing."

7. In addition, Dr. Hauda makes no mention of the fact that Noah's medical records reveal that a wooden plaque fell on his head, causing an abrasion, approximately ten days prior to this event. In my opinion, this is a potentially important impact injury. This injury should be viewed as one of a series of events, or pre-existing conditions, that made Noah vulnerable to thrombophilia or overclotting.

8. In sum, Dr. Hauda is reaching conclusions based upon misinterpretations of Noah's scans that are contradicted not only by me, but by the Commonwealth's own radiologist, Dr. Mueller. In my medical opinion, Noah most likely suffered from multiple thromboses and strokes in the brain, which may have been caused by infection.

9. I have recommended that Ms. Munoz's habeas attorney seek the appointment of a medical expert such as a pediatrician or other clinician who can address the myriad pediatric medical issues in this case.

**FURTHER AFFIANT SAYETH NAUGHT.**

Dr. Patrick Barnes

Signed and sworn before me this 8th day of March, 2013.

Notary Public

My commission expires: 03/22/2015

State of California, County of San Mateo
Subscribed and sworn to (or affirmed) before me on this
3rd day of Mar 20 13, by Patrick Barnes
proved to me on the basis of satisfactory evidence
to be the person(s) who appeared before me.

(Signature of Notary)

Shridhar Gore.

SHRIDHAR GORE
COMM. # 1926557
NOTARY PUBLIC-CALIFORNIA
SAN MATEO COUNTY
MY COMM. EXP. MAR. 22, 2015

FED APP 327

**Ex. 3**
**Three photographs of Noah Whitmer's head.**



**Ex. 4**
**Second Kearney Affidavit.**

FED APP 332

**COMMONWEALTH OF VIRGINIA** )
                                     )
**CITY OF FAIRFAX**                )

### AFFIDAVIT OF JAMES KEARNEY

I, James Kearney, make the following sworn statement:

1. I previously provided an affidavit to post-conviction counsel in the case of *Trudy Munoz Rueda v. Clarke*. I offer the following additions to my previous affidavit.

2. Until I was informed by Ms. Munoz's current post-conviction lawyers, I was unaware that one of Noah Whitmer's medical records, dated April 21, 2009, indicated that Noah's parents informed hospital staff that a wooden plaque had fallen on Noah's head about ten days prior to his admittance to the hospital.

3. If I had known that a plaque fell on Noah's head ten days before his incident, I would have made that fact a significant issue at trial. There would have been significant questioning about how hard the plaque fell, from how high it fell, how much it weighed, what part of Noah's head it struck, and numerous other questions about the plaque falling on Noah's head. I could have brought in a plaque and dropped it on the floor as a demonstration to the jury. It would have been powerful to present evidence of an impact injury directly to Noah's head at a time when he was with his parents, and not Trudy Munoz. I could have pointed out to the jury that this was the only actual evidence of trauma to Noah's head.

4. Due to the late disclosure of Noah Whitmer's medical records, I was unable to review the medical records in the level of detail to which I am accustomed in a civil case. I remember that Noah had a temperature, which suggested an infection. I was not aware of many of the other indications that Noah suffered from an infection. Had I been aware of those facts, I would have brought them to the jury's attention.

FURTHER AFFIANT SAYETH NAUGHT.

James Kearney

Signed and sworn before me this 8th day of March, 2013.

Notary Public 287926

My commission expires: 10-31-16 .

ORIGINAL

1

V I R G I N I A

IN THE CIRCUIT COURT OF FAIRFAX COUNTY

- - - - - - - - - - - x
                                          :
TRUDY MUNOZ RUEDA,                        :
                                          :
          Plaintiff,                      :
                                          :
     -vs-                                 :      CL-2012-0017074
                                          :
HAROLD W. CLARKE,                         :
                                          :
          Defendant.                      :
                                          :
- - - - - - - - - - - x

                         Circuit Courtroom 5G
                         Fairfax County Courthouse
                         Fairfax, Virginia

                         Thursday, May 23, 2013

          The above-entitled matter came on to be heard

before the HONORABLE JAN L. BRODIE, Judge, in and for the

Circuit Court of Fairfax County, in the Courthouse,

Fairfax, Virginia, beginning at 10:00 o'clock a.m.

          APPEARANCES:

               On Behalf of the Plaintiff:

                    MATTHEW ENGEL, ESQUIRE
                    JONATHAN P. SHELDON, ESQUIRE

               On Behalf of the Defendant:

                    ROSEMARY BOURNE, ESQUIRE
                    Senior Assistant Attorney General

FED APP 334

2

1              P R O C E E D I N G S

2              (The Court Reporter was sworn by the Clerk of

3      the Court.)

4              THE COURT:   This is the case of Trudy Munos

5      Rueda versus Harold W. Clarke, CL-2012-17074.   We're here

6      on the -- it appears the motion to dismiss the habeas.

7              Are you ready to proceed today?

8              MS. BOURNE:   Yes, Your Honor.

9              THE COURT:   I have before me --

10             MS. BOURNE:   Rosemary Bourne, Your Honor.   I'm

11     Senior Assistant Attorney General and I represent Harold

12     Clarke, the Director of the Department of Corrections.

13     May it please the Court, I would like to make some general

14     observations first related to habeas matters that I think

15     apply to all these claims to try to make this go more

16     quickly.

17             And the first is, that habeas corpus differs

18     from other civil matters.   It's a special entity.   And

19     there is a statute, 801.654 and it differs from other

20     civil matters in that under (b)2, the Petitioner is

21     required to state all allegations and the facts in support

22     thereof in his habeas petition.

23             And also because under the statute, the Court

RUDIGER, GREEN & KERNS REPORTING SERVICE
CERTIFIED VERBATIM REPORTERS
4116 LEONARD DRIVE
FAIRFAX, VIRGINIA 22030
(703) 591-3136

FED APP 335

3

1    is allowed to decide matters based on the record alone and

2    can consider affidavits and that's a separate statute

3    under 801.660.  And the Court in Yates versus Murray

4    specifically stated that the Court can consider affidavits

5    and resolve these factual issues through the use of

6    affidavits and that is entirely proper, if the Court feels

7    that it can make that determination on the record alone.

8         So that is why habeas matters are different

9    from other civil matters.  Notice pleading is not

10   sufficient in a habeas corpus, rather all of the

11   allegations and the facts to support must be adequately

12   pled and he, of course, the Petitioner, has the burden.

13        She has the burden in this case to prove that

14   she is unlawfully detained.  And she has not done so here.

15   The first claims I would like to address are the

16   procedurally defaulted claims and the first one being

17   Claim 2A, that the 911 Brady tape was a Brady violation

18   and that claim fails for two reasons, Your Honor.

19        The first is that it's procedurally defaulted

20   under Slayton versus Paragon (sp.) and reason being that

21   there are certain forums for these types of claims and

22   claims that can be raised at trial and on direct appeal

23   must be raised there.  They cannot be raised in habeas

FED APP 336

4

1   corpus and that's what Slayton versus Paragon tells us.

2          It's not a substitute for direct appeal.  And

3   here a Brady claim can be barred under Paragon.  We know

4   that because of Elliott versus Warden where there's

5   evidence that the Petitioner knew about this particular

6   evidence before trial, and here she did.

7          She clearly knew whether she had made a 911

8   call to police before trial.  And so, this claim could

9   have been raised at trial and on direct appeal.  But the

10  Court need not reach the merits of this issue, but beyond

11  that the claim is simply without merit, so a pleading in

12  the alternative because this evidence is simply not

13  material.

14         There's no reasonable probability of a

15  different result which is what under Brady must be

16  demonstrated to show materiality.  We're certainly not

17  conceding, Your Honor, that this was exculpatory evidence

18  because there has been really no proffer of any

19  exculpatory evidence on the tape.

20         However, Jocelyn Waldron and the other

21  witnesses in the case all conceded that she had provided

22  CPR and attempted to help the child and called 911.  And

23  all this testimony that she alleges in her affidavit which

RUDIGER, GREEN & KERNS REPORTING SERVICE
CERTIFIED VERBATIM REPORTERS
4116 LEONARD DRIVE
FAIRFAX, VIRGINIA 22030
(703) 591-3136

FED APP 337

5

1    is the evidence that's before the Court now, all came from

2    other sources that she had tried to provide a

3    (unintelligible) this would have merely been cumulative

4    evidence and thus was not material to the outcome in this

5    case.

6              Finally, this evidence was, as they can see,

7    available from other sources and we know that from United

8    States versus Roan, if it's available from other sources

9    or they could have gotten it themselves then it's not a --

10   they're not entitled to have Brady relief.

11             And here they conceded in their pleading that

12   this evidence could have been gotten from the 911 call

13   center.

14             Claim 2 being that the prosecutor knowingly

15   presented false testimony, involving Noah's health,

16   allowed experts to mislead the Court and the jury

17   regarding the baby's health and that the prosecutor had

18   opportunities to correct this, but did not.

19             Again, all of these claims could have been

20   raised at trial and on direct appeal under Elliott and

21   thus they are procedurally defaulted.  The medical records

22   were available a month before trial.  They had this

23   evidence.  If they chose to raise it, they could have and

RUDIGER, GREEN & KERNS REPORTING SERVICE
CERTIFIED VERBATIM REPORTERS
4116 LEONARD DRIVE
FAIRFAX, VIRGINIA 22030
(703) 591-3136

FED APP 338

6

1    there is no cause and prejudice exception in Virginia.

2            But further and beyond this, there is no merit

3    here, because essentially there is no their there.  They

4    have not met their burden showing that these statements

5    were false, that he knowingly presented false evidence.

6            This was a jury issue and he certainly

7    reasonably relied on his medical experts who said that

8    this child was healthy and upon the -- we now have an

9    affidavit from the mother saying this child was healthy

10   and she so testified as well.

11           So there is no evidence that would support a

12   different conclusion.  They essentially have proffered no

13   evidence beyond conjecture and speculation that he suffers

14   from any of the serious conditions that they maintained

15   could have created these types of serious injuries that

16   this baby suffered from.

17           And I would just note.  You don't need to rely

18   on affidavits here to reach the decision in this case

19   because in these claims there was adequate testimony at

20   trial that the Court could evaluate the new evidence that

21   they had brought forth with regard to Dr. Barnes and so

22   forth, and still decide that there was no reasonable

23   probability of a different result at trial.

FED APP 339

7

1        But as the director, we have also given you

2   affidavits which you could consider.  But certainly, we

3   don't argue that you must rely on those affidavits, that's

4   just additional evidence.  Our position is that the

5   evidence at trial was so overwhelming given her confession

6   and the testimony of the Commonwealth's eight medical

7   experts that -- and you don't even need to consider those

8   affidavits to find that there's no reasonable probability

9   of a different result.

10        With regard to Claim 3 which is the unnumbered

11   claim, but which is throughout the entire petition that

12   shaken baby is not a valid diagnosis, this is not the

13   correct forum to decide this issue.

14        This argument was made at trial, it was

15   presented to the jury, it was argued during the closing

16   argument and the jury rejected this argument.  And thus,

17   under Henry versus Warden, this is a non-cognizable

18   procedurally defaulted issue.

19        To the extent that they're presenting some new

20   twist on this argument is procedurally defaulted under

21   Slayton versus Paragon and also cannot be considered.  And

22   to the extent that this is an actual innocence or they're

23   trying to say that she's actually innocent, it's also not

RUDIGER, GREEN & KERNS REPORTING SERVICE
CERTIFIED VERBATIM REPORTERS
4116 LEONARD DRIVE
FAIRFAX, VIRGINIA 22030
(703) 591-3136

FED APP 340

8

1    cognizable in habeas corpus.

2              There are other forums and other mechanisms by

3    which these arguments could be properly raised, but habeas

4    corpus is not the proper forum.  So anyway you slice it,

5    this is not the correct forum for this argument.

6              Essentially what Ms. Rueda is asking for here

7    is a re-do to allow these defense experts, who testify in

8    many of these trials and who rely on each other's own

9    papers for validation, to have another opportunity to

10   present their arguments to allege that there's a

11   controversy which I would argue they have created

12   themselves through the publication of their own papers and

13   testimony with regard to shaken baby syndrome.

14             But nonetheless, this claim is not cognizable

15   in habeas and should not be reached.  With regard to the

16   ineffective assistance of counsel claims, and I did some

17   general observations here.  The Court can decide it on

18   either prong; either the deficient performance prong or

19   the prejudice prong and need not reach one to decide the

20   other.  So it's an or.

21             If there's no reasonable probability of a

22   different result at trial or the performance was not

23   Constitutionally unreasonable, then the Court must dismiss

RUDIGER, GREEN & KERNS REPORTING SERVICE
CERTIFIED VERBATIM REPORTERS
4116 LEONARD DRIVE
FAIRFAX, VIRGINIA 22030
(703) 591-3136

FED APP 341

9

1    these claims.

2              THE COURT:   So this is the Strickland case.

3              MS. BOURNE:   Yes, Your Honor.   And under

4    Strickland, it is an objective analysis with regard to

5    deficient performance and that means that the attorney's

6    own opinion about whether they could have done something

7    different in hindsight does not -- it matters little as I

8    think the case that I cited to you in the motion to

9    dismiss states, because it's an objective analysis, what a

10   reasonable attorney would have done under the

11   circumstances.

12             And I would certainly argue just in a general

13   way, this was a week long jury trial which almost no stone

14   was left unturned with regard to medical evidence that was

15   challenged and it just was very thorough.

16             And so based on that alone, certainly this is

17   not an objectively unreasonable performance.   With regard

18   specifically to Claim 1A and 1C, these claims are related,

19   so I'd like to discuss them together.   With regard to

20   Claim 1A that counsel was ineffective for failing to

21   request a continuance to procure Dr. Barnes for trial and

22   Claim 1C that counsel was ineffective for failing to call

23   Dr. Barnes as a witness, counsel's performance was not

RUDIGER, GREEN & KERNS REPORTING SERVICE
CERTIFIED VERBATIM REPORTERS
4116 LEONARD DRIVE
FAIRFAX, VIRGINIA 22030
(703) 591-3136

FED APP 342

10

1    objectively unreasonable.

2              And I would certainly note that inexperience

3    -- although these attorneys not inexperienced and I have

4    detailed in the motion why they were not.   But

5    inexperience is not equal in effectiveness and attorneys

6    with far less experience than these two have certainly

7    been found to be effective in very serious cases.

8              And here, although one of the attorneys

9    suggested that he did not know he could ask for a

10   continuance, other continuances based on -- at least one

11   -- and perhaps two -- one may have been a joint

12   continuance but at least one continuance was requested

13   because one of their experts was not available to testify.

14             So that claim is simply just belied by the

15   evidence in the case that they had already asked for a

16   continuance in this matter.   In any event, it's not

17   objectively unreasonable not to present Barnes when they

18   already had three experts prepared to testify at trial.

19             They had spoken to Barnes.   He apparently had

20   provided them with slide shows and other evidence to help

21   them with their cross examination according to his own

22   affidavit and he had reviewed the medical records.

23             Further, there was no prejudice here because

RUDIGER, GREEN & KERNS REPORTING SERVICE
CERTIFIED VERBATIM REPORTERS
4116 LEONARD DRIVE
FAIRFAX, VIRGINIA 22030
(703) 591-3136

FED APP 343

11

1    there's no probability of a different -- reasonable

2    probability of a different result had they asked for a

3    continuance where -- and this applies to both claims --

4    where they're just offering a different opinion and one, I

5    would know, which wouldn't have contradicted their own

6    experts.

7            Now, in the reply, there is some suggestion

8    that just because their experts might have disagreed that

9    that's okay, that doesn't mean it would have been

10   persuasive, Your Honor, where we have eight Commonwealth's

11   doctors all finding that this is a result of shaken baby

12   syndrome.

13           And then there are four defense experts that

14   don't agree with each other as to the alleged cause of

15   this injury.  So certainly there's no reasonable

16   probability of a different result where we have yet

17   another opinion that is inconsistent with the testimony of

18   at least one of their experts who said that the venous

19   thrombosis which Dr. Barnes now alleges is the cause of

20   this injury although he's unclear as to the etiology of

21   specifically how that happened but that that was an

22   incidental finding and unrelated to this re-believed

23   theory.

FED APP 344

12

1          Essentially, the arguments are based on

2   conjecture and speculation that there is some other cause

3   of this injury where it happened at the very same time

4   that she had confessed to shaking this child, and such

5   evidence simply would not have been persuasive.

6          I was talking with the family outside and one

7   of them made a very interesting observation that these

8   injuries don't just occur in Walmart while everybody's

9   standing around.  I mean, if this -- we believe just

10  occurred spontaneously, why is it always when people are

11  alone with the children and their admissions of shaking

12  and so forth.

13          It's not, you know, in a group of people where

14  the child suddenly goes limp for no apparent reason.  You

15  don't need to rely on how this affidavit for this.  The

16  evidence at trial demonstrates that there's no reasonable

17  probability of a different result.

18          But we certainly did provide you with how this

19  affidavit -- and he testified at trial and would have so

20  testified if this new theory had been brought up at trial,

21  certainly would have testified that this doesn't hold

22  water.

23          And in the pleading we waded down into the

RUDIGER, GREEN & KERNS REPORTING SERVICE
CERTIFIED VERBATIM REPORTERS
4116 LEONARD DRIVE
FAIRFAX, VIRGINIA 22030
(703) 591-3136

FED APP 345

13

1   minutia with Dr. Hauda's affidavit about how the theories

2   contradict each other, about how the respiratory symptoms

3   -- whether it was a mild respiratory infection that he had

4   or whether it was the result of his intubation, could not

5   have caused all of these injuries, how the venous

6   thrombosis itself could not have caused all of these

7   injuries, how the evidence was not consistent with

8   meningitis.

9         And so you certainly can rely on that

10   affidavit, but I would argue you're not required to to

11   reach the correct result in this case.  Thus, both of

12   these claims should be dismissed.

13         With regard to Claim 1B, that counsel failed

14   to review the medical records, frankly what he said, I

15   think, in this affidavit is that he didn't thoroughly --

16   this is Uriarte -- and I apologize if I'm pronouncing his

17   name incorrectly -- didn't thoroughly review the medical

18   records, but he had retained an expert in dealing with

19   medical malpractice cases, another attorney in this case

20   who was responsible for dealing with the medical experts.

21         And the argument is that had he reviewed these

22   medical records, he would have noticed that this child had

23   an infection, that there was pre-existing head trauma, and

RUDIGER, GREEN & KERNS REPORTING SERVICE
CERTIFIED VERBATIM REPORTERS
4116 LEONARD DRIVE
FAIRFAX, VIRGINIA 22030
(703) 591-3136

FED APP 346

14

1    then we have a very unimpressive photograph that's

2    attached I think in the response.

3              An unexplained family history because some

4    cousin far removed had some sort of genetic problem.  An

5    instantaneous misdiagnosis of all the doctors of Fairfax

6    INOVA, because apparently they all instantaneously came to

7    the wrong conclusion and that they conducted no reasonable

8    differential diagnosis.

9              And I would simply note, Your Honor, that for

10   you to accept these latter two arguments, you would have

11   to find that all of these doctors at INOVA are guilty of

12   either rank malpractice or some sort of sinister agenda to

13   promote the idea of shaken baby syndrome, that they did

14   not look at this child's actual injuries in trying to

15   treat him and come up with a diagnosis, but rather just

16   relied on something else because either they were totally

17   incompetent and or had some sort of other agenda.

18             And it's interesting that although they allege

19   that he should have recognized all of these issues from

20   looking at the medical records, they had experts who

21   testified at trial and who testified that they had

22   reviewed the medical records before they got up there and

23   swore and testified as to what the cause of these injuries

RUDIGER, GREEN & KERNS REPORTING SERVICE
CERTIFIED VERBATIM REPORTERS
4116 LEONARD DRIVE
FAIRFAX, VIRGINIA 22030
(703) 591-3136

FED APP 347

15

1    were.

2           And none of them apparently recognized this

3    newly coined theory as being significant.  So how it is

4    deficient performance for an attorney who has no medical

5    training not to be able to recognize these issues is

6    baffling.  And I would certainly say he reasonably relied

7    on his experts to review these records.

8           He did review them in some way himself and he

9    also had another attorney involved in this case.  So I

10   would argue that his failure to review these medical

11   records more thoroughly is not Constitutionally deficient

12   performance and it certainly does not meet the second

13   prong, the prejudice prong.

14          Because the record doesn't support that this

15   child was sick upon admission, that the doctors conducted

16   no reasonable differential diagnosis, that they

17   instantaneously reached the wrong conclusion that he had

18   been shaken or that he had some pre-existing head trauma

19   that caused these injuries, and thus, Claim 1B should also

20   be dismissed.

21          With regard to Claim 1C, that counsel failed

22   to present testimony that the baby was cranky, first of

23   all, this claim has to be reviewed by itself because as we

RUDIGER, GREEN & KERNS REPORTING SERVICE
CERTIFIED VERBATIM REPORTERS
4116 LEONARD DRIVE
FAIRFAX, VIRGINIA 22030
(703) 591-3136

FED APP 348

16

1   know from Lenz (sp.), there is no cumulative prejudice

2   analysis in Virginia.

3            And really what the argument Petitioner

4   presents is that you need to look at all of these claims

5   together including the shaken baby diagnosis is not a real

6   thing, that Dr. Barnes would have been this critical

7   witness, and that somehow in the context of all of these

8   other failures, that the fact that the baby was cranky,

9   that there was testimony that the baby was cranky, would

10  have made a difference in this case.

11           But of course, as we know from Lenz, that is

12  not the proper Lenz for the Court to review this through

13  because these claims must rise and fall on their own.  But

14  even so, the notion that there was a cranky baby does not

15  prove that he was suffering from some illness that caused

16  these very serious injuries.

17           And Ms. Rueda testified that he was a little

18  fussy at trial, but was also playing with toys and playing

19  that very day.  So certainly this testimony would have cut

20  both ways because the testimony at trial was that when she

21  shook this child, she was saying, "Why are you crying?",

22  or something to that effect, and I apologize if I'm not

23  quoting the actual quote correctly.

RUDIGER, GREEN & KERNS REPORTING SERVICE
CERTIFIED VERBATIM REPORTERS
4116 LEONARD DRIVE
FAIRFAX, VIRGINIA 22030
(703) 591-3136

FED APP 349

17

1          But, why are you crying?  Frustrated and then

2     shaking this child.  So the notion that she should have

3     presented that -- excuse me -- the attorneys should have

4     presented evidence that the baby was cranky to show that

5     this child was sick, frankly could have cut both ways and

6     it was not objectively unreasonable for him not to present

7     this evidence, particularly where it doesn't establish

8     anything.

9          Because it doesn't show that he was suffering

10    from an illness.  And it wasn't objectively unreasonable

11    to call -- I think her last name is Valle, who was the

12    other caretaker who lives there.  She was out of state and

13    there was certainly a suggestion made in closing argument

14    that the fact that the prosecution hadn't been able to get

15    her there because she was out of state, didn't exclude the

16    possibility that she was the actual perpetrator, which

17    frankly, is very reasonable argument for counsel to have

18    made.

19          And so it wasn't objectively unreasonable

20    under those circumstances not to call her as a witness to

21    testify that the baby was cranky.  With regard to Claim

22    1E, failed to challenge the social worker's testimony

23    regarding the confession.

RUDIGER, GREEN & KERNS REPORTING SERVICE
CERTIFIED VERBATIM REPORTERS
4116 LEONARD DRIVE
FAIRFAX, VIRGINIA 22030
(703) 591-3136

FED APP 350

18

1        First, the allegation is that the cross

2   examination was inadequate.  However, the record doesn't

3   support that.  There was a 25-page cross examination which

4   spanned 25 pages of the transcript and counsel established

5   that she didn't write down every word, she attacked her

6   knowledge of Spanish.

7        He did have Waldron describe how Petitioner

8   demonstrated she shook the baby or somebody did.  There's

9   no reason to believe that additional cross examination

10  would have rendered anything else and they haven't

11  proffered any testimony from Ms. Waldron to show that

12  there would have been any other evidence gleaned from

13  additional cross examination.

14        With regard to the husband's testimony and

15  Valle's testimony, as previously argued with regard to the

16  other claim, there was certainly a legitimate tactical

17  reason and it's not objectively unreasonable not to call

18  Valle to testify where she was in a position to have

19  injured this child.

20        But moreover, the fact that there was some

21  demonstration about how this child was shaken or some

22  comments made, it doesn't show anything where all of this

23  testimony came out.  Ms. Rueda gave a demonstration of how

RUDIGER, GREEN & KERNS REPORTING SERVICE
CERTIFIED VERBATIM REPORTERS
4116 LEONARD DRIVE
FAIRFAX, VIRGINIA 22030
(703) 591-3136

FED APP 351

19

1    she allegedly shook this child.

2         Ms. Waldron gave a demonstration as to how she

3    allegedly shook this child and there's no evidence that

4    these demonstrations really differ in any significant way.

5    So for a variety of reasons, and not excluding the fact

6    that husband's testimony is maybe not the most persuasive

7    testimony anyway and he certainly has a reason to be

8    biased, there's no reasonable probability of a different

9    result at trial had counsel done these additional things.

10        With regard to Claim 1F, that counsel did not

11   argue that physicians did not consider other differential

12   diagnoses.  You know, Dr. Young, Dr. Jeffrey, Dr.

13   Fisherman, Dr. Hauda, all concluded that these injuries

14   were caused by shaken baby syndrome, and I cited to you in

15   the pleading to their specific points in testimony which I

16   won't belabor here.

17        And they decided that based on the injuries

18   that they observed and the notion that the doctors are

19   required to come up with some other explanation just to

20   exonerate the Defendant is not what medicine is about.

21        They evaluated this child.  They came to a

22   reasonable diagnosis based on the injuries they observed

23   and said that there was no other diagnosis that would

RUDIGER, GREEN & KERNS REPORTING SERVICE
CERTIFIED VERBATIM REPORTERS
4116 LEONARD DRIVE
FAIRFAX, VIRGINIA 22030
(703) 591-3136

FED APP 352

20

1    explain these injuries.

2            So it was not unreasonable not to make this

3    argument and there is no reasonable probability of a

4    different result.  And I would certainly argue they did

5    make the argument, the did attack the testimony of these

6    experts.

7            With regard to Claim 1G that additional

8    character evidence should have been presented.  You know,

9    it's not unreasonable, Constitutionally unreasonable, not

10   to present cumulative evidence of character evidence, at

11   least one character witness did testify.

12           And further, the character evidence that they

13   have proffered is not proper character evidence, the fact

14   that her house was clean or that they didn't believe that

15   she would have done such a thing, would never have been

16   proper admissible character evidence.

17           And so, there is no reasonable probability of

18   a different result had this evidence been presented, but

19   it would not have been admissible in any event.

20           With regard to Claim 1H, that they didn't

21   present testimony regarding the 911 call.  Now, the fact

22   that she provided CPR does not prove that she didn't

23   inflict these injuries and we don't have a -- we don't

RUDIGER, GREEN & KERNS REPORTING SERVICE
CERTIFIED VERBATIM REPORTERS
4116 LEONARD DRIVE
FAIRFAX, VIRGINIA 22030
(703) 591-3136

FED APP 353

21

1   know what's on the 911 tape, although she testified as to

2   what she did and said, so certainly this evidence came in.

3        All this testimony about choking on the milk

4   and the fact that she provided CPR came in at trial

5   through other sources and not just through her.  So

6   there's no reasonable probability of a different result

7   had the 911 tape been presented.

8        With regard to Claim 1I and that there were no

9   pre-trial motions filed, well, it's not ineffective

10  assistance of counsel not to file frivolous motions and

11  there has been no Constitutional basis, reasonable

12  Constitutional basis proffered here to file a pre-trial

13  motion.

14       Essentially what they're saying is they don't

15  agree with the Commonwealth's experts' conclusions as to

16  what happened to this child and therefore, that evidence

17  should not have even been allowed to be presented to the

18  jury.

19       But clearly, that's a jury question and there

20  is no basis by which -- and they haven't proffered a

21  single authority that says the Commonwealth can be

22  precluded from presenting its medical evidence and this

23  was a jury issue and there was no reasonable probability

22

1    of a different result had counsel filed pre-trial motions

2    in this case.

3              With regard to Claim 1J, the jury instruction

4    issue.  In their response, they've cited to Commonwealth

5    versus Morris -- may I approach, Your Honor?

6              THE COURT:  Yes.

7              (Ms. Bourne handed a document to the Court.)

8              MS. BOURNE:  And state in their response that

9    this case involves 18.2-371 -- I hope I'm saying that

10   right -- A -- except it doesn't.  It involves 18.2-371B,

11   which is a reckless disregard for human life.  Ellis, the

12   case that we cited, that they say is outdated, involves

13   18.2-371A and that is the correct standard that is in the

14   model jury instruction.

15             It's a different standard because it's a

16   different crime.  One involves reckless disregard for

17   human life and the other one involves intentionally

18   inflicting injury and it certainly wasn't ineffective

19   assistance of counsel to rely on the model jury

20   instruction given that there is case law to support it and

21   that this case and the Duncan case involve a separate Code

22   Section.

23             And there's no reasonable probability of a

RUDIGER, GREEN & KERNS REPORTING SERVICE
CERTIFIED VERBATIM REPORTERS
4116 LEONARD DRIVE
FAIRFAX, VIRGINIA 22030
(703) 591-3136

FED APP 355

23

1   different result.  I think I may have skipped a claim.  If

2   the Court will just give me a moment of indulgence.

3               (Brief pause.)

4               MS. BOURNE:  1G is the failure to present

5   testimony from Dr. Barnes and I think I did address that.

6   I may have gotten my numbers mixed up and I apologize.

7   And there is an accumulative prejudice claim which I think

8   in my pleading I addressed as Claim 3, but that's

9   incorrect.  It's actually Claim 2C or something, but

10  nonetheless, it's been addressed, but I apologize if I --

11              THE COURT:  1D.  Did you address 1D?

12              MS. BOURNE:  I believe 1D is failure to

13  present testimony from Dr. Barnes.

14              THE COURT:  I thought that was 1B.  I have 1A

15  and 1C as being Barnes.

16              MS. BOURNE:  I'll make sure I've addressed

17  everything.  1D is fail to present evidence from Patrick

18  Barnes.  I may have misspoken about B.  I think it's

19  similar though.  Fail to review medical records.  Well, I

20  hope I haven't purposely confused the Court.  I think I

21  have addressed all the claims.

22              So unless the Court has questions for me, I

23  would just ask that the Court grant our motion to dismiss.

24

1    And I'll go back and review and make sure I haven't missed

2    anything because I think I've tried to give myself a few

3    minutes for rebuttal.

4              THE COURT:  Okay.

5              MR. ENGEL:  Good morning, Your Honor.

6              THE COURT:  Good morning.

7              MR. ENGEL:  May it please the Court, my name

8    is Matthew Engel.  I'm the legal director of the Innocence

9    Project Clinic at the University of Virginia Law School.

10   With me at counsel table is Dierdre Enre (sp.), co-

11   director of the clinic.  And behind counsel table is John

12   Sheldon, co-counsel in the case.

13             Obviously, we're here on behalf of the

14   Petitioner, Ms. Munoz and I would point out to the Court

15   and to the Respondent that her correct name is actually

16   Ms. Munoz, not Ms. Rueda.

17             I actually don't intend this morning, Your

18   Honor, to go through claim by claim unless that's what the

19   Court would like me to do.

20             THE COURT:  I'm going to let you do it the way

21   you want to do it, sir.

22             MR. ENGEL:  Okay.  I would like to talk about

23   the case in some broader, big picture terms.

25

1          THE COURT:  All right.

2          MR. ENGEL:  And, of course, address any

3   particular questions that the Court may have.  We're here

4   this morning on Respondent's motion to dismiss.  This is

5   effectively a summary judgment motion and the law is clear

6   that when moving for summary judgment, the Court must draw

7   all factual inferences in favor of the non-moving parties

8   to the extent that there are conflicts in the facts

9   proffered by the Petitioner and the Respondent, all

10  inferences must be drawn in favor of the non-moving party

11  for the case to be dismissed summarily.

12          And it is certainly our position here this

13  morning, Your Honor, that there is no basis upon which the

14  Court can grant a summary judgment to the Respondent that

15  the case is right with factual disputes that need to be

16  mitigated and I'm going to outline what some of those are

17  here this morning and that the proper course is to deny

18  the motion at this time and to proceed to schedule an

19  evidentiary hearing at which the Court can take evidence,

20  can hear evidence first hand in lieu of affidavits and

21  make the credibility determinations that need to be made

22  and the factual determinations that need to be made to

23  rule on the merits of the claims.

FED APP 358

26

1        I did want to address a couple of the legal

2   standards very briefly.  Strickland is the obviously the

3   controlling case and does have the two elements that the

4   Respondent talked about, deficient performance and

5   prejudice.

6        And deficient performance is judged

7   objectively.  The question is whether counsel's

8   performance fell below the standard of a reasonably

9   competent attorney.

10        But there's a little bit -- I think the

11   Respondent is mixing up some of the legal standards a

12   little bit as she argues and talking about strategic

13   decisions, because the question is not whether a different

14   attorney, a reasonably competent attorney, would have made

15   a strategic decision.

16        And there were several times when the

17   Respondent was arguing this morning where it sounded to me

18   like what she was saying was that another attorney might

19   have reasonably made a strategic decision not to seek a

20   continuance, not to call Dr. Barnes, not to do the things

21   that we have criticized counsel for not doing in this

22   case.

23        That's not the proper way to evaluate these

FED APP 359

27

1    claims.  The question isn't whether a different attorney

2    might have made a strategic decision.  If these attorneys

3    did make a strategic decision, then that's entitled to a

4    great deal of deference and the law is clear on that.

5              Strickland itself, the U. S. Supreme Court

6    says that strategic decisions to the extent that they're

7    based on reasonable investigation and reasonable

8    familiarity with the facts, are virtually unimpeachable.

9    We don't dispute that.

10             But the question isn't whether some other

11   competent attorney would have made a strategic decision.

12   The question is whether these attorneys made a strategic

13   decision and the only evidence we have in the record is

14   the affidavits the trial counsel has provided in this case

15   in which they address, virtually claim by claim, as raised

16   in our petition, the fact that they did not make such

17   strategic decisions.

18             So it's really improper to hypothesize that

19   there may have been strategic decisions made here when the

20   only evidence in the record, and it's undisputed at this

21   point, I suppose if we proceed to a hearing that the

22   Respondent might be able to present evidence or cross

23   examine trial counsel or whatever the case may be to

FED APP 360

28

1    develop evidence that there was a strategic decision, but

2    the only evidence in the record at this point was that

3    these lawyers themselves disavowed having made strategic

4    decisions on the issues that we have raised in our habeas

5    petition and that's the way we talk about strategic

6    decisions.

7            They just simply don't exist and the Court can

8    read the affidavits and see for itself that trial counsel

9    repeatedly say, we didn't do this for a strategic reason,

10   certain things were oversights, certain things were

11   mistakes.  I'll talk about that more as I get into some of

12   the individual claims.

13           I wanted to clear up how the Court should look

14   at this question of objective analysis and strategic

15   decisions because I really feel that the Respondent was

16   mumbling up two different standards in addressing that.

17           So I actually want to start in terms of

18   getting into our claims, I actually want to start with the

19   so-called confession because it seemed like at least a

20   half dozen times this morning I heard that Ms. Munoz

21   confessed to the crime of shaking Noah Whitmer and

22   certainly that was the way that Jocelyn Waldron, the

23   social worker from Child Protective Services who testified

RUDIGER, GREEN & KERNS REPORTING SERVICE
CERTIFIED VERBATIM REPORTERS
4116 LEONARD DRIVE
FAIRFAX, VIRGINIA 22030
(703) 591-3136

FED APP 361

29

1   at trial, was that Ms. Munoz had confessed to her to

2   shaking Noah.

3               We deny that entirely.  Categorically deny

4   that Ms. Munoz confessed to shaking Noah Whitmer.  And, in

5   fact, she has maintained her innocence of abusing him from

6   day one of this investigation until the present day and

7   has been unwavering in her insistence that she did nothing

8   to harm Noah.

9               And, if fact, trial counsel here had

10  significant evidence that could have been presented to

11  undermine Ms. Waldron's testimony and counsel acknowledges

12  in their affidavits that it was of critical importance to

13  undermine Ms. Waldron, but they failed to develop the

14  evidence that they needed to do it.

15              And specifically there were two witnesses who

16  were home in Ms. Munoz's house on the day that she was

17  interrogated by Jocelyn Waldron and I believe the

18  officer's name was Cottrell, Nancy Cottrell.  And those

19  two witnesses give very different versions of events than

20  what Ms. Waldron testified to.

21              And one of the witnesses was Hernani Ames who

22  was Ms. Munoz's husband at the time, who testified that he

23  came home while this interview was going on and when he

FED APP 362

30

1    walked in the door, he was informed by Waldron and

2    Cottrell that Ms. Munoz had confessed.  They said, "She's

3    confessed."

4           And he turned to his wife and he said, "What

5    did you say to them?"  And she picked up a doll that was

6    on the table that apparently had been being used in the

7    course of the interrogation, and she held the doll with

8    one hand over its butt and one hand under its back,

9    against her shoulder, the way anybody would pick up a

10   fussy, crying, upset infant, and tried to comfort it, and

11   tried to soothe it.

12          And I want to point out also that the

13   testimony was that she said to the baby, "Why are you

14   crying?"  And this morning, the Respondent said that

15   indicates frustration.  No.  It doesn't indicate

16   frustration.  That's the Respondent's interpretation of

17   the evidence.  "Why are you crying" indicates compassion.

18          It indicates the desire to comfort.  It's

19   something that I say to my children constantly when

20   they're crying, when they're upset and when I want to

21   comfort them.

22          Any parent does that and I think it's a bit

23   disingenuous to suggest that we can read frustration into

31

1   Ms. Munoz's tone of voice when she asked the baby, "Why

2   are you crying?"  Because she holds it, cradles it with a

3   hand under its rear end and a hand on its back to comfort

4   the child.

5          And it's interesting, too, to hear the

6   Respondent say that Ms. Waldron's testimony didn't differ

7   very much from Ms. Munoz's in this regard because if

8   that's the case, we simply shouldn't be here, Your Honor,

9   because there's simply no way, talking about the injuries

10  that -- the symptoms that this child had in terms of the

11  bleeding and the hemorrhaging and the significant symptoms

12  this child had, there's simply no way that those symptoms

13  couldn't have been caused by the type of action that Ms.

14  Munoz described that she demonstrated and that apparently

15  Jocelyn Waldron agreed with.

16          It's simply medically, scientifically

17  impossible for injuries to result from that.  So to

18  characterize that as a confession is absolutely false.

19  And to go back to what Mr. Ames had to say when he asked

20  Trudy what she had told the detective and the social

21  worker and she demonstrated this action to him, the

22  response of the police officer and the social worker was

23  see, that's shaking, that's shaking, pointing at what she

FED APP 364

32

1    was doing while cradling the doll and said, "That's

2    shaking."  The jury needed to hear that evidence and I

3    would also like to point out, that's absolutely undisputed

4    at this point.

5            We have the Respondent has given us nothing

6    from Ms. Waldron or Officer Cottrell to contradict what

7    Mr. Ames said about what happened when he came home and

8    interviewed this interrogation.  So the Court has to take

9    that at face value.

10           It's an undisputed factual proffer at this

11   point and it's evidence that we will present when we get

12   to an evidentiary hearing and then we'll have an

13   opportunity to rebut.  But of course if there was rebuttal

14   evidence, I'm quite certain we would have seen it attached

15   to the motion to dismiss, so that's undisputed.

16           And that is evidence that the jury didn't hear

17   and that the Court didn't hear in terms of the police

18   officer and the social worker's observations of what Ms.

19   Munoz had actually done with Noah, and in terms of how

20   that was characterized -- mischaracterized, I should say

21   by the police officer and the social worker as being

22   shaking, as being abuse.

23           It absolutely was no such thing but because

RUDIGER, GREEN & KERNS REPORTING SERVICE
CERTIFIED VERBATIM REPORTERS
4116 LEONARD DRIVE
FAIRFAX, VIRGINIA 22030
(703) 591-3136

FED APP 365

33

1    trial counsel didn't present this evidence, the jury never

2    got to hear that.  And there was also evidence from Ms.

3    Valle who was home at the time of the interrogation, who

4    also would have been able to provide testimony to the jury

5    to say that Trudy never admitted any wrongdoing to the

6    police officer and the interview was highly accusatory.

7              It also could have contradicted Waldron's

8    testimony that Trudy refused to allow to have the

9    interview recorded because as the Court may recall, there

10   was no recording of this interview in which there was

11   supposed to be a confession.

12             And Ms. Waldron's testimony was that Trudy

13   refused to allow her to record it even though she offered

14   to do so.  That's not true either, Your Honor, and that's

15   belied by the fact that in the police interrogation the

16   day before which I don't know if the Court has heard or

17   not, but which there is a recording of, the very first

18   thing they say on the tape is to Trudy is, "Do you mind if

19   we record this?" and she absolutely agrees,

20   enthusiastically agrees to have it recorded.

21             "Sure, sure, no problem," is what she says.

22   So the idea that she's that agreeable to being recorded on

23   one day and then suddenly wasn't on the other days is

RUDIGER, GREEN & KERNS REPORTING SERVICE
CERTIFIED VERBATIM REPORTERS
4116 LEONARD DRIVE
FAIRFAX, VIRGINIA 22030
(703) 591-3136

FED APP 366

34

1    implausible on its face, but it's also directly

2    contradicted by Ms. Valle who was present and heard the

3    interrogation as it was taking place.

4           So why is all this important?  It's important

5    because the so-called confession is at the core, is at the

6    very core of this case.  And once you accept that the

7    confession never happened, that it was mischaracterized,

8    and once the jury could have been informed of that fact,

9    then the entire medical house of cards in this case starts

10   to crumble.

11          Because if the Court looks through the

12   voluminous medical records that we've provided as an

13   exhibit to our habeas petition, you will see that those

14   records are absolutely right with the physicians basing

15   their conclusions that this was non accidental trauma on

16   Ms. Waldron's report that Trudy had confessed to her, her

17   false report that Trudy had confessed to her.

18          Over and over and over again on dozens and

19   dozens of pages in those records, there are references to

20   the fact that the care giver confessed to shaking the

21   baby.  It's simply not true.

22          And what you're left with at that point is the

23   question of if, in fact, Trudy didn't confess to shaking

RUDIGER, GREEN & KERNS REPORTING SERVICE
CERTIFIED VERBATIM REPORTERS
4116 LEONARD DRIVE
FAIRFAX, VIRGINIA 22030
(703) 591-3136

FED APP 367

35

1    Noah and if, in fact, the medical staff at Fairfax INOVA

2    was deferring to Ms. Waldron and basing their really what

3    they were were legal conclusions, not medical conclusions,

4    but I'll say more about that in a second, but if they were

5    basing those conclusions on her report, really the only

6    question that's left is, is there a medical explanation

7    for what happened to Noah Whitmer that doesn't involve

8    abuse or intentional trauma?

9              And the answer to that question is yes, there

10   is, but trial counsel failed to develop that evidence and

11   failed to present it to the jury.  And this is where we

12   get into our claims about trial counsel's failure to

13   review the medical records comprehensively which they

14   concede that they did not do, to present testimony from

15   Dr. Barnes even though he was available, willing to

16   testify for free, but simply couldn't be present on the

17   date that had been scheduled, to seek a continuance in

18   order to accomplish these things, and to interview lay

19   witnesses like Renata Ames and Eva Valle.

20             The fact of the matter is that there was

21   significant evidence available to trial counsel that

22   Noah's injuries were not caused by trauma, but the jury

23   never got to hear this evidence because of trial counsel's

RUDIGER, GREEN & KERNS REPORTING SERVICE
CERTIFIED VERBATIM REPORTERS
4116 LEONARD DRIVE
FAIRFAX, VIRGINIA 22030
(703) 591-3136

FED APP 368

36

1  errors.

2          We turn to the medical records that counsel

3  didn't have time to carefully review because the medical

4  records, which are extensive, were turned over, I believe

5  the date is December 16 -- I'm doing that from memory, but

6  it's in our petition -- but anyway, the middle of December

7  of 2009 is when the records were turned over.

8          The trial was scheduled in this case for

9  January 10 of 2010.  So less than a month and in the

10  middle of that time is the holiday season when it was

11  very difficult to work with experts and it's very

12  difficult to get much done.

13          So there were a little over three weeks that

14  trial counsel had, following discovery, to review the

15  records, to line up their experts, to give to the experts

16  to review them, to prepare their testimony and to get

17  ready for trial.

18          And that is not a reasonable amount of time to

19  get that sort of thing done.  And trial counsel should

20  have, at that point, when the late disclosure of the

21  medical records was made, they should have sought a

22  continuance.

23          Reasonably effective counsel would have

37

1   recognized the need to seek a continuance.  And, in fact,

2   these trial attorneys stated that in their affidavits that

3   they didn't have a strategic reason for not seeking a

4   continuance.

5          Instead, they said that it was an oversight or

6   that they didn't think -- that they had never heard of

7   that -- that's the line I'm searching for.  It didn't

8   occur to them and that's what Mr. Uriarte says and his

9   attorney says, I didn't understand that we had a strong

10  basis for a continuance.

11         Well, they did have a strong basis.  They had

12  an extremely strong basis for a continuance at that point

13  because they had only gotten discovery with less than a

14  month to go before trial.  And this is -- there are

15  difficult cases to litigate and they involve complicated

16  medical testimony.

17         And this is why, even though I would agree

18  that the mere fact that counsel were inexperienced is not

19  in and of itself equal in effectiveness, their

20  inexperience does come into play here because the fact is

21  that Mr. Uriarte had only done one prior jury trial.

22         He was not an experienced criminal defense

23  trial lawyer and Mr. Kearney had never done a criminal

RUDIGER, GREEN & KERNS REPORTING SERVICE
CERTIFIED VERBATIM REPORTERS
4116 LEONARD DRIVE
FAIRFAX, VIRGINIA 22030
(703) 591-3136

FED APP 370

38

1    trial before and didn't understand that when discovery is

2    made that late in the game and when it's this significant

3    and is going to require this amount of time and energy and

4    consultation with experts in order to master those

5    documents and obtain the relevant information, you simply

6    have to ask for more time.  You simply have to do that.

7            And these attorneys say they didn't understand

8    that they could have done that.  Well, they could have.

9    Had they sought a continuance and had they adequately

10   reviewed the medical records, they would have found a

11   wealth of evidence that would have contradicted the

12   portrait of Noah Whitmer that was presented to the jury.

13           And it was argued to the jury by the

14   Commonwealth that Noah Whitmer was a perfectly healthy

15   child.  That's the phrase that was used and it was used

16   repeatedly.  And the argument was made, how does a

17   perfectly healthy child suddenly become so ill if there

18   isn't trauma involved?

19           Well, the fact is the medical records revealed

20   that Noah wasn't a perfectly healthy child, that there

21   were many signs in the medical records that were never

22   pulled out of the records and presented to the jury that

23   there was no expert testimony regarding the significance

RUDIGER, GREEN & KERNS REPORTING SERVICE
CERTIFIED VERBATIM REPORTERS
4116 LEONARD DRIVE
FAIRFAX, VIRGINIA 22030
(703) 591-3136

FED APP 371

39

1    of those facts that had trial counsel done their jobs

2    effectively, would have created a strong possibility of an

3    acquittal in this case or --

4           THE COURT:  Well, weren't they working -- they

5    were working with experts who didn't pull it out for them

6    to notice.

7           MR. ENGEL:  Well, it's not the experts' job --

8    and this is very clear from the case law -- to pull the

9    facts out of the records and call them to the attorneys'

10   attention.  And we have cited in our brief and I will cite

11   to the Court the recent Fourth Circuit decision in Winston

12   versus Calvin in which the issue was mental retardation.

13          In that case there was an expert appointed

14   specifically to do an evaluation of mitigation and the

15   Defendant -- it was a capital murder case and the

16   Defendant's mental state and there were records that were

17   obtained by counsel and turned over to the expert that

18   indicated that Mr. Winston had previously been classified

19   as mentally retarded by the school system.

20          And the Fourth Circuit in that case very

21   clearly said it is not the expert's responsibility --

22   you're not entitled to the effective assistance of an

23   expert.  You're entitled to the effective assistance of

RUDIGER, GREEN & KERNS REPORTING SERVICE
CERTIFIED VERBATIM REPORTERS
4116 LEONARD DRIVE
FAIRFAX, VIRGINIA 22030
(703) 591-3136

FED APP 372

40

1    counsel and it's counsel's job to review the records and

2    to discover the relevant information.

3              Now, do you work with your expert to try to

4    explore the significance of the information you find?

5    Yes.  That's what your expert is for.  Do you work with

6    your expert to try to figure out how to effectively

7    communicate this information to the jury?  Of course.

8    That's what your experts are all about.

9              But having an expert absolutely does not

10   absolve counsel, themselves, of the obligation to review

11   thoroughly the evidence.  And this case was going to come

12   down, in large part, to these medical records.  And both

13   attorneys say in their affidavits that they were unable to

14   review those records thoroughly in the time that they had

15   after the late disclosure.

16             But what those records show, and this is

17   really interesting to me because if you look in the

18   medical records when Noah Whitmer was first taken to the

19   hospital at 6:13 p.m. on April 20th -- and this is Exhibit

20   A at Page 1,013 they do what's called a review of

21   symptoms, an ROS.

22             And in that review of symptoms, the hospital

23   staff notes, there's no fever, no fussiness, no cough, no

RUDIGER, GREEN & KERNS REPORTING SERVICE
CERTIFIED VERBATIM REPORTERS
4116 LEONARD DRIVE
FAIRFAX, VIRGINIA 22030
(703) 591-3136

FED APP 373

41

1    vomiting, no stool changes.  Those are the five factors

2    that they look at in the review of symptoms and they ruled

3    out every one of them.

4            No fever, no fussiness, no cough, no vomiting,

5    no stool changes.  The records themselves and the

6    interviews that trial counsel could have done with lay

7    witnesses were refuted every single one of those symptoms.

8    The fact is, there was fever, there's fever throughout the

9    medical records.

10           It spikes the day after, I believe, when Noah

11   was admitted to the hospital and it comes and it goes in

12   the time of his hospitalization and courses of antibiotics

13   were started and stopped during that time and when they

14   stopped, the fever spiked again.

15           So there was fever present in Noah.   There

16   was fussiness.  This could have come from the lay

17   witnesses.  This is the significance of trial counsel's

18   failure to interview people who interacted with Noah

19   Whitmer in the week before he became so ill, because there

20   was actually lots of evidence available to trial counsel

21   that Noah had been fussier than usual and those affidavits

22   are from Ms. Valle and from Renata Ames who was Trudy's

23   daughter, who would come home from school and would spend

RUDIGER, GREEN & KERNS REPORTING SERVICE
CERTIFIED VERBATIM REPORTERS
4116 LEONARD DRIVE
FAIRFAX, VIRGINIA 22030
(703) 591-3136

FED APP 374

42

1    time with the children that her mother was looking after.

2            There were many reports of coughs.  The

3    medical records note that Noah had difficulty breathing,

4    that he had stridor, high pitched wheezing, and a course

5    rattling sound when he would breathe, when he was admitted

6    to the hospital.  They found signs of strep and staph

7    infections, what they call heavy growth of strep and staph

8    infections on sputum cultures that they took.

9            He had been vomiting and had been spitting up

10   milk.  This was the event that led to the entire episode

11   because Ms. Munoz said that she was trying to give him a

12   bottle and then he began choking and spitting up the milk.

13   He was regurgitating it and it was coming out through his

14   mouth and his nose and yet it says no vomiting and no

15   stool changes.

16           Again, could have been contradicted by the lay

17   witnesses.  So you could put what the lay witnesses say

18   together with the medical records which showed not only

19   the infections that I talked about, but a fever and the

20   antibiotic treatments and the wheezing and the stridor,

21   but they had the suction clear and white and tan

22   secretions of moderate to thick viscosity out of Noah's

23   lungs, and that his chest imaging showed opacities and

FED APP 375

43

1   markings.

2            All of these facts are reflected in the

3   medical records that counsel should have reviewed and none

4   of this came out.  None of this came out at trial.  None

5   of this was presented to the jury.  And the Court may

6   think, well, what's the significance of all this?

7            It's extremely significant and it is obviously

8   significant particularly when the Court looks at the

9   affidavits that Dr. Barnes has now provided.  Because Dr.

10  Barnes -- and this is probably the single biggest factual

11  dispute we have at this point -- we've got competing

12  affidavits from experts in our petition and in

13  Respondent's motion to dismiss wherein Dr. Barnes and Dr.

14  Hauda simply have irreconcilable views of the evidence in

15  this case and one of them is right about what the evidence

16  and what the medical records show and one of them is

17  wrong, but they simply cannot be reconciled.

18            But the significance of Dr. Barnes is that he

19  notes that Noah had the imaging of Noah's brain and I

20  should point out to the Court that Dr. Barnes is a

21  radiologist and the Commonwealth had a radiologist, Dr.

22  Muller, I think is the pronunciation, testified but there

23  was no radiologist that testified on behalf of Ms. Munoz.

RUDIGER, GREEN & KERNS REPORTING SERVICE
CERTIFIED VERBATIM REPORTERS
4116 LEONARD DRIVE
FAIRFAX, VIRGINIA 22030
(703) 591-3136

FED APP 376

44

1          So when the Respondent argues that simply

2     because they had three other experts it wasn't ineffective

3     to put on Dr. Barnes, that misses the point entirely.

4     Probably is the most significant evidence in this case was

5     the scans, the imaging, the CT and the MRI scans that were

6     done of Noah Whitmer after he was taken to the hospital

7     and as Dr. Uscinski notes in his affidavit, it was

8     absolutely critical for the defense to have a radiologist

9     available to testify about what that imaging shows.

10          And so what that imaging does show is that

11     Noah had a venous thrombosis in his head, essentially, a

12     clotted blood vessel in his head and Dr. Hauda and Dr.

13     Barnes had an actual dispute about the significance of

14     this venous thrombosis.

15          Dr. Hauda discounts it as a small minor venous

16     thrombosis that couldn't possibly have caused all of the

17     other injuries that he claims to have seen.  Dr. Barnes,

18     who is a radiologist, unlike Dr. Hauda, says that's

19     absolutely incorrect, that this was a large, obvious

20     venous thrombosis that was easily visible on the scans.

21          What's not in dispute is that there was a

22     thrombosed vein.  There was a clotted vein in Noah's

23     scans.  Everybody agrees on that, even Dr. Muller, the

RUDIGER, GREEN & KERNS REPORTING SERVICE
CERTIFIED VERBATIM REPORTERS
4116 LEONARD DRIVE
FAIRFAX, VIRGINIA 22030
(703) 591-3136

FED APP 377

45

1    Commonwealth's expert who testified at trial concedes that

2    there was a thrombosed vein.

3              And if the Court thinks about this, the

4    Respondent's and the Commonwealth's position is sort of

5    remarkable because nobody's claiming that you can cause a

6    thrombosed vein by shaking a baby.  Nobody claims that.

7    In fact, Dr. Barnes says it's impossible, it can't happen.

8              But no one from the Commonwealth is claiming

9    it can cause a thrombosed vein from shaking a baby.  So

10   really what their position is is that sure, Noah had a

11   clotted vein in his head, but that's entirely

12   coincidental.  That had nothing to do with the other

13   injuries.

14             That had nothing to do with the fact that he

15   fell ill and started having seizures and had subdural

16   hematoma.  In fact, it had everything to do with it.  It

17   would be a pretty remarkable coincidence, actually, for

18   Ms. Munoz to have shaken Noah, to have somebody snap after

19   years of being a wonderful care giver, described --

20   uniformly described as gentle and loving with the children

21   she took care of to suddenly have snapped and shaken this

22   child violently enough to cause these injuries and lo and

23   behold, simply by coincidence when he gets to the

RUDIGER, GREEN & KERNS REPORTING SERVICE
CERTIFIED VERBATIM REPORTERS
4116 LEONARD DRIVE
FAIRFAX, VIRGINIA 22030
(703) 591-3136

FED APP 378

46

1   hospital, he's got a thrombosed vein.

2            That's unrealistic, Your Honor, and Dr.

3   Barnes' view makes a lot more sense which is that this

4   thrombosed vein was the cause of Noah's other symptoms and

5   he explains that what Dr. Hauda -- and this is another

6   factual dispute that is going to require the taking of

7   evidence to clear up, but he says what Dr. Hauda is

8   characterizing as deep brain injuries aren't those at all.

9            They show strokes.  And that strokes are

10  commonly the result of thrombosed veins and that strokes

11  are no mimic of deep brain tissue injury and this is what

12  his affidavit says, so we've got fundamental

13  disagreements.

14           But the point is that the jury should have had

15  the opportunity to hear these different interpretations.

16  The jury should have had the opportunity to hear what Dr.

17  Barnes had to say, that there are non traumatic causes for

18  the symptoms that Noah experienced and the jury was denied

19  that opportunity.

20           And the reason they were denied that

21  opportunity is because trial counsel didn't seek a

22  continuance, didn't review the medical records, didn't

23  present testimony from Dr. Barnes, didn't interview the

RUDIGER, GREEN & KERNS REPORTING SERVICE
CERTIFIED VERBATIM REPORTERS
4116 LEONARD DRIVE
FAIRFAX, VIRGINIA 22030
(703) 591-3136

FED APP 379

47

1    lay witnesses, and in failing to do all of those things,

2    fell below the objective standard of reasonableness that

3    Strickland talks about.

4              This case should have had an entirely

5    different presentation to the jury, Your Honor, and would

6    have had an entirely different presentation to the jury

7    had trial counsel sought the time they needed to prepare.

8              Really, frankly, more experienced counsel

9    should have been brought into a case of this magnitude,

10   but be that as it may, at the very least, the attorneys

11   that did have the case should have taken more time and

12   they acknowledge as much.

13             And with respect to that, I do want to address

14   the point that I don't think the Respondent argued this

15   morning, but it is in their brief, which is this notion

16   that trial attorneys, defense attorneys when they lose

17   cases are -- all over the Commonwealth -- are falling on

18   their swords in order to save their clients.

19             I've been doing habeas cases for over a decade

20   now, Your Honor, and I can tell you that in virtually

21   every habeas case that I've worked on, trial attorneys

22   have provided an affidavit not to their former client, but

23   to the Attorney General, defending their actions,

RUDIGER, GREEN & KERNS REPORTING SERVICE
CERTIFIED VERBATIM REPORTERS
4116 LEONARD DRIVE
FAIRFAX, VIRGINIA 22030
(703) 591-3136

FED APP 380

48

1    explaining their strategic reasons, sticking up for

2    themselves and saying, I wasn't ineffective and here's why

3    I did the things that I did.

4              And this is from my experiences a unique case

5    in which these attorneys recognize that they were in over

6    their heads, that they made mistakes and that it resulted

7    in a conviction of an innocent person and that is a unique

8    experience for me.

9              And so I really -- I can't simply let that

10   lie.  I have to take that on and point out that the

11   defense attorneys aren't falling over their swords.  We

12   actually provided a footnote with citations to habeas

13   cases reported in habeas decisions from the Supreme Court

14   of Virginia in which trial counsel has provided affidavits

15   to the Respondent that in fact is the norm.

16             So here we've got a case where the lawyers are

17   willing to acknowledge that -- are able and willing to

18   acknowledge that mistakes were made and there's no

19   evidence on the other side to push against that so we're

20   left with what they have to say.

21             And their opinions do matter.  They certainly

22   matter when they claim that they made strategic decisions

23   and that results in the dismissal of the habeas petition

RUDIGER, GREEN & KERNS REPORTING SERVICE
CERTIFIED VERBATIM REPORTERS
4116 LEONARD DRIVE
FAIRFAX, VIRGINIA 22030
(703) 591-3136

FED APP 381

49

1    and they should matter in this context as well.

2                 Are they dispositive?  No.  They're not

3    dispositive because this is an objective standard and we

4    will have to present evidence about the standard of

5    practice and whether these attorneys' conduct fell below

6    an objective standard of reasonableness, but it matters

7    and it should be considered by the Court and it certainly

8    should merit taking evidence, putting these people on the

9    stand and allowing us to develop evidence in support of

10   our claims.

11                If the Court will indulge me one moment.

12                (Counsel conferred, off the record.)

13                MR. ENGEL:  Would Your Honor hear from Mr.

14   Sheldon very briefly on one small point?

15                THE COURT:  No.

16                MR. ENGEL:  Okay.  Well, I will then inform

17   the Court that Mr. Sheldon has informed me -- and this is

18   just -- I know this was simply a debater's point that was

19   made -- but this idea that this never happens to babies in

20   public places.

21                Mr. Sheldon has a case right now, it's the

22   case of Commonwealth versus Stoffa or Stoffa, I'm not sure

23   of the pronunciation S-t-o-f-f-a which is another shaken

RUDIGER, GREEN & KERNS REPORTING SERVICE
CERTIFIED VERBATIM REPORTERS
4116 LEONARD DRIVE
FAIRFAX, VIRGINIA 22030
(703) 591-3136

FED APP 382

50

1    baby case and the allegation is that the baby was shaken

2    and became ill and it actually happened in a Walmart is

3    where the baby collapsed.

4            And there's video, Walmart video of the two-

5    year-old child collapsing.  The Commonwealth in that case

6    is apparently claiming that the baby had been shaken the

7    day before but there was a lucid interval before the

8    symptoms manifested.

9            So, you know, I know that that's not the basis

10   on which the Court is going to deny or grant this motion,

11   but at the same time I feel like I can't let that stand

12   unrebutted because this does happen.

13           There are other cases of exonerations, many of

14   which we've cited in our petition in which the reason that

15   the exonerations ultimately came about is because there

16   were people present to -- there were percipient witnesses

17   who could say that nothing bad had happened to this child

18   before they fell ill.

19           In fact what's really, what's compelling to me

20   at least is to think about the Conver (ph.) situation.

21   The problem is we have so many of these cases where we

22   know that it happens that babies, people, become ill and

23   sometimes we can't explain what happens and I know

RUDIGER, GREEN & KERNS REPORTING SERVICE
CERTIFIED VERBATIM REPORTERS
4116 LEONARD DRIVE
FAIRFAX, VIRGINIA 22030
(703) 591-3136

FED APP 383

51

1    everybody wants an explanation for what happens, everybody

2    wants a simple explanation, but we don't always have them.

3             And so what's terrifying is to think about

4    these care givers, people like Ms. Munoz who are alone

5    with these children and when they become ill, take the

6    measures to try to resuscitate them, take the measures to

7    try to protect them, cooperate fully with law enforcement.

8             She couldn't have been more cooperative with

9    law enforcement.  She had nothing to hide.  But because

10   she was alone with the child and because the child is now

11   ill, you know, everybody concludes that she must have done

12   something to him.

13            Those are the terrifying cases when there are

14   no other witnesses, but it's simply not true to say that

15   these things never happen in public places.  And one other

16   thing that I wanted to respond to, Your Honor, was this

17   idea that we're accusing the Fairfax Hospital staff of

18   rank malpractice.

19            We're doing no such thing.  We're not saying

20   that there was anything wrong in the way that they treated

21   Noah Whitmer and my understanding is -- and, you know, we

22   should all be extremely grateful that he has maybe not

23   made a full recovery, I don't know, but that there has

RUDIGER, GREEN & KERNS REPORTING SERVICE
CERTIFIED VERBATIM REPORTERS
4116 LEONARD DRIVE
FAIRFAX, VIRGINIA 22030
(703) 591-3136

FED APP 384

52

1    been significant recovery, at least certainly many of the

2    hospital records indicate that there is a more rapid

3    recovery than the doctors originally anticipated when they

4    evaluated him and thank God for that.

5             So we're not accusing them of malpractice, but

6    what we're saying is they went well beyond their capacity

7    as doctors when they stopped simply diagnosing and

8    treating Noah's illnesses but started drawing conclusions,

9    legal conclusions about the causes of those injuries and

10   Ms. Munoz's culpability.

11            When they started characterizing this as non

12   accidental trauma, that's not the practice of medicine.

13   That's the practice of law.  And those conclusions were

14   being based on the report of a Child Protective Services

15   worker who was being dishonest about what Ms. Munoz said

16   in an unrecorded interview.

17            So we're not accusing them of malpractice, but

18   what we are saying is that they were going outside the

19   realm of their expertise and they were drawing legal

20   conclusions and that that was highly prejudicial.

21            And the solution to that would have been to do

22   exactly what we said in our petition, to go through the

23   medical records to point out in the medical records how

RUDIGER, GREEN & KERNS REPORTING SERVICE
CERTIFIED VERBATIM REPORTERS
4116 LEONARD DRIVE
FAIRFAX, VIRGINIA 22030
(703) 591-3136

FED APP 385

53

1   frequently those so-called medical conclusions are being

2   based on the report of law enforcement or Child Protective

3   Services and to educate the jury about how they came to

4   the conclusions they came to, because these were not,

5   these simply were not medical conclusions.

6          They were legal conclusions and they were

7   based on reports from law enforcement.  Unfortunately, the

8   jury never got to hear that story.  I don't intend to

9   address any of the claims unless the Court has particular

10  questions about them.

11         THE COURT:  No.

12         MR. ENGEL:  I would just conclude by saying it

13  would be inappropriate at this stage to dismiss the case.

14  We will ultimately have the burden of proving that the

15  Constitutional violations have occurred and that will

16  involve showing that counsel's performance is objectively

17  unreasonable and that it prejudiced Ms. Munoz.

18         We will carry that burden once we've had the

19  opportunity to develop and present evidence at a hearing

20  in this matter.  We would ask the Court to deny the motion

21  at this time.

22         MS. BOURNE:  Just briefly, Your Honor.  I mean

23  this is a habeas corpus matter.  It's not a straight

RUDIGER, GREEN & KERNS REPORTING SERVICE
CERTIFIED VERBATIM REPORTERS
4116 LEONARD DRIVE
FAIRFAX, VIRGINIA 22030
(703) 591-3136

FED APP 386

54

1    summary judgment standard and Yates versus Murray

2    specifically discusses that the Court can consider

3    affidavits even competing affidavits and render a

4    decision.

5              They have a burden now in their pleading to

6    show a reasonable probability of a different result had

7    this evidence been presented.  And so based on Yates and

8    the fact that the Court can consider affidavits, I mean,

9    certainly we would argue you don't have to consider Dr.

10   Hauda's affidavit based on the other evidence in this

11   case.

12             There is no reasonable probability of a

13   different result based on the evidence at trial.  But you

14   can consider it.  And with regard to this issue with the

15   confession, I mean, Ms. Rueda -- I'm sorry, Ms. Munoz

16   testified at trial and the jury rejected her testimony.

17             And the fact that she confessed to shaking and

18   then gave a somewhat minimized demonstration of what she

19   did does not prove that she didn't confess to shaking

20   because what she said was that she shook the baby and then

21   she told Ms. Waldron that she knew she was not supposed to

22   shake the baby.

23             So I mean all the time -- I'm sure the Court's

RUDIGER, GREEN & KERNS REPORTING SERVICE
CERTIFIED VERBATIM REPORTERS
4116 LEONARD DRIVE
FAIRFAX, VIRGINIA 22030
(703) 591-3136

FED APP 387

55

1   familiar that people or Defendants give some explanation

2   that isn't entirely accurate of what happened.  And

3   certainly, here she gave a statement that she shook the

4   baby and that was consistent with the medical evidence.

5            And the doctors in this case didn't reach

6   legal conclusions.  This is a diagnosis.  They diagnosed

7   this child with shaken baby syndrome.  It's like saying,

8   okay, well, someone gets shot and you can't say they were

9   shot because that's a non accidental trauma.

10           I mean, this is a medical diagnosis and that's

11  what they did and there's nothing improper about it.

12  Further, there is -- it's an objective analysis.  It's an

13  objective analysis with regard to whether counsel was

14  ineffective and whether his performance was

15  Constitutionally deficient.

16           And I have cited you to cases in the motion to

17  dismiss that say that counsel's own opinion about what

18  they did matters little and that's because this is an

19  objective analysis.  It has to be Constitutionally

20  unreasonable performance and we look at that based on

21  norms and that's other people and how they would have

22  behaved and what other lawyers would have done and could

23  there be a reasonable explanation for this.

FED APP 388

56

1          And there is here.  So there's nothing

2     improper about that either.  That's what the law currently

3     states.  And finally, I would just say that the entire

4     argument is a cumulative prejudice argument.

5          I mean these claims have to be viewed

6     separately, that's what Lenz requires and to say that they

7     could have presented evidence that there was some other

8     explanation, yet another competing expert's opinion, I

9     mean, it differed with the opinions they did offer.

10          And so Dr. Uscinski specifically said that

11     this thrombosis was ancillary, was not the cause of this

12     -- I don't know if he specifically used those words, but

13     he did say it was an ancillary finding.

14          And I've cited the Court to the place in the

15     record where he has said this.  But further, Dr. Hauda did

16     say that it was the same trauma that caused the subdural

17     hemorrhage that caused the venous thrombosis.  This isn't

18     a venous thrombosis that appeared out of nowhere.

19          And so to argue that there's no evidence or

20     that we never, you know, maintained that is just simply

21     inaccurate.  I just ask you to grant our motion to

22     dismiss.

23          THE COURT:  All right, counsel, I will notify

FED APP 389

57

1    you when I have a decision.  And what I will do is ask you

2    to have a Court Reporter ready on the decision.  Ma'am, I

3    know you come from Richmond.  You're coming up from

4    Charlottesville.

5              MR. ENGEL:  Yes.  It's a lovely drive, though,

6    Your Honor.

7              THE COURT:  I know.  I hate for you to have to

8    come back for this, but I want to spend some time on this.

9    What I can do sometime is have call in, if it's easier for

10   counsel, we can arrange that.

11             MR. ENGEL:  We'll do whatever is convenient

12   with the Court.

13             THE COURT:  Well, I'll leave that to you and

14   we'll discuss that later when I'm closer to a decision.

15   Thank you, very much for the briefing.

16             MS. BOURNE:  Thank you, Your Honor.

17             MR. ENGEL:  Thank you, Your Honor.

18                    *  *  *  *  *

19             (Whereupon, at approximately 11:13 o'clock

20   a.m., the hearing in the above-entitled matter was

21   concluded.)

22                    *  *  *  *  *

23

FED APP 390

58

* * * * *

CERTIFICATE OF REPORTER

I, PATRICIA L. BLOOM, a Verbatim Reporter, do hereby certify that I took the stenographic notes of the foregoing proceedings which I thereafter reduced to typewriting; that the foregoing is a true record of said proceedings; that I am neither counsel for, related to, nor employed by any of the parties to the action in which these proceedings were held; and, further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially or otherwise interested in the outcome of the action.


_Patricia L. Bloom_
PATRICIA L. BLOOM, CCR
Verbatim Reporter

RUDIGER, GREEN & KERNS REPORTING SERVICE
CERTIFIED VERBATIM REPORTERS
4116 LEONARD DRIVE
FAIRFAX, VIRGINIA 22030
(703) 591-3136

FED APP 391



**V I R G I N I A:**

## IN THE CIRCUIT COURT FOR FAIRFAX COUNTY

**TRUDY MUNOZ-RUEDA,**

        **Petitioner,**

    **v.**                                     **At Law No. 2012-17074**

**HAROLD W. CLARKE, DIRECTOR OF VIRGINIA DEPT. OF CORRECTIONS,**
                        **Respondent.**

### <u>Final Order</u>

Upon mature consideration of the pleadings and controlling legal authority and a review of the record in the case of <u>Commonwealth of Virginia v. Trudy Munoz-Rueda</u>, (Case No. FE-2009-1289), which are hereby made a part of the record in this habeas corpus matter, and after hearing the argument of counsel, the Court finds, for the reasons stated from the bench at the hearing held on July 25, 2013, a transcript of which is attached and incorporated by reference into this order, that the respondent's motion to dismiss should be granted.

The Court thus is of the opinion that the petition for a writ of habeas corpus should be denied and dismissed; it is, therefore,

FED APP 392

**ADJUDGED** and **ORDERED** that the petition for a writ of habeas corpus be, and is hereby, denied and dismissed.

The Clerk is directed to forward a certified copy of this Order to, Jonathan P. Sheldon, Esquire, and Matthew Engle, Esquire, counsel for the petitioner, and Rosemary V. Bourne, Senior Assistant Attorney General, counsel for the respondent.

Entered this 11th day of September 2013.

_____
Judge

I ask for this:

_____
Rosemary V. Bourne
Senior Assistant Attorney General
Office of the Attorney General
900 East Main Street
Richmond, Virginia  23219
(804) 786-2071; (804) 3170151 (fax)
Counsel for Respondent

Seen/Objected to: for the reasons stated in the pleadings and at the July 25 hearing.

_____
Jonathan Sheldon, Esquire
10621 Jones Street, Suite 301
Fairfax, Virginia 22030
Counsel for the Petitioner

A COPY TESTE:
JOHN T. FREY, CLERK

BY:_____
Deputy Clerk
Date:_____
Original retained in the office of
the Clerk of the Circuit Court of
Fairfax County, Virginia

FED APP 393

FILED
COURT SERVICES

2013 SEP -6 PM 12: 19    1

VIRGINIA

    IN THE CIRCUIT COURT OF FAIRFAX COUNTY

- - - - - - - - - - x
                :
TRUDY MUNOZ-RUEDA,      :
                :
      Petitioner,   :
                :
    -vs-          :  CL No. 2012-17074
                :
HAROLD W. CLARKE,      :
                :
      Respondent.   :
                :
- - - - - - - - - - x

                       Courtroom 5C
               Fairfax County Courthouse
                    Fairfax, Virginia

                Thursday, July 25, 2013

      The above-entitled matter came on to be heard
before the JAN L. BRODIE, JUDGE, in and for Circuit Court
of Fairfax County, in the Courthouse, Fairfax, Virginia,
beginning at 9:52 o'clock a.m.

      APPEARANCES:

         On Behalf of the Petitioner:

            JONATHAN P. SHELDON, ESQUIRE

         On Behalf of the Respondent:

            ROSEMARY BOURNE, ESQUIRE
            Assistant Attorney General

FED APP 394

2

```
 1              P R O C E E D I N G S

 2              (The court reporter was sworn by the Clerk of

 3    the Court.)

 4              THE COURT:  We are here in the decision in the

 5    case of Trudy Munoz Rueda vs. Harold W. Clark, CL 2012-

 6    17074.

 7              This matter came before the Court on May 23rd,

 8    2013 on Petitioner Trudy Munoz Rueda's petition for writ

 9    of habeas corpus subject to amendment filed on

10    November 14, 2012.  The respondent's corrected motion was

11    dismissed on February 4, 2013.

12              After the hearing the Court took the matter

13    under advisement and since that time I have reviewed the

14    pleadings of the case, the memoranda and exhibits

15    presented and the arguments of counsel.  Currently the

16    petitioner is confined in the Department of Corrections

17    pursuant to the final judgment of this Court entered on

18    April 19, 2010.

19              She was convicted of felony child neglect in

20    violation of Virginia Code §18.2-371.1(a), and willful or

21    negligent cruelty or injury to a child, Noah Whitmer, in

22    violation of Virginia Code §40.1-103.  She was sentenced

23    in accordance with the sentence fixed by the jury, 10
```

FED APP 395

3

1   years and six months incarceration and a fine of $12,500.

2            She was represented at trial by Mr.

3   James R. Kearney and Mr. Guillermo Uriarte.  Her petition

4   to the Court of Appeals was denied on December 27, 2010.

5   Her appeal to the Supreme Court of Virginia was refused on

6   on September 21, 2011 and later her request for a

7   re-hearing was denied on November 19th, 2011.

8            In her petition Petitioner alleges convictions

9   were obtained in violation of her 14th Amendment right of

10  due process and the right to effective assistance of

11  counsel under Strickland vs. Washington and its progeny,

12  that the Commonwealth violated her 5th and 14th Amendment

13  right of due process rights by failing to disclose

14  favorable evidence that was in its possession and by

15  knowingly allowing witnesses to present false testimony,

16  and finally that the cumulative effect of these errors

17  undermines confidence in the outcome of her trial.

18            This Court makes the following findings of

19  facts and conclusions of law for each claim in accordance

20  with Rule 3A:24 of the Rules of the Supreme Court of

21  Virginia.

22            The Court will first deal with the claims of

23  ineffective assistance of counsel.  In its decision in

FED APP 396

4

1    Strickland vs. Washington the Supreme Court of the United

2    States provided the analytical framework for all

3    ineffective assistance of counsel claims.  In the Court's

4    consideration of these claims counsel is strongly presumed

5    to have rendered adequate assistance and made all

6    significant decisions in the exercise of reasonable

7    professional judgment.

8            Under the two-pronged test of Strickland the

9    Court must first determine whether the defendant's

10   counsel's representation fell below an objective,

11   non-subjective standard of reasonableness.

12           Next the Court must determine whether there is

13   a reasonable probability that but for counsels'

14   unprofessional errors the result of the proceedings would

15   have been different.  That is to say counsels' errors must

16   be so serious as to deprive the defendant of a fair trial.

17           The defendant has the burden to show that both

18   prongs have been met in order to prevail.  Failure to meet

19   one of these prongs requires dismissal of the claims.

20           As to claim 1A -- I'm going to go ahead and

21   number them as your sections.  In claim 1A Munoz-Rueda

22   argues that the defense attorneys provided ineffective by

23   failing to request a continuance in light of the

FED APP 397

5

1    considerable number of medical records to be reviewed that

2    would be the basis of their defense and because of the

3    unavailability of one of their experts, Dr. Patrick

4    Barnes, on the date of trial.  However, Mr. James Kearney,

5    counsel for Munoz-Rueda, is a very experienced attorney in

6    Fairfax Circuit Courts with expertise in working with

7    medical issues and personal injury cases.

8              The parties had already received three

9    continuances in this case due in part to the

10   unavailability of witnesses: On July 24, 2009 continuing

11   the case from August 12, 2009 to October 26, 2009; on

12   September 10, 2009 continuing the case to from October 26,

13   2009 to December 7th 2009; and again on October 22, 2009

14   continuing the case from December 7, 2009 to January 11,

15   2011.  It was clear that counsel knew how to obtain a

16   continuance when necessary.  Moreover, in light of the

17   other continuances it would be less likely that yet

18   another would be granted.

19             Counsel had three qualified medical experts to

20   present their case and at trial Ms. Munoz-Rueda

21   represented she was ready for trial.  Although counsel

22   would always prefer to have more time to review documents

23   an evidence for trial they did have sufficient time to

FED APP 398

6

1    review the medical records of this case.

2              Counsel was not ineffective for failing to

3    pursue yet another continuance for an additional expert.

4    Moreover, based on the evidence presented the Court finds

5    that counsel has failed to demonstrate there is reasonable

6    probability that even had they had a continuance the

7    result of the proceeding would have been any different.

8              In claim 1B Munoz-Rueda claims that her

9    counsel failed to review the medical records which would

10   have revealed, one, that Noah had an infection; two, Noah

11   was likely dehydrated and had pre-existing head trauma;

12   three, that Noah had a family history that was unexplored;

13   four, that Inova Fairfax Hospital arrived at a diagnosis

14   of Shaken Baby Syndrome almost instantaneously; and five,

15   that Inova medical professionals conducted no reasonable

16   diagnosis of possible alternative causes for his symptoms.

17             There was no evidence presented that counsel

18   did not review the medical records.  In fact it's clear to

19   the Court on the direct and cross-examination of the

20   witnesses that counsel had reviewed the records and were

21   familiar with them.  Although one of the attorneys may be

22   more experienced in dealing with the medical records and

23   was given the responsibility of developing medical issues

FED APP 399

7

1 at trial it does not amount to ineffective assistance of

2 counsel.

3   As anticipated and appropriate they also

4 relied on the expertise of their expert who testified that

5 they had reviewed medical records.  Furthermore, there is

6 no credible evidence that Noah suffered from any infection

7 prior to this accident.  The fact that child was fussy

8 does not in and of itself indicate there was a pre-

9 existing infection.  There was no reference to any fever

10 or cough or admission in the records and there was

11 testimony that the fever that occurred later was most

12 likely the result of the intubation and ventilation.

13   None of Munoz-Rueda's experts even noted fever

14 for being a factor in their opinions.  Moreover, although

15 it may have been Dr. Barnes' explanation for the venous

16 cortical thrombosis there is no evidence that would have

17 accounted for the other findings related to the injuries

18 -- the left paracortical contusion and injury to the

19 corpus callosum.  In fact Munoz-Rueda's has presented

20 conflicting testimony through her experts as to the

21 significance of the thrombosis cortical vein.  There was

22 also no evidence that cross examination on the referenced

23 family history would have made a difference in the

FED APP 400

8

1  diagnosis and the jury has been given the opinion that

2  some of the bleeding could be associated and related to

3  the trauma of childbirth.

4       The medical records and the attached affidavit

5  from counsel also do not support Munoz-Rueda's conclusion

6  that there was a rush to judgment that the injuries were

7  the result of Shaken Baby Syndrome, or that there was no

8  reasonable differential diagnosis of possible alternative

9  causes of the symptom.   Thus Munoz-Rueda has failed to

10  demonstrate that counsel's performance was deficient or

11  that there is a reasonable probability that but for

12  counsel's alleged errors the result of the proceeding

13  would have been different.

14       As to 1C, in claim 1C Munoz-Rueda claims that

15  counsel were ineffective because they failed to present

16  evidence from any witnesses regarding Noah's possible

17  illness.   She alleges that her daughter Renata Ames and

18  her daycare helper Eva Valley would have testified that

19  Noah was unusually irritable and cranky in the week before

20  the injury.   However, Mr. Kearney explained that counsel

21  took two approaches in this case.   One was that injuries

22  did not support the Shaken Baby Syndrome, and two, if they

23  did there was a possibility it was inflicted by someone

FED APP 401

9

1    else.

2          Accordingly, there may have been good reason

3    for not calling Eva Valley, who was with the baby while

4    Ms. Munoz-Rueda was not. Moreover, it was not

5    unreasonable to not call the daughter for the reasons she

6    gives in her affidavit, namely that she would not have

7    been a good witness and would cry under the pressure on

8    the stand.

9          As already stated the fact that the child was

10    fussy and not playing does not mean that he was sick.

11    There are a myriad of reasons for fussiness aside from the

12    illness depending on the age, diet, amount of sleep and

13    circumstances. Munoz-Rueda never testified that the child

14    felt feverish at any time while she was holding him prior

15    to the episode. Munoz-Rueda had failed to demonstrate

16    that counsel's performance was deficient in not calling

17    these two witnesses and if there is a reasonable

18    probability -- she failed to show that there was a

19    reasonable probability that but for counsels' errors the

20    result of the proceeding would have been different.

21          In Claim 1D Munoz-Rueda alleges that counsel

22    failed to present testimony from Dr. Barnes. As mentioned

23    already there's a problem with presenting conflicting

FED APP 402

10

1   testimony of expert witnesses, in this case Dr. Uscinski's

2   and Dr. Barnes' opinions relative to the significance of

3   the venous cortical thrombosis.  In contrast the

4   Commonwealth presented consistent testimony through its

5   expert that the injuries were caused by shaking the child.

6   Moreover, Dr.  Barnes' opinion does not explain the other

7   injuries that were present.  Thus Munoz-Rueda has failed

8   to demonstrate that counsel's performance was deficient or

9   that there is reasonable probability that but for

10  counsel's alleged errors the result of the proceeding

11  would have been any different.

12       In claim 1E Munoz-Rueda alleges that counsel

13  were ineffective by failing to challenge Joslyn Waldron's

14  testimony regarding Munoz-Rueda's confession.  However,

15  the records reveal considerable cross-examination on just

16  this point.  There were multiple questions and

17  demonstration during the trial regarding the action taken

18  by Munoz-Rueda, both by her and Waldron in discussing the

19  translation of the words used and how Munoz-Rueda handled

20  the child.

21       Munoz-Rueda fails to establish that more

22  comprehensive cross-examination would have resulted in

23  Waldron changing her unequivocal, uncontradicted

FED APP 403

11

1    testimony.  She failed to provide the Court with any

2    evidence of an answer that would have changed her

3    testimony in court or that there is a reasonable

4    probability that but for counsel's alleged errors the

5    result of the proceeding would have been different.

6           Munoz-Rueda also claims her husband should

7    have been called as well as Ms. Valley to confirm Munoz-

8    Rueda's description of how she moved the child and what

9    Ms. Valley was able to hear about the interview while in

10    the basement.  However, neither of these potential

11    witnesses were actually present at the interview.  Their

12    testimony would likely not have been permitted as

13    impermissible hearsay.

14           Considering their relationships with Munoz-

15    Rueda and the reasonableness of not calling Ms. Valley for

16    reasons discussed Munoz-Rueda has failed to demonstrate

17    that counsel's performance was deficient or that there is

18    a reasonable probability that but for counsel's alleged

19    errors the result of the proceeding would have been

20    different.

21           In claim 1F Munoz-Rueda claims that defense

22    counsel failed to bring forth testimony at trial that

23    would reveal the treating physicians at Inova Fairfax took

FED APP 404

12

1   for granted Waldron and Cockrill's investigatory

2   conclusion that Munoz-Rueda had shaken Noah Whitman.  The

3   evidence in this case does not support the petitioner's

4   position.  There is ample testimony from doctors who were

5   treating Noah on that day that they considered many of the

6   alternative causes presented by defense counsel.  They did

7   blood and lab tests to rule out bleeding disorders and

8   other diseases.  They took CT and MRI scans and reviewed

9   them.  The fact that they were told of the investigation

10  and noted that in the medical records indicated that they

11  were including all information and everything was under

12  consideration.  There was no evidence proffered that would

13  tend to show that the doctors jumped to any conclusions or

14  discounted any causes until reviewed, only that it seemed

15  that way to petitioner's counsel.

16        Munoz-Rueda had failed to demonstrate that

17  counsels' performance was deficient or there was

18  reasonable probability that but for counsel's alleged

19  errors the result of the proceedings would have been

20  different.

21        In claim 1G petitioner alleges that counsel

22  failed to present character evidence in the form of other

23  parents who gave glowing accounts of petitioner as a

RUDIGER, GREEN & KERNS REPORTING SERVICE
CERTIFIED VERBATIM REPORTERS
4116 LEONARD DRIVE
FAIRFAX, VIRGINIA 22030
(703) 591-3136

FED APP 405

13

1    daycare provider.  However, none of these parents were

2    present on the day that Noah received his injury, and the

3    fact that they believed her to be gentle and that her

4    house was clean would not have assisted the jury in coming

5    to its termination regarding how Noah received his

6    injuries.  This character testimony would likely also not

7    have been admissible.  Moreover, she already had one

8    witness testify as to her character.  In fact Noah's

9    parents appeared to be happy or content with the childcare

10   arrangement and trusted the petitioner with their child's

11   safety up until the incident.  In a case that is based

12   primarily on medical evidence presented, counsels' failure

13   to call more laudatory references does not demonstrate

14   that counsel's performance was deficient or that there is

15   a reasonable probability that if these witnesses had been

16   called the result of the proceeding would have been

17   different.

18        In claim 1H Munoz-Rueda alleges that counsel

19   failed to obtain a copy of the 911 tape to bolster her

20   account of what happened.  However, there is nothing in

21   the record that contradicts her testimony that she called

22   911 and that she attempted CPR with their help.  The tape

23   was repeated what she testified to at trial and was not

RUDIGER, GREEN & KERNS REPORTING SERVICE
CERTIFIED VERBATIM REPORTERS
4116 LEONARD DRIVE
FAIRFAX, VIRGINIA 22030
(703) 591-3136

FED APP 406

14

1    refuted by the Commonwealth.  The fact that the 911 tape

2    did not address the real issues of the case, specifically

3    how baby obtained his injuries and not what happened after

4    Noah went limp.  Failure to obtain the tape in light of

5    the other evidence and Munoz-Rueda's testimony does not

6    equate to ineffective assistance of counsel.  There was no

7    evidence that having a tape of the 911 call would have

8    changed the outcome of the case and her argument fails on

9    that prong alone.

10          In claim 1L the petitioner alleges that

11   counsel was ineffective for failing to file pretrial

12   motions, one motion to suppress her statements to Waldron

13   and the other to prevent the Commonwealth's witness from

14   attributing Noah's symptoms to non-accidental trauma or

15   SBS.  However, in order to prevail on these grounds the

16   petitioner must show that the motions were meritorious and

17   the verdict would have been different absent the

18   excludable evidence.

19          Ms. Munoz-Rueda's statement was relevant and

20   it was for the jury to decide the weight and value that it

21   would give that statement and her testimony concerning

22   that statement.  Similarly, it is for the jury to weigh

23   and credit or discard the testimony of a witness that they

FED APP 407

15

1    do not find credible.  Unless the expert has no valid

2    basis for his opinion it is the jury's role  to determine

3    the outcome of the case based on the different opinions

4    presented after they had evaluated them and it was not the

5    Court's role.  It was abundantly clear to the jury and the

6    Court that there was a divergence of opinion and it was

7    for the jury to decide which expert was more persuasive.

8    Both parties presented thoughtful and thorough testimony

9    from their experts on this issue.

10           It is clear that it is a debated issue in the

11   medical community.  The petitioner has not presented

12   sufficient evidence to show that counsel's performance was

13   deficient or that there was a reasonable probability that

14   but for failing to file these motions the result of the

15   proceedings would have been different.

16           Claim 1J, Munoz-Rueda alleges defense counsel

17   failed to object to jury Instruction Number 6 which they

18   claim was an erroneous statement of law.  The Court finds

19   that the instruction correctly stated the law applicable

20   to this case.  Accordingly Munoz-Rueda has failed to

21   demonstrate counsel's performance was deficient or there

22   was a reasonable probability that but for counsel's

23   alleged error the result of the proceedings would have

FED APP 408

16

1    been different.

2           In claim 2 of the petition the Petitioner

3    alleges that her 5th and 14th Amendment due process rights

4    were violated by the Commonwealth by its failing to

5    disclose evidence favorable to her in its possession and

6    by knowingly allowing witnesses to present false

7    testimony.

8           In the first instance she alleges that the 911

9    call contained evidence favorable to her because it would

10   bolster her account over that of Waldron's and because it

11   would have supported the views of her experts.  She

12   described the statements made on this call as exculpatory

13   and therefore the failure to provide a statement was a

14   violation under the decision in Brady vs. Maryland.  In

15   this case the petitioner was aware that she had made the

16   911 call and knew what had been said.  Furthermore, she

17   knew where to obtain a recording of the 911 call.

18          Moreover, the same evidence came in both

19   through the Petitioner's and the Commonwealth's witness

20   Ms. Waldron.  The fact that she called and was given

21   directions for CPR does not automatically mean she was not

22   responsible for the child's injuries.

23          There is no additional evidence from which

RUDIGER, GREEN & KERNS REPORTING SERVICE
CERTIFIED VERBATIM REPORTERS
4116 LEONARD DRIVE
FAIRFAX, VIRGINIA 22030
(703) 591-3136

FED APP 409

17

1      this Court could find there is a reasonable probability of

2      a different result had the jury been provided the 911 tape

3      in light of the other evidence presented.

4              As to the claim of allowing false testimony

5      before the jury, under Jaleo(ph) vs. United States and its

6      progeny the petitioner must show that the testimony was

7      false, that the Commonwealth knew that the testimony was

8      false and that such testimony was material.

9              Munoz-Rueda alleges that the prosecution

10     mislead the jury in its opening and closing arguments;

11     that the Commonwealth allowed its medical experts,

12     specifically Dr. William Hauda and Dr. Dawn Thornton, to

13     mislead the jury regarding Noah's health without

14     correcting the record; that the prosecution had many

15     opportunities to correct the record and did not in such

16     mischaracterization was material.  These claims could have

17     and should have been raised at trial and on direct appeal

18     and are barred by the rule in Slayton vs. Perrigrine.

19             Moreover, there is no evidence that the

20     statements that Noah had been a healthy baby was false or

21     that the Commonwealth knew that they were false.  On the

22     other hand there was evidence that Noah's condition was

23     not related to the underlying conditions.  There was no

FED APP 410

18

1    evidence of any genetic predisposition had manifested

2    itself at all in Noah prior to the incident or that

3    manifested itself after the accident up until the time of

4    trial.   Therefore claim 2B is dismissed.

5           Claim 3, the Petitioner alleges that the

6    cumulative effort of the claimed errors undermines the

7    confidence and the outcome of the trial.  She claims that

8    but for the errors of her counsel at trial and the

9    prosecutor's failure to present accurate information to

10    the jury the result would have been different.  Having

11    already ruled that the individual claims do not amount to

12    ineffective assistance of counsel and that there was no

13    evidence that the prosecutor knowingly mislead the jury

14    with misinformation, or that any of the alleged errors

15    would have affected the outcome of this case this claim is

16    also not supported by the evidence and is dismissed.

17           For these reasons and after considering the

18    arguments of counsel the motion to dismiss Munoz-Rueda's

19    petition for a writ of habeas corpus is granted.

20           Are there any questions?

21           MS. BOURNE:  No, Your Honor.

22           THE COURT:  All right.  Ms. Bourne, will you

23    draft an order reflecting the Court's ruling and present

FED APP 411

19

1   it to Mr. Sheldon for endorsement.  The transcript of this

2   decision will be referenced and incorporated in the order.

3   I will place the matter on my docket for August 16, 2012

4   at 10:00 for the presentation of the order.  If you have

5   an fully-endorsed order forward it to chambers before that

6   date and there is no need for anyone to appear.  Please

7   contact my law clerk Kate Tellus at 246-4189 to let her

8   know that that matter may be removed from the docket.

9            Thank you, counsel, for a very thorough

10  briefing and presentation.

11           MS. BOURNE:  Thank you, Your Honor.

12                    *  *  *  *  *

13           (Whereupon, at approximately 10: 15 o'clock

14  a.m., the hearing in the above-entitled matter was

15  concluded.)

16

17

18

19

20

21

22

23

FED APP 412

20

1

* * * * *

CERTIFICATE OF COURT REPORTER

I, CAROL D. NEELEY, a Verbatim Reporter, do hereby certify that I took the stenographic notes of the foregoing proceedings and thereafter reduced the same to typewriting; that the foregoing is a true record of the testimony given by said witnesses; that I am neither counsel for, related to, nor employed by any of the parties to the action in which these proceedings were held; and, further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially or otherwise interested in the outcome of the action.

_____
CAROL D. NEELEY
Court Reporter

FED APP 413

# IN THE SUPREME COURT OF VIRGINIA

Record No. _____

## TRUDY ELIANA MUÑOZ RUEDA,

### *Petitioner-Appellant,*

v.

## HAROLD W. CLARKE, DIRECTOR,
## VIRGINIA DEPARTMENT OF CORRECTIONS,

### *Respondent-Appellee.*

## PETITION FOR APPEAL

Matthew L. Engle, VSB No. 46833
THE INNOCENCE PROJECT AT UVA SCHOOL OF LAW
580 Massie Road
Charlottesville, Virginia 22903
(434) 924-2912
(434) 924-7315 (facsimile)
matthewengle@virginia.edu

Jonathan P. Sheldon, VSB No. 66726
SHELDON, FLOOD & HAYWOOD, PLC
10621 Jones Street, Suite 301-A
Fairfax, Virginia 22030
(703) 691-8410
(703) 251-0757 (facsimile)
JSheldon@csfdefense.com

FED APP 414

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................iii

ASSIGNMENTS OF ERROR.......................................................... 1

NATURE OF THE CASE AND
MATERIAL PROCEEDINGS BELOW ............................................ 3

STATEMENT OF FACTS ................................................................ 4

SUMMARY OF THE ARGUMENT.................................................. 8

STANDARD OF REVIEW............................................................... 12

AUTHORITIES AND ARGUMENT.................................................. 12

CONCLUSION ............................................................................... 35

CERTIFICATE PURSUANT TO  5:17(i) ......................................... 37

FED APP 415

# TABLE OF AUTHORITIES

## STATE CASES

*Green v. Young*, 264 Va. 604, 571 S.E.2d 135 (2002) .............................. 31

*Slayton v. Parrigan*, 215 Va. 27, 205 S.E.2d 680 (1974) .......................... 33

*State* v. *Edmunds*, 746 N.W.2d 590 (Wisc. App. 2008)............................... 8

*Westgate at Williamsburg Condominium Ass'n, Inc. v. Philip Richardson Co., Inc.*, 621 S.E.2d 114, 118, 270 Va. 566, 574 (2005) ....................... 12

## STATUTES

Va. Code § 18.2-371.1 .............................................................................. 3

Code § 40.1-103………………………………………………………………...3

## FEDERAL CASES

*Brady v. Maryland*, 373 U.S. 83 (1963)..................................................... 31

*Giglio v. United States*, 405 U.S. 150 (1972) ....................................... 32, 33

*Morris v. Commonwealth*, 272 Va. 732, 738, 636 S.E.2d 436, 439 (2006) 30

*Napue v. Illinois*, 360 U.S. 264 (1959) ................................................ 32, 33

*Strickland v. Washington*, 466 U.S. 668 (1984)………...…………………..12

FED APP 416

## ASSIGNMENTS OF ERROR

1.      The circuit court erred in dismissing Ms. Muñoz's claim that her Sixth and Fourteenth Amendment right to the effective assistance of counsel was violated when trial counsel failed to seek a continuance (habeas claim I-A, preserved at Petition 13-15, Reply 6-11).

2.      The circuit court erred in dismissing Ms. Muñoz's claim that her Sixth and Fourteenth Amendment right to the effective assistance of counsel was violated when trial counsel failed to review the medical records of the alleged victim (habeas claim I-B, preserved at Petition 15-25. Reply 11-15).

3.      The circuit court erred in dismissing Ms. Muñoz's claim that her Sixth and Fourteenth Amendment right to the effective assistance of counsel was violated when trial counsel failed to challenge Joslyn Waldron's testimony regarding Ms. Muñoz's alleged confession (habeas claim I-E, preserved at Petition 29-33, Reply 19-21).

4.      The circuit court erred in dismissing Ms. Muñoz's claim that her Sixth and Fourteenth Amendment right to the effective assistance of counsel was violated when trial counsel failed to attack the integrity of the treating physicians' medical investigation into the cause of Noah Whitmer's symptoms (habeas claim I-F, preserved at Petition 33-35, Reply 22-23).

5.      The circuit court erred in dismissing Ms. Muñoz's claim that her Sixth and Fourteenth Amendment right to the effective assistance of counsel was violated when trial counsel failed to present testimony from Dr. Barnes (habeas claim I-D, preserved at Petition 26-29, Reply 18-19).

6.      The circuit court erred in dismissing Ms. Muñoz's claim that her Sixth and Fourteenth Amendment right to the effective assistance of counsel was violated when trial counsel failed to present medical evidence regarding Noah's illness (habeas claims I-B(1), I-B(2), and I-B(3), preserved at Petition 17-22).

7.      The circuit court erred in dismissing Ms. Muñoz's claim that her Sixth and Fourteenth Amendment right to the effective assistance of counsel was violated when trial counsel failed to present evidence from lay

FED APP 417

witnesses regarding Noah's illness (habeas claim I-C, preserved at Petition 25-26, Reply 15-18).

8.    The circuit court erred in dismissing Ms. Muñoz's claim that her Sixth and Fourteenth Amendment right to the effective assistance of counsel was violated when trial counsel failed to present character evidence (habeas claim I-G, preserved at Petition 35-37).

9.    The circuit court erred in dismissing Ms. Muñoz's claim that her Sixth and Fourteenth Amendment right to the effective assistance of counsel was violated when trial counsel failed to secure a copy of the 911 call (habeas claim I-H, preserved at Petition 37-39, Reply 23-24).

10.    The circuit court erred in dismissing Ms. Muñoz's claim that her Sixth and Fourteenth Amendment right to the effective assistance of counsel was violated when trial counsel failed to failed to object to an improper jury instruction (habeas claim I-J, preserved at Petition 41-44, Reply 25-26).

11.    The circuit court erred in dismissing Ms. Muñoz's claim that her Sixth and Fourteenth Amendment right to the effective assistance of counsel was violated when trial counsel failed to file pre-trial motions (habeas claim I-I, preserved at Petition 39-41, Reply at 24).

12.    The circuit court erred in dismissing Ms. Muñoz's claim that her due process rights were violated when the Commonwealth withheld exculpatory evidence (habeas claim II-A, preserved at Petition 44-47).

13.    The circuit court erred in dismissing Ms. Muñoz's claim that her due process rights were violated when the Commonwealth knowingly presented false testimony (habeas claim II-B, preserved at Petition 47-51).

14.    The circuit court erred in dismissing Ms. Muñoz's claim that her Sixth and Fourteenth Amendment rights to the effective assistance of counsel and due process of law were violated by the cumulative prejudicial impact of her attorney's failures and prosecutorial misconduct (habeas claim III, preserved at Petition 51-52, Reply 26-27)

FED APP 418

15.   The lower court erred in granting summary dismissal without an evidentiary hearing and without permitting discovery (preserved at Petition 53).

## NATURE OF THE CASE AND MATERIAL PROCEEDINGS BELOW

Petitioner Trudy Muñoz Rueda (hereinafter "Ms. Muñoz") is innocent. Her convictions of abusing the infant in her care are the result of a failure of the adversarial process.  Her defense attorneys, Guilliermo Uriarte and James Kearney, had never previously tried a felony case of this magnitude; Kearney concedes that they provided constitutionally ineffective representation in numerous ways.  *See* Pet. Ex. B at ¶ 6.  Despite the fact that defense counsel admits that Ms. Muñoz did not receive effective representation, the lower court summarily denied Ms. Muñoz's habeas petition without taking any evidence.

On July 20, 2009, Ms. Muñoz was indicted for child abuse or neglect (Va. Code § 40.1-103) and willful or negligent cruelty or injury to a child (Va. Code § 18.2-371.1(A)) in Fairfax County.  The Commonwealth's theory of the case was that the child in question, Noah Whitmer, suffered severe intracranial injuries when his caretaker, Ms. Muñoz, violently shook him.  The Commonwealth's evidence focused on Shaken Baby Syndrome (hereinafter "SBS"), a highly controversial medical hypothesis, which posits that abusive trauma can be inferred from a triad of symptoms: subdural

3

hematoma (bleeding in the brain), retinal hemorrhages (bleeding in the eyes), and cerebral edema (accumulation of water in the brain). On January 21, 2010, a jury found Ms. Muñoz guilty on both counts. The trial court imposed six years and six months and fine of $12,500 for the child abuse or neglect charge, and four years for the willful or negligent cruelty or injury to a child charge.

Ms. Muñoz's direct appeals were concluded on November 14, 2011. This habeas action was instituted on November 14, 2012, by undersigned *pro bono* counsel. Without conducting a hearing, the lower court granted summary dismissal on September 11, 2013. Ms. Muñoz asks this Court to grant an appeal.

## STATEMENT OF FACTS

On April 20, 2009, Ms. Muñoz was caring for five children at her home daycare center in Alexandria. Five-month old Noah Whitmer had enrolled in Ms. Muñoz's day care nearly five weeks earlier. Tr. 1/11/2010 at 118. Witnesses had observed that Noah had been unusually fussy throughout the day and during the preceding week prior to April 20. Pet. Ex. F at ¶ 8; Pet. Ex. C at ¶ 9; Tr. 1/20/2010 at 103. Even Noah's mother was aware of Noah's recent discontent, and believed that a recent switch to solid food might have been the cause (Tr. 1/20/2010 at 103); however, both

4

FED APP 420

Ms. Muñoz and a second care-taker, Eva Valle, noted that Noah was not inclined to drink formula that day either.  Tr. 1/20/2010 at 87.  Additionally, Valle had observed that Noah's bowel movements were abnormal and off-color.  Pet. Ex. F. at ¶ 8.

On April 20, Ms. Muñoz attempted to comfort Noah in every way she knew; she fed him (Tr. 1/20/2010 at 88); she changed his diaper (Tr. 1/20/2010 at 90); she played games with him (Tr. 1/20/2010 at 92); she helped him exercise (Tr. 1/20/2010 at 94); she sang to him (Tr. 1/20/2010 at 95); she gave him a pacifier (Tr. 1/20/2010 at 99); she encouraged him to nap (Tr. 1/20/2010 at 108-09).  These efforts helped temporarily, but each time he would soon become fussy again.  Tr. 1/20/2010 at 88-103.

Between 1:00 P.M. and 2:15 P.M., shortly after Ms. Muñoz began feeding Noah another bottle, she suddenly felt that one of his arms had gone limp.  Tr. 1/20/2010 at 114.  Concerned that he was having difficulty swallowing the formula, Ms. Muñoz cradled Noah on her shoulder and patted him on the back.  Tr. 1/20/2010 at 115.  As she was holding him, she felt his body curl into a "little ball," so she moved him to the changing table and tried to move his arms.  Tr. 1/20/2010 at 115.  Once she saw that Noah's chest was not moving, she placed him on the floor and began performing CPR.  Simultaneously, she called 911 for assistance.  Tr.

FED APP 421

1/20/2010 at 116.  The dispatcher stayed on the phone with her, instructing

her to perform CPR and to remove Noah's clothes.  Tr. 1/20/2010 at 118.

Noah then began vomiting milk through his nose and mouth.  Tr. 1/20/2010

at 119.  When the EMTs arrived, Ms. Muñoz advised them of the situation,

telling them that Noah appeared to have choked on milk.  Tr. 1/12/2010 at

22.  Noah was quickly transported to the hospital.

Later that day, the police interviewed Ms. Muñoz in her home.  Tr.

1/12/2010 at 200.  This interview lasted approximately two hours and was

recorded.  *Id.* at 201-02.  During that time, Ms. Muñoz consistently denied

doing anything to harm Noah, but explained that he went limp as she was

trying to give him a bottle.  *Id.* at 200-01.  Ms. Muñoz did not hesitate to

allow this interview to be recorded.  *Id.* at 206.

The following day, April 21, Ms. Muñoz was again interviewed in her

home, this time by Joslyn Waldron, a Child Protective Services social

worker who investigates cases of child abuse.  Tr. 1/12/2010 at 150-51.

Also present was a police officer, Nancy Cottrell.  *Id.* at 152.  Waldron

testified that Ms. Muñoz declined to consent to having the interview

recorded (a highly dubious claim given Ms. Muñoz's willingness to have the

prior police interview recorded).  *Id.* at 155.  At any rate, Waldron testified

that during this interview, Ms. Muñoz told her essentially the same story

6

FED APP 422

that she had told police the day before and denied that she had harmed

Noah. *Id.* at 160-61.  During the interview, Waldron received a call from

INOVA-Fairfax hospital describing Noah's symptoms. *Id.* at 161.  Waldron

explained Noah's symptoms to Ms. Muñoz, told Ms. Muñoz that these

symptoms were consistent with shaking, and emphasized the importance

of knowing the truth about what happened to Noah.  *Id.*  Waldron claimed

that Ms. Muñoz responded by stating that she had picked Noah up, held

him with one hand under his butt and another hand on the back of his neck,

shook him and "moved him hard." *Id.* at 162.  Waldron also provided a

visual demonstration of the way Ms. Muñoz reported handling Noah.  *Id.*

       In reports to INOVA-Fairfax Hospital, Waldron characterized Ms.

Muñoz's statement as a confession to having shaken Noah.  *See infra* at

AOE 4.  Based upon Waldron's reports, healthcare professionals at

INOVA-Fairfax Hospital cursorily concluded that Ms. Muñoz had

intentionally injured Noah.  Noah's medical records are rife with erroneous

reports that Ms. Muñoz confessed to shaking Noah.  Pet. Ex. A;[1] *see also*

*infra* at AOE 4.  Based upon this alleged confession, Noah's treating

---

[1] Petitioner's Exhibit A is Noah's medical file from INOVA-Fairfax.  This
exhibit was filed under seal on a compact disc by order of the lower court.

FED APP 423

physicians accepted that Ms. Muñoz had abused Noah, and never seriously investigated other potential and likely causes of his symptoms.

### SUMMARY OF THE ARGUMENT

Recent developments in the medical and legal communities establish that convictions based upon the SBS hypothesis are highly suspect.  SBS convictions across the country are being overturned because of the faulty nature of the "scientific" expert testimony underlying them.  Conclusions of abuse based merely on the triad of symptoms without any further external signs of trauma (such as grip marks, bruises, or broken bones) are unable to withstand scrutiny.  As of March 2013, at least sixteen SBS convictions have been vacated or commuted in the United States.  *See* Reply Brief at 3 fn. 3.[2]  Former experts who provided testimony, courts, and the medical community realize that the "science" underpinning these convictions was never adequately established and does not exist in the absence of evidence of external trauma.  *See, e.g., State* v. *Edmunds,* 746 N.W.2d 590, 596 (Wisc. App. 2008) ("Doubt has increased in the medical

---

[2] In addition to those listed in Ms. Muñoz's Reply Brief, the additional convictions have been thrown out: Armando Castillo, Arizona, 1998-2011; Cathy Lynn Henderson, Texas, 1994-2012; Ernie Lopez, Texas, 2003-2012; Quentin Louis, Wisconsin, 2006-2009.

FED APP 424

community 'over whether infants can be fatally injured through shaking alone.'").

In this case, post-conviction investigation uncovered a wealth of evidence undermining the Commonwealth's case against Ms. Muñoz, and proving that Noah's symptoms were most likely non-traumatic in nature. But due to a combination of ineffective representation by defense counsel and withheld exculpatory evidence, the jurors never got to hear any of this information. In light of this compelling evidence—all of which was available to defense counsel or in the possession of the Commonwealth—this Court should have no confidence in the outcome of Ms. Muñoz's trial.

Defense counsel's failures can be roughly grouped into two categories. First, defense counsel failed to undermine the Commonwealth's case. Specifically, defense counsel failed to present evidence that, in reaching their "diagnosis" of SBS, the treating physicians relied on social worker Joslyn Waldron's false report that Ms. Muñoz had confessed to shaking Noah. In fact, defense counsel could have proven that Ms. Muñoz never confessed to shaking Noah. Instead of conducting differential diagnoses and eliminating possible non-traumatic causes of Noah's symptoms, his medical team at INOVA-Fairfax simply accepted Waldron's false report that Ms. Muñoz had confessed. This misinformation

9

FED APP 425

was then transmitted to the jury through the medical witnesses under the guise of a diagnosis, even as Waldron took the stand and walked back her claim that Ms. Muñoz had confessed to shaking Noah.

Counsel's failure to show the jury the extent to which Waldron's false report of a confession had tainted the medical testimony was a direct result of their failure to review Noah's medical records carefully and thoroughly. In fact, those records—spanning over 1000 pages—were not provided to defense counsel until December 16, 2009, less than a month before trial. The records, which included Noah's CT and MRI scans, were the single most important piece of evidence in this case but were not provided to the defense experts until December 29, 2009 (Dr. Barnes), January 4, 2010 (Dr. Gardner), and January 6 (Dr. Thibault).  Trial commenced *five days* later.  Trial counsel have admitted that they had insufficient time to review the medical records adequately, yet failed to request a continuance so that they and their experts could review and understand the significance of this information.

For the same reason, defense counsel was unable to rebut the Commonwealth's false assertion that prior to April 20, 2009, Noah Whitmer was a perfectly healthy child.  In fact, Noah's medical files were replete with information suggesting that Noah was sick prior to April 20, but the jury

FED APP 426

never heard this information due to trial counsel's failure to review his records carefully. Evidence that Noah was unwell prior to April 20 would have been relevant to presenting the jury an alternate explanation for his symptoms. This was the second category of ineffective representation: trial counsel failed to present the jury with the most plausible non-traumatic explanations for Noah's symptoms. Once he had time to review the medical records, Dr. Patrick Barnes, a pre-eminent pediatric neuroradiologist who has testified for both the prosecution and defense in SBS cases, would have been able to provide the jury with his firm medical opinion that Noah's symptoms were actually the result of a series of strokes caused by a thrombosed (clotted) vein in Noah's brain. In fact, Dr. Barnes was so convinced that Noah's symptoms were not the result of abuse that he offered to travel to Virginia from California and provide *pro bono* expert services to the defense team. However, the jury never got to hear this testimony because trial counsel failed to secure Dr. Barnes's presence at trial and failed to obtain a continuance so that they could present this critical medical opinion.

These were not the only constitutional errors that occurred at Ms. Muñoz's trial. However, standing alone, they are more than sufficient to undermine confidence in her convictions. The Court should grant this

11

appeal to review the lower court's decision to grant summary dismissal of this habeas action.  At a minimum, the Court should reverse the lower court's judgment and remand this case for discovery, factual development, and an evidentiary hearing.

## STANDARD OF REVIEW

The circuit court's rulings on Ms. Muñoz's habeas claims are mixed questions of law and fact; therefore, this Court's standard of review of Assignments of Error 1-15 is *de novo*.  *Westgate at Williamsburg Condominium Ass'n, Inc. v. Philip Richardson Co., Inc.*, 621 S.E.2d 114, 118, 270 Va. 566, 574 (2005).

## AUTHORITIES AND ARGUMENT

I.   **TRIAL COUNSEL FAILED TO CHALLENGE THE COMMONWEALTH'S EVIDENCE THAT NOAH'S SYMPTOMS WERE THE RESULT OF SHAKEN BABY SYNDROME.**

In her habeas petition, Ms. Muñoz raised a number of claims of ineffective assistance of counsel.  Analysis of these claims is controlled by the two-part test articulated in *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  First, petitioner must show that "in light of all the circumstances, the identified acts or omissions [by counsel] were outside the wide range of professionally competent assistance."  *Strickland*, 466 U.S. at 690. Second, petitioner ordinarily must demonstrate prejudice by showing "a

reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A "reasonable probability" of a different result does not mean that the result "more likely than not" would have been different; rather, the probability of a different result is reasonable if it is "sufficient to undermine confidence in the outcome" of the trial. *Id.* at 693-94.

**AOE 1:**   As discussed previously, the Commonwealth did not provide Noah Whitmer's voluminous medical records until December 16, 2009, less than a month before trial. The defense experts did not receive them until much later. Pet. Ex. R at ¶ 2. This simply did not allow sufficient time for counsel and their experts to review these records thoroughly.

Defense counsel have admitted as much. Uriarte confirms, "I never considered asking for a continuance of the trial date. I had no reason not to ask for one, and in retrospect, it likely would have been helpful to give both Kearney and our experts more time to develop their medical theory of the case." Pet. Ex. Q at ¶ 15. Uriate felt "rushed into trial" and that the defense team's "preparation in the weeks after discovery was provided was frantic." *Id.* Defense attorney James Kearney states:

> Mr. Uriarte did not discuss with me the possibility of securing a continuance in order to ensure Dr. Barnes's availability, and I never thought of it. Based upon my experience in civil cases, the court will not grant a continuance because the defense

FED APP 429

needs additional time to prepare its experts.  At the time, I did
not understand that we had a strong basis for a continuance in
light of the fact that the Commonwealth provided over 1,000
pages of medical records less than one month before our trial
date.  It simply never occurred to me, as a civil attorney, that we
would have been able to get a continuance of the trial.  I
recognize now that my understanding was 180 degrees off.  We
almost certainly could have gotten a continuance, and more
time was critical in order to present testimony from our experts
and Dr. Barnes that there were alternate medical explanations
for Noah Whitmer's injuries that did not involve trauma.

Pet. Ex. B at ¶ 11.

   **AOE 2:**     Because they had so little time to review Noah's medical

records before trial, defense counsel failed to discover the relevant

information they contained.  Uriarte stated, "I may have looked through the

medical records briefly, but my review of them was not comprehensive."

Pet. Ex. R at ¶ 10.  Kearney added, "[d]ue to the late disclosure of Noah

Whitmer's medical records, I was unable to review the medical records in

the level of detail to which I am accustomed in a civil case."  Pet. Reply Ex.

B at ¶ 4.  This failure prevented trial counsel from understanding the extent

to which the treating physicians' testimony was based upon Joslyn

Waldron's false report to the hospital that Ms. Muñoz had confessed to

shaking Noah (*see infra* at AOE 4), and from finding significant information

regarding the actual and non-traumatic causes of Noah's symptoms (*see*

*infra* at AOE 5).

FED APP 430

**AOE 3:**   Ms. Muñoz never confessed to shaking Noah.  At trial,

Ms. Muñoz demonstrated how she handled Noah prior to his admission to

the hospital—she lifted him and moved him while holding him close to her

body.  Tr. 01/20/2010 at 149.  Waldron also testified to Ms. Muñoz's

handling of Noah.  She testified at trial that, during an unrecorded interview

on April 21, 2010, Ms. Muñoz said that she moved Noah "hard."  Tr.

1/12/2010 at 162.  Waldron further testified that when she asked Ms.

Muñoz to clarify, "[Ms. Muñoz] said that she had one hand under his butt

and she had one hand on the base of his neck."  Tr. 1/12/2010 at 162.

Whether the jury credited the testimony of Waldron or Ms. Muñoz is

inconsequential.  At the end of the day, neither of the abovementioned

characterizations conceivably amounts to a confession that Ms. Muñoz

shook Noah to the extent necessary to cause his symptoms.

In post-conviction proceedings, two key witnesses provided affidavits

corroborating that Ms. Muñoz never confessed to shaking Noah.  Hernani

Ames, Ms. Muñoz's husband at the time of trial, stated in his affidavit that

he arrived home on April 21, 2009, while Waldron and Detective Nancy

Cottrell were questioning Ms. Muñoz.  Ames stated that when he arrived

home, Waldron and Cottrell were talking amongst themselves and told

Ames that Ms. Muñoz had already admitted to shaking Noah.  Pet. Ex. D at

¶ 4.  Alarmed, Ames then turned to his wife and asked, "[w]hat did you say?"  Pet. Ex. D at at ¶ 5.  Ames stated that Ms. Muñoz then demonstrated to him what she had shown to Waldron minutes earlier.  He explained that she had one hand under the doll's bottom and one behind its back—"the way anyone would hold a baby to calm" it down.  Pet. Ex. D at ¶ 5.  As Ms. Muñoz demonstrated this movement, Ames recalled that either Waldron or Cottrell cried: "See? That's shaking, that's shaking!"  Pet. Ex. D at ¶ 5.  Ames stated that he was "surprised when [they] said 'that's shaking,' because Ms. Muñoz clearly was not shaking the doll.  She was bouncing the doll gently in a soothing way."  Pet. Ex. D. at ¶ 6.

Another witness that could have attested to this series of events was Eva Valle—a daycare helper and Ms. Muñoz's sister-in-law. In her affidavit, Valle explained that as she sat in the basement and overheard the discussions between Ms. Muñoz and Waldron, she recalled that Ms. Waldron kept probing Ms. Muñoz about what she did to Noah and accusing her of hurting the baby.  Pet. Ex. F. at ¶ 9.  Valle asserted, "Trudy never accepted that she did anything to harm the baby.  Pet. Ex. F. at ¶ 11.

Trial counsel's failure to present testimony from Ames and Valle was ineffective.  Given the manner in which the Commonwealth ultimately downplayed Waldron's testimony and Ms. Muñoz's alleged confession, it is

FED APP 432

possible that the jury did not place much weight on Waldron's testimony. Nonetheless, it is abundantly clear in light of the trial and habeas records that no such confession actually happened. Moreover, however incredible Waldron's trial testimony might have seemed to the jury, there was a more fundamental problem. Despite what Waldron said on the witness stand, she told Noah's treating physicians that Ms. Muñoz had confessed to shaking Noah. Reasonably effective trial counsel would have presented all available evidence that Ms. Muñoz had not confessed, including the testimony of Ames and Valle, and, more importantly, would have demonstrated to the jury how Waldron's false report of a confession tainted the medical conclusions and testimony of Noah's treating physicians.

**AOE 4:** At trial, the Commonwealth urged the jury to convict Ms. Muñoz primarily on the strength of its medical testimony. During closing arguments, the prosecution urged that, whatever the jury's thoughts were surrounding Ms. Muñoz's alleged admission, it could undoubtedly rely on the soundness of the medical evidence and witnesses attesting to the cause of Noah's injuries. Tr. 1/20/2010 at 276. What the jury never heard, however, was that the Commonwealth's medical witnesses formed their opinions based upon Waldron's false report that Ms. Muñoz had confessed.

FED APP 433

The medical records reveal that on April 22, 2009, at 7:46 A.M., a CPS worker called the hospital to inform treating physicians of Ms. Muñoz's alleged confession to shaking Noah. That call sealed Ms. Muñoz's fate— initiating a domino effect in which treating physicians repeatedly viewed it and relied upon it for its truth. The notation "confession from baby sitter who shook baby" appears at least nine times throughout Noah's medical file. *See* Pet. Ex. A at 530 (4/22/2009 at 7:46 AM); *id.* at 538 (4/23/2009 at 2:21 PM); *id.* at 545 (4/24/2009 at 7:38AM); *id.* at 555 (4/26/2009 at 6:47PM); *id.* at 559 (4/29/2009 at 3:46PM); *id.* at 568 (4/29/2009 at 12:37AM); *id.* at 575 (4/30/2009 at 3:55PM); *id.* at 1003 (5/08/2009); *id.* at 1037 (5/08/2009). Other references to "babysitter shaking baby" are also found throughout the medical records. *Id.* at 149 (4/22/2009); *id.* at 839 (5/3/2009). Of course, Waldron never showed her trial "demonstration," which consisted of Ms. Muñoz cradling Noah with a hand on his butt and a hand on his back, to Noah's doctors; all the doctors were told was that Ms. Muñoz had confessed.

The defense counsels' failure to recognize this crucial evidence in the medical records led to a series of additional failures. Had defense counsel recognized that "confession by babysitter" appeared so rampantly throughout the records, they could have explored the extent to which

18

Waldron's false report of a confession contaminated the treating physicians' conclusions about what happened to Noah. Any reasonably effective defense attorney would have used the records to ask each Commonwealth's expert (1) whether he was aware of the report that Ms. Muñoz had "confessed;" (2) whether his understanding of this "confession" was consistent with Waldron's trial testimony—that Ms. Muñoz cradled Noah with a hand on his butt and a hand on his neck; and (3) whether the way that Ms. Muñoz actually handled Noah could conceivably have caused the cerebral edema, retinal hemorrhaging, and subdural hematoma. Any honest witness would have had to admit that the report that Ms. Muñoz had "confessed" was not consistent with what Waldron described at trial, and that what Waldron described at trial could not possibly resulted in these symptoms.

## II.   TRIAL COUNSEL FAILED TO PRESENT EVIDENCE THAT NOAH'S SYMPTOMS WERE NON-TRAUMATIC IN ORIGIN.

**AOE 5:**      Had trial counsel thoroughly familiarized themselves with the medical records, they would have realized that the critical and concrete evidence that Noah's condition was not caused by abuse was memorialized on his MRI and CT scans, and that Dr. Patrick Barnes was the only defense expert qualified to interpret the scans and explain them to the jury. Dr. Barnes is a pediatric neuroradiologist, and he has been

FED APP 435

practicing for 35 years.  Pet. Ex. R at ¶ 1.  He is currently Chief of the

Section of Pediatric Neuroradiology and Co-Director of the Pediatric MRI

and CT Center at the Lucile Packard Children's Hospital and the Stanford

University Medical Center in Palo Alto, California.  *Id.*  He is also a

professor of radiology at Stanford.  *Id.*  His CV, spanning over 50 pages, is

attached to his affidavit.  Pet. Ex. R.  After reviewing Noah's scans, Dr.

Barnes was so convinced that his symptoms were not caused by shaking

or abuse that he offered to travel from California to Virginia to testify *pro

bono* in this case.  Pet. Ex. R at ¶¶ 2, 19.  However, because Dr. Barnes

only received the scans on December 29, 2009, less than two weeks

before trial began, he was unable to attend the trial unless counsel

obtained a continuance.  *Id.* at ¶ 19.  Counsel's failure to seek a

continuance so that Dr. Barnes could testify was not the result of a

reasoned strategic decision.  *See* Pet. Ex. Q at ¶¶ 14-15 (although he

intended to use Dr. Barnes as a witness up until the week of trial, Uriarte

"never considered" seeking a continuance); *see also* Pet. Ex. B at ¶ 10-11.

The failure to secure Dr. Barnes's testimony was enormously

prejudicial to Ms. Muñoz.  Dr. Barnes determined that on April 20, 2009,

Noah suffered at least one latent cortical venous thrombosis—in layman's

terms, a blood clot in the brain—that caused a series of strokes.  Pet. Ex. R

FED APP 436

at ¶ 3; Reply Ex. 2 at ¶ 5. Dr. Barnes could have explained to the jury that these thromboses were very serious and capable of causing all of the symptoms observed in Noah on April 20, 2009. In Dr. Barnes's opinion, the retinal hemorrhage and subdural hematoma were the direct result of the venous thrombosis.[3] Pet. Ex. R. at ¶¶ 3, 12.

In response to Dr. Barnes's habeas affidavit, the Respondent submitted 18 pages of obfuscation in the form of an affidavit from one of its own experts, Dr. William Hauda. MTD Ex. B. Dr. Hauda is a pediatric emergency physician and a member of the "Pediatric Forensic Assessment and Consultation Team" at INOVA-Fairfax Hospital. *Id.* at 18; Tr. 1/13/10 at 94-95, 98. Although Dr. Hauda's affidavit is lengthy and uses a lot of big words, it makes only two salient points, both of which are wrong. First, Dr. Hauda describes the thrombosed vein in Noah's brain as a "single small vein thrombose." MTD Ex. B at 6. Significantly, Dr. Hauda is not a

---

[3] Dr. Barnes states that this is particularly likely where there are pre-existing conditions such as a re-bleed from an injury during the birthing process. Pet. Ex. R at ¶ 5. Another of the defense's experts, Dr. Ronald Uscinski, posited birth injury a likely pre-existing condition leading to Noah's symptoms on April 20, 2009. Pet. Ex. P at ¶ 14; Pet. Ex. R at ¶ 5. Where this condition does not heal on its own, it is a preexisting condition that by re-triggered by a venous thrombosis, a fact that Dr. Barnes would have corroborated. Pet. Ex. P at ¶ 14; *see also* Pet. Ex. R at ¶ 5. Thus, contrary to the lower court's opinion that testimony from Drs. Uscinski and Barnes would have been contradictory (Tr. 9/11/2013 at 9-10), their opinions were actually complementary.

FED APP 437

radiologist; he is an emergency room doctor. Therefore, he is not qualified to interpret the CT and MRI scans that reveal the thrombosed vein. Dr. Barnes, who is a neuroradiologist, "vigorously disputes [Dr. Hauda's] mischaracterization" of the thrombosed vein. Reply Ex. 2 at ¶ 3. In fact, Dr. Barnes states that Noah's thrombosed vein was "quite large, easily visible on his brain scans, and was capable of causing tremendous damage." Id. In fact, this was confirmed by the Commonwealth's radiologist, Dr. Muller, who also observed the thrombosed vein in Noah's scans. Tr. 1/20/2010 at 242, 245, 252.[4]

Second, Dr. Hauda contends that Noah's scans reveal cortical contusions and a corpus callosum injury—essentially, blunt force injuries to Noah's brain—and that these injuries could not have been caused by the venous thrombosis. MTD Ex. B at 6-7. But again, Dr. Hauda is offering opinions that he is not qualified to give. Dr. Barnes, who is qualified to interpret Noah's brain scans, "dispute[s] that these were injuries at all." Reply Ex. 2 at ¶ 4. Dr. Barnes continues: "What Dr. Hauda concludes are injuries are most likely strokes, which are a known mimic for, and are often mistaken as, deep brain injuries." Id. And again, this is confirmed by the testimony of the Commonwealth's radiologist, Dr. Muller, who testified that

---

[4] In fact, Dr. Barnes opined that Noah's MRI scans reveal other areas of the brain in which there appear to be thromboses. Reply Ex. 2 at ¶ 3.

FED APP 438

he saw abnormal results in Noah's MRI that were consistent with a stroke, and that the stroke "fits with that thrombus cortical vein." Tr. 1/20/2010 at 261. This is a critical factual dispute. Even Dr. Hauda concedes that, but for these deep brain injuries, "non-accidental trauma was a plausible explanation for [Noah's] findings *but certainly not the only explanation.*" MTD Ex. B at 14 (emphasis added). According to Dr. Hauda, "[f]urther evaluation in the hospital identified additional intracranial findings such as cortical contusions and injury to the corpus callosum which validated this initial diagnostic possibility." *Id.* at 14-15. Thus, Dr. Hauda would be forced to concede that if these so-called contusions and injury were actually strokes as the radiologist believed, then non-accidental trauma would still be merely a "plausible explanation" and a "diagnostic possibility," rather than a reliable medical diagnosis.[5]

If Dr. Barnes is correct, then all of Noah's symptoms can be explained by strokes resulting from a thrombosed cortical vein or veins. The obvious question remains: what caused the thromboses? In his post-

---

[5] Without taking evidence, and despite the fact that on a motion for summary dismissal the court is supposed to resolve factual disputes in favor of the non-moving party, the lower court appeared to credit Dr. Hauda's unqualified interpretation of Noah's scan over Dr. Barnes's qualified interpretation. The lower court opined that "Dr. Barnes' opinion does not explain the other injuries that were present." Tr. 7/25/2013 at 10. But Dr. Barnes denied that these were injuries at all.

FED APP 439

conviction affidavit, Dr. Hauda suggests for the first time that Noah's venous thrombosis was caused by impact trauma.  MTD Ex. B at 7.  This new supposition is remarkable given that there was no testimony at trial, nor any indication in the medical records, that Noah suffered any impact trauma whatsoever.  In fact, the Commonwealth's radiologist, Dr. Muller, testified that he specifically looked for fractures or other injuries to Noah's skull and found none.  Tr. 1/20/2010 at 243.  Dr. Muller concluded "there's no outward signs of direct trauma to the head."  *Id.*

Dr. Barnes would have testified that, in his entire 35-year career as a pediatric radiologist, he has **never** seen a case where shaking, without an accompanying impact injury, had caused a venous thrombosis.  Pet. Ex. R at ¶ 4.  Dr. Barnes agrees with Dr. Muller that Noah exhibited no bruising or other outward sign of abuse.  *Id.* at ¶ 4.  In fact, if defense counsel had reviewed the medical records and consulted with Dr. Barnes, they would have understood that Noah's records suggested several possible non-traumatic causes for the thrombosed vein that caused Noah's symptoms.

**AOE 6:**     As discussed previously, it is not contested that trial counsel only received the medical records less than a month before Ms. Muñoz's trial, but failed to seek a continuance.  *See supra* at AOE 2.  Consequently, defense counsel failed to understand the significance of

FED APP 440

much of the information contained in the medical records.  Had counsel

reviewed those records carefully, they would have understood that Noah

was unhealthy prior to April 20, 2009, and that his illnesses point to non-

abusive causes for the venous thrombosis that led to his crisis on April 20.

Contained in Noah's medical records are numerous notes from

nurses, doctors, and other professionals that the defense had an obligation

to present to the jury.  Noah's parents admitted to an intake nurse that a

"wooden plaque" had fallen off the wall in their home and struck Noah in

the head ten days prior to his admission to the hospital.  Pet. Ex. A at 527.

The same intake form records the parents' admission that Noah picked up

another "small bruise" on the right side of his forehead earlier in the week

from a separate unrelated incident.  *Id.*

The records also demonstrated that immediately upon reaching the

hospital, Noah was running a fever.  *Id.* at 907-14.  This fever persisted

through the next two days, went away, returned again on April 25, and

persisted through April 30, reaching a maximum temperature of 102.3

degrees.  *Id.* at 947-95.  This fever was likely due to the infections Noah

had.  The records show that doctors ran blood, urine, and sputum cultures

on Noah within hours of his hospital admissions, which tested positive for

pneumonia, strep, and staphylococcus aureus infections.  *Id.* at 237-39;

FED APP 441

907-14.  These infections persisted at least through April 28, Noah's ninth day in the hospital.  *Id.* at 650; 658-59.  Noah also had an issue with his breathing that pre-dated the incident on April 20.  Dr. Hulver, one of the Commonwealth's witnesses at trial, saw Noah for his four-month check-up days before the incident, and testified that the Whitmers reported at that time that Noah had been wheezing when breathing.  Tr. 1/21/10 at 78.[6] This is consistent with the hospital reports showing that Noah had to have white and tan fluids suctioned from his lungs on multiple occasions throughout his stay.  Pet. Ex. A at 907-95.  Indeed, the imaging that the hospital did of Noah's chest revealed that his infection had spread throughout his lungs.  *Id.* at 213; 216; 217; 223.  Other notes in the medical records indicate that Noah may have had a genetic predisposition that triggered his injuries; Noah's paternal grandfather experienced febrile seizures as an infant, he had cousins who suffered from muscular dystrophy, and he had another relative that died as a child from an unspecified chromosomal abnormality.  *Id.* at 85.

With the exception of Dr. Hulver's testimony, the jury never heard or saw any of this evidence.  The Commonwealth's experts were not cross-

---

[6] In an affidavit submitted in post-conviction proceedings, Noah's mother confirms that he had sounded like he had fluid on his lungs or was "wheezing" before April 20, 2009, and that these problems last many months after his hospitalization.  MTD Ex. A at ¶ 3.

26

FED APP 442

examined on these points, and Ms. Muñoz's attorneys did not present these facts affirmatively through their own witnesses. These facts are highly significant because, according to Dr. Barnes, infection and dehydration are common non-traumatic triggers of venous thrombosis, particularly where they exist in conjunction with one another, and especially where there are pre-existing conditions. Pet. Ex. R at ¶ 7. Dr. Barnes would have tied this knowledge to the facts of the case to illustrate the likelihood that infection and dehydration were factors leading to Noah's symptoms. Dr. Barnes would have emphasized to the jury the many powerful indications in the medical records that Noah's body was heavily infected with three different types of foreign microbes upon his admission to the hospital. *Id.* at ¶ 10.[7]

In summary, Dr. Barnes could have explained that Noah's venous thrombosis was most likely the result of infection, dehydration, and possibly

---

[7] Because venous thrombosis is a well-known complication of meningitis, Dr. Barnes would have also directed the jury's attention to a note made by Noah's opthamologist indicating that he may have had meningitis. Pet. Ex. R at ¶ 13. Because the eyes are connected to the brain by the optic nerve and its blood vessels, anything that happens in the brain can manifest itself in the eye. *Id.* at ¶ 12. Dr. Barnes would have been able to introduce the jury to Dr. Gardner, the defense opthamologist, who testified that the retinal hemorrhaging Noah experienced was consistent with meningitis. Moreover, it is significant that Dr. Hauda concedes the impossibility of ruling out meningitis as a cause of Noah's venous thrombosis because a lumbar puncture, the only test for conclusively diagnosing bacterial meningitis, was never even performed.

FED APP 443

non-intentional impact trauma such as a plaque falling on his head.  There was ample evidence in the medical records to support each of these theories, but the jury never heard any of it.  Dr. Barnes could further have explained that the thrombus led to stroke, which explains all of Noah's symptoms.  There is a reasonable probability that the outcome of trial would have been different if the jury had heard this testimony.

**AOE 7:**     In addition, the defense failed to call Renata Ames, the daughter of Ms. Muñoz, who helped take care of the children.  Ames recalled that Noah had been acting abnormally prior to April 20: "There was nothing I could do to stop him from crying…Nothing really calmed him down.  He was like this a couple of days before he got sick."  Pet. Ex. C at ¶ 9.  She noted that this behavior was "very unusual for him.  Normally, he was a very playful and happy baby." *Id.*  Eva Valle, Ms. Muñoz's sister and co-worker at the daycare, recalled much the same.  In "the week before April 20, 2009, Noah cried a lot and seemed troubled."  Pet. Ex. F at ¶ 9. She remembered that she and Ms. Muñoz "both noticed that his behavior was strange and wondered if it was because he was teething." *Id.*  Valle also noticed his feces was "abundant and green." *Id.*

This information could have bolstered Dr. Barnes's conclusion that Noah's throbus was a result of illness rather than abuse.  Pet. Ex. R at ¶ 7.

FED APP 444

Dr. Barnes could have explained to the jury that dehydration resulting from not feeding well, taking in too little fluid, or having diarrhea (all of which Valle's affidavit indicates to have been the case) causes cells and proteins in the body to become rigid, which can cause thrombosis. *Id.* at ¶ 9.

With respect to Ames, both attorneys admitted they simply neglected to ask what she knew. Pet. Ex. Q at ¶ 20; Pet. Ex. B at ¶ 13. With respect to Valle, one of the attorneys stated his "intent to call Eva Valle" (Pet. Ex. Q at ¶ 19) while the other claimed, "It did not occur to me that we could use Ms. Valle," although he "would have supported putting Ms. Valle on the stand" if he had. Pet. Ex. B at ¶ 12.

## III.   OTHER IAC CLAIMS

**AOE 8:**   Defense counsel was free to prove character through reputation, and many witnesses were available and happy to do this. Pet Ex. I; Pet. Ex. H. Counsel could also have shown the jury many photos of Ms. Muñoz's well-organized, licensed, and immaculate day care center. Pet. Ex. S. Instead, defense counsel presented one character witness, Michelle Shirey, who he called a week before trial, and who says she was never prepared for her testimony. Pet. Ex. G at 5. Defense counsel admits that he should have presented multiple character witnesses, and that he had no strategic reason for not doing this. Pet. Ex. Q at 25.

FED APP 445

**AOE 9:**     As soon as Ms. Muñoz realized that Noah was suffering some sort of stroke or seizure, she immediately began performing CPR and called 911.  The relevance of Ms. Muñoz's conduct in those moments can not be overstated.  The circuit court noted that there was testimony that Ms. Muñoz had called 911.  Tr. 9/11/2013 at 13-14.  But testimony that Ms. Muñoz called 911 was no substitute for listening to the call itself.  In order to convince the jury that she did not abuse Noah, reasonably effective lawyers would have played the 911 call, so that the jurors could hear her contemporary account that Noah had gone limp while she was feeding him a bottle, hear her panic and shock, and hear the 911 caller lead her through her successful efforts to save his life.

**AOE 10:** Defense counsel failed to object to jury instruction number six, which contained an erroneous statement of law.  In order to convict Ms. Muñoz of a "willful" act, the Commonwealth needed to prove that the act was intentional and undertaken (1) with a bad purpose or (2) without justifiable excuse _and_ without ground for believing the conduct is lawful. _Morris v. Commonwealth_, 272 Va. 732, 738, 636 S.E.2d 436, 439 (2006). Instead, instruction number six permitted the jury to convict if it found that the act was voluntary as opposed to intentional.  Moreover, by mistakenly using the disjunctive "or," instruction number six permitted the jury to

30

FED APP 446

convict if Ms. Muñoz's conduct was intentional and undertaken without justifiable excuse <u>or</u> without ground for believing the conduct is lawful. Effective counsel would have objected to this instruction and there is a reasonable probability of a different outcome if the jury had been properly instructed.  *See Green v. Young*, 264 Va. 604, 609, 571 S.E.2d 135, 138 (2002).

**AOE 11:**    Reasonably effective trial counsel would have moved to suppress Waldron's testimony or to prevent her from mischaracterizing Ms. Muñoz's unrecorded April 21 statement as a confession.  Reasonably effective counsel would also have moved to prevent the Commonwealth's expert witnesses from attributing Noah's symptoms to non-accidental trauma or SBS.  Had counsel done so, there is a reasonably probability that the outcome of trial would have been different.

## IV.    THE COMMONWEALTH SUPPRESSED EXCULPATORY EVIDENCE AND KNOWINGLY PRESENTED FALSE TESTIMONY TO THE JURY.

Petitioner claimed that the Commonwealth's failure to turn over the 911 call was a violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and the Commonwealth's presentation of false evidence and argument that Noah Whitmer was a healthy baby before prior to April 20, 2009, was a violation

31

FED APP 447

of *Giglio v. United States*, 405 U.S. 150 (1972) and *Napue v. Illinois*, 360 U.S. 264 (1959).

**AOE 12:**   Uriarte asked the Commonwealth for a copy of the recording repeatedly and was repeatedly ignored, until the prosecutor ultimately insisted that the Commonwealth did not have a copy.[8] Pet. Ex. Q at ¶ 9. The Commonwealth's refusal to disclose this evidence deprived Ms. Muñoz of the opportunity to play a nearly contemporaneous tape recording of herself describing what happened to Noah and saving his life. It is difficult to imagine a more "material" piece of evidence than that.

**AOE 13:**   The Commonwealth knowingly presented false testimony and argument that Noah was a "perfectly healthy child." *See e.g.* Tr. 1/11/2010 at 92; Tr. 1/21/2010 at 19.  Dr. Dawn Thornton testified that Noah did not have a fever when he was in the Emergency Room.  Tr. 1/11/2010 at 180-83.  But as soon as he was transferred to the Pediatric Intensive Care Unit ("PICU") his fever was noted and he was treated with antibiotics.  Pet. Ex. A at 907-14, 947-95.  Dr. Thornton also testified that Noah's blood did not reveal the presence of infection (Tr. 1/11/2010 at 183), but Noah's sputum revealed heavy growths of infection.  Pet. Ex. A at

---

[8] Petitioner has raised this as a separate claim of ineffective assistance of counsel, *infra* at AOE 9.

369.  The next day, when the defense re-called Dr. Thornton to correct this mischaracterization, Dr. Thornton claimed she could not recall her testimony of the previous day.  Tr. 1/12/2010 at 32.

Similarly, Dr. Hauda testified that Noah had no genetic predisposition that would be of concern, but that was not true.  Tr. 1/13/2010 at 152. Noah's parents had reported several family conditions, including a history of febrile seizures and a chromatic disorder.  Pet. Ex. A at 85.   The Commonwealth made no effort to correct the record regarding the false testimony of its expert witnesses, and compounded the false testimony with a closing argument that emphasized Noah's health. This false testimony was material because it "could . . . in any reasonably likelihood have affected the judgment of the jury . . . ." *Giglio*, 405 U.S. at 155; *Napue*, 360 U.S. at 271.[9]

## V.   CUMULATIVE PREJUDICE

AOE 14:   The cumulative effect of the *Strickland* and *Brady* violations in this case is to undermine confidence in the outcome of Ms.

---

[9] The lower court also held that this claim was barred under *Slayton v. Parrigan*, 215 Va. 27, 205 S.E.2d 680 (1974), because it could have been raised at trial and direct appeal.  Tr. 9/11/2013 at 17.  However, claims of prosecutorial misconduct based upon false evidence are cognizable in habeas proceedings, and Ms. Muñoz has separately raised counsel's failure to present evidence regarding Noah's illness as a claim of ineffective assistance of counsel.

FED APP 449

Muñoz's trial.  These errors are deeply intertwined.  Because counsel failed to seek a continuance, they did not adequately review the medical records.  Because they did not adequately review the medical records, they failed to recognize the extent to which Waldron's false report of a confession contaminated the conclusions of the Commonwealth's experts, and failed to identify the many signs of Noah's illness.  Their failure to secure a continuance also prevented them from presenting testimony from Dr. Barnes, which could have explained how Noah's illness, rather than abuse, caused his medical crisis on April 20, and could have provided the jury with a complete medical explanation for what happened.  In total, every facet of the Commonwealth's case could have been undermined by competent counsel, and a complete defense could have been presented to the jury.  Moreover, these efforts were compounded by the Commonwealth's failure to disclose the exculpatory 911 tape and its mischaracterization of Noah Whitmner as a perfectly healthy child prior to April 20.  In light of these failures, the Court should have no confidence in the outcome of trial.

## VI.    FAILURE TO CONDUCT AN EVIDENTIARY HEARING

**AOE 15:**    The lower court erred by denying Ms. Muñoz discovery and an evidentiary hearing.  There are material factual disputes in this case regarding what happened to Noah, as evidenced by the competing

FED APP 450

affidavits of the unqualified Dr. Hauda and the eminently qualified Dr. Barnes. The lower court erred by failing to presume the truth of the Petitioner's facts in ruling on the Respondent's motion to dismiss. This Court should clarify that discovery and a hearing is required when the facts as proffered by the Petitioner would entitle her to relief.

## **CONCLUSION**

For the foregoing reasons, Ms. Muñoz respectfully requests that this Court grant the Petition for Appeal, vacate the order of the Fairfax Circuit Court, and grant the petition or remand this case for further proceedings including an evidentiary hearing.

FED APP 451

Respectfully submitted,

Trudy Eliana Muñoz Rueda
*by counsel*

Matthew L. Engle, VSB No. 46833
THE INNOCENCE PROJECT
       AT UVA SCHOOL OF LAW
580 Massie Road
Charlottesville, Virginia 22903
(434) 924-2912
(434) 924-7315 (facsimile)
matthewengle@virginia.edu

Jonathan P. Sheldon, VSB No. 66726
SHELDON, FLOOD & HAYWOOD, PLC
10621 Jones Street, Suite 301-A
Fairfax, Virginia 22030
(703) 691-8410
(703) 251-0757 (facsimile)
JSheldon@csfdefense.com

36

FED APP 452

## CERTIFICATE PURSUANT TO RULE 5:17(i)

Pursuant to Sup. Ct. Rule 5:17(i), I hereby certify as follows:

(1) The Petitioner-Appellant is Trudy Eliana Muñoz Rueda.  Counsel

for Ms. Muñoz are:

> Matthew L. Engle, VSB No. 46833
> THE INNOCENCE PROJECT
>     AT UVA SCHOOL OF LAW
> 580 Massie Road
> Charlottesville, Virginia 22903
> (434) 924-2912
> (434) 924-7315 (facsimile)
> matthewengle@virginia.edu

> Jonathan P. Sheldon, VSB No. 66726
> SHELDON, FLOOD & HAYWOOD, PLC
> 10621 Jones Street, Suite 301-A
> Fairfax, Virginia 22030
> (703) 691-8410
> (703) 251-0757 (facsimile)
> JSheldon@csfdefense.com

(2)    Respondent-Appellee is Harold Clarke, Director of the Virginia

Department of Corrections.  Counsel for Mr. Clarke is:

> Rosemary V. Bourne, VSB No. 41290
> Assistant Attorney General
> 900 East Main Street
> Richmond, Virginia 23219
> (804) 786-2071
> (804) 371-0151 (facsimile)
> rbourne@oag.state.va.us

FED APP 453

(3)     Counsel for the Petitioner-Appellant served counsel for the Respondent-Appellee with a copy of the Petition for Appeal by hand-delivery on December 11, 2013.

(4)     Exclusive of the cover page, table of contents, table of authorities, signature page, and certificate, this petition does not exceed 35 pages.  It is produced in Arial font, size 14.

(5)     Counsel for Ms. Muñoz in this habeas corpus action are providing *pro bono* representation to her.

(6)     The Petitioner-Appellant wishes to state orally to a panel of this Court in person the reasons why the Petition for Appeal should be granted.

Matthew L. Engle
Counsel for Ms. Muñoz

38

FED APP 454

## VIRGINIA:

*In the Supreme Court of Virginia held at the Supreme Court Building in the City of Richmond on* Tuesday *the* 11th *day of* March, 2014.

Trudy Eliana Munoz Rueda                                    Appellant,

  against          Record No. 131940
                   Circuit Court No. CL-2012-17074

Harold W. Clarke, Director, etc.,                          Appellee.

From the Circuit Court of Fairfax County

        Upon review of the record in this case and consideration
of the argument submitted in support of the granting of an appeal,
the Court is of the opinion there is no reversible error in the
judgment complained of.  Accordingly, the Court refuses the
petition for appeal.

        Justice McClanahan took no part in the consideration of
this case.

                        A Copy,

                        Teste:

                                Patricia L. Harrington, Clerk

                        By:

                                Deputy Clerk

FED APP 455