IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

**Alexandria Division**

Trudy Eliana Munoz Rueda,      )
      Petitioner,               )
                                )
v.                             )          1:14cv699 (LMB/IDD)
                                )
Harold Clarke,                 )
      Respondent.               )

<u>MEMORANDUM OPINION</u>

      Trudy Eliana Munoz Rueda, a Virginia inmate proceeding through counsel, has filed a

petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging the

constitutionality of her conviction by a jury in the Circuit Court for Fairfax County of felony

child neglect and willful or negligent cruelty to a child.  On August 18, 2014, respondent filed a

Motion to Dismiss and Rule 5 Answer, along with a supporting brief.  Petitioner has filed a

response to the Motion to Dismiss, to which respondent has replied.  Accordingly, this matter is

now ripe for disposition.[1]  For the reasons that follow, respondent's Motion to Dismiss will be

granted, and the petition will be dismissed with prejudice.

### I. Background

      On July 20, 2009, petitioner was indicted in Fairfax County for child abuse or neglect, in

---

    [1]Petitioner's argument that she is entitled to an evidentiary hearing in this matter, <u>see</u> Pet. at 20 -
24, is not well taken.  In <u>Cullen v. Pinholster,</u> __ U.S. __, 131 S. Ct. 1388,1400 (April 4, 2011),
which superceded the law upon which petitioner relies, the Supreme Court held that "[i]f a claim has
been adjudicated on the merits in a state court, a federal habeas petitioner must overcome the
limitation of § 2254(d)(1) on the record that was before that state court."  Thus, "[i]n such a
circumstance, any evidentiary hearing in federal court is unwarranted, as new evidence adduced
during such a hearing could not be considered in making the determination under § 2254(d)(1)."
<u>Williams v. Stanley</u>, 581 F. App'x 295, 296 (4th Cir. Aug. 20, 2014).

violation of Va. Code § 40.1-103, and willful or negligent cruelty to a child, in violation of Va.

Code § 18.2-271.1(A)). The circumstances that gave rise to her prosecution were described by

the Court of Appeals of Virginia on direct appeal as follow[2]:

> [T]he evidence established that appellant had been operating a licensed in-home daycare center in the basement of her home since 2004. On March 16, 2009, Erin Whitmer began taking her infant son, N.W., to appellant's daycare. [FN]  On the morning of April 20, 2009, Whitmer took N.W. to daycare at appellant's home.  Later that day, EMS technician Luis Mata was dispatched to the daycare to assist N.W., who was choking. When Mata arrived, he immediately saw N.W. was unresponsive, having trouble breathing, and clear fluid was coming from his mouth. N.W. had seizures all the way to the hospital. Because the emergency medical technicians suspected N.W.'s injuries were caused by trauma, N.W. was treated as trauma patient. A CT scan of N.W.'s brain revealed an acute subdural hematoma (bleeding on the brain), deep brain injuries, injuries to the tissue of the brain itself, and a cortical venous thrombosis, all of which are often caused by trauma. N.W. remained in the hospital until May 9, 2009.
>
> > [FN: N.W. was born November 29, 2008.  Prior to April 20, 2009, he was a healthy child.]
>
> Appellant explained to police officers that N.W. was asleep and he awoke crying. Appellant prepared a bottle for N.W. and began feeding him. N.W.'s eyes rolled toward the back of his head and he went limp. Appellant picked up N.W. and tapped him on the back. She then began conducting CPR on N.W. When appellant was interrogated by social worker Joslyn Waldron, she stated she never shook N.W. During the interview, Waldron received a call from one of N.W.'s physicians, who maintained N.W.'s injuries were consistent with shaking. Waldron emphasized the importance of knowing the truth in order to properly treat N.W. Appellant stated she 'moved [N.W.] hard,' and when asked what she meant, appellant stated she picked up N.W., shook him approximately three times with one hand under N.W.'s bottom and the other hand at the base of

---

[2] Because a federal court on habeas review of a state conviction  must defer to findings of fact made by state trial and appellate courts, 28 U.S.C. § 2254(d), it is appropriate to look to the state court's recitation of the salient facts.

N.W.'s neck. After this, appellant said she fed N.W. his bottle, and he went limp after sucking on the bottle three to four times. [FN]

> [FN:  Although appellant asserts that the Spanish word used to describe 'shaking' can also mean 'to jiggle,' Waldron testified appellant used the verb 'to shake' to describe her actions.]

Eight medical experts testified for the Commonwealth at trial. [FN] Several of those doctors explained that N.W. was a healthy child with no underlying medical problems, and the other doctors testified N.W.'s injuries were caused by [shaken baby syndrome ("SBS")]. Appellant testified at trial and denied she ever shook N.W.  Three medical experts also testified on behalf of appellant.

> [FN: Six of those experts were N.W.'s treating physicians.]

Following a jury trial, appellant was convicted of child abuse or neglect and willful or negligent cruelty or injury to a child.

Munoz Rueda v. Commonwealth, R. No. 0879-10-4 (Va. Ct. App. Dec. 27, 2010), slip op. at 2-3.

Petitioner was sentenced to serve six years and six months in prison and to pay a fine of $12,500 for the child abuse or neglect conviction, and to serve a consecutive sentence of four years for the conviction of willful or negligent cruelty or injury to a child.

On direct appeal, petitioner raised the following claims:

1.   The trial court erred in finding the evidence was sufficient to convict where the Commonwealth's medical expert admitted that for a baby's brain to be subject to shaken baby syndrome ('SBS') the child would have to be shaken sufficiently to generate a force of 50 to 500 times gravity, and the defense's biomechanical engineer testified that his testing had disclosed it was not possible for a woman like petitioner to subject a child to such force.

2.   The trial court erred in allowing the Commonwealth's medical experts to state opinions on the ultimate issue of guilt.

3.  The jury instruction explaining the 'willful act' element of abuse and neglect of a child was erroneous.

4.  The jury instruction explaining the 'negligence' element of cruelty or injury to a child was erroneous.

A single judge of the Court of Appeals of Virginia rejected claims 1, 2 and 4 as listed above on the merits, and declined to address claim 3 on the ground that no contemporaneous objection was raised at trial to the "willful act" language in the challenged jury instruction and no clear miscarriage of justice occurred. Munoz Rueda v. Commonwealth, supra. A subsequent demand for a three-judge panel review was declined on February 23, 2011. The Supreme Court of Virginia dismissed petitioner's petition for review as to assignment of error 3 and refused the petition as to the remaining assignment of error. Munoz Rueda v. Commonwealth, R. No. 110521 (Va. Sept. 21, 2011). Rehearing was denied on November 14, 2011.

On November 14, 2012, petitioner filed a petition for habeas corpus relief in the trial court, alleging that she received ineffective assistance from her trial counsel, James R. Kearney, Esquire ("Kearney") and Guillermo Uriarte, Esquire ("Uriarte") who failed:

1.  to seek a continuance;

2.  to review the medical records which would have revealed that the child (1) had an infection; (2) was likely dehydrated and had pre-existing head trauma; (3) had a family medical history which remained unexplored; (4) was diagnosed almost instantaneously with SBS; (5) was not examined for possible alternative causes for his symptoms.

3.  to present evidence from lay witnesses regarding the child's illness;

4.  to present adequate expert medical testimony from Dr. Patrick Barnes;

5.  to present evidence to challenge Joslyn Waldron's

4

testimony regarding petitioner's confession;

6.   to attack the integrity of the treating physician's medical investigation into the cause of the child's brain injuries;

7.   to present character evidence;

8.   to secure a copy of the 911 call;

9.   to file pretrial motions;

10.  to object to jury instruction 6.

Petitioner also alleges that the Commonwealth violated her Fifth and Fourteenth Amendment rights by failing to turn over a copy of the 911 tape which was a Brady violation, and knowingly using false argument and testimony regarding the child's health. Lastly, petitioner argues that the cumulative effect of these errors undermines confidence in the outcome of petitioner's trial.

The circuit court conducted a hearing on the state habeas petition on May 23, 2013, Pet. App., 334-91, taking the matter under advisement. After reviewing "the pleadings of the case, the memoranda and exhibits presented and the arguments of counsel," the hearing was reconvened on July 25, 2013, and findings of fact and conclusions of law were made on the record. Ultimately, respondent's motion to dismiss the petition for habeas corpus relief was granted, and a final order reflecting that decision and incorporating by reference the findings announced from the bench was entered on September 11, 2013. Pet. App. 392 et seq. The Supreme Court of Virginia refused Munoz Rueda's petition for appeal of that decision on March 11, 2014. Munoz Rueda v. Clarke, R. No. 131940 (Va. Mar. 11, 2014).

Petitioner timely filed the instant application for relief pursuant to § 2254 on June 9, 2014, in the United States District Court for the Western District of Virginia. By an Order dated June

11, 2014, the matter was transferred to this court as the district where the conviction was entered. For her federal petition, petitioner reiterates most of the claims raised in her application for a state writ of habeas corpus, albeit in a slightly different order. Specifically, petitioner argues that counsel was ineffective by:

1. Failing to present testimony from Dr. Patrick Barnes regarding the actual cause of N.W.'s symptoms.[3]

2. Failing to request a fourth continuance.

3. Failing to review N.W.'s medical records.

4. Failing to challenge Joslyn Waldron's false report that Munoz had confessed to shaking N.W.

5. Failing to challenge the integrity of the treating physicians' medical investigation into the cause of N.W.'s symptoms.

6. Failing to present testimony from lay witnesses regarding N.W.'s illness.

7. Failing to call available character witnesses on Munoz's behalf.

8. Failing to obtain a copy of Munoz's call to 911.

9. Failing to object to an incorrect jury instruction.

The same two errors of prosecutorial misconduct are alleged, specifically that Brady was violated by the Commonwealth's failure to disclose the 911 recording and its presentation of false evidence and argument regarding N.W.'s health. Petitioner also repeats her argument that the cumulative effect of trial counsels' errors and the Commonwealth's misconduct undermines confidence in the jury's verdict.

---

[3]To maintain consistency with the orders and opinions of the Virginia courts, the child victim will be referred to here as "N.W."

### III. Merits Standard of Review

When a state court has addressed the merits of a claim raised in a federal habeas petition, a federal court may not grant the petition based on that claim unless the state court's adjudication is contrary to, or an unreasonable application of, clearly established federal law, or based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). This standard reflects the view that "state courts are the principal forum for asserting constitutional challenges to state convictions," and federal habeas actions are a "guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." Harrington v. Richter, 526 U.S. 86, 102-03 (2001) (citation and internal quotation marks omitted). Under this standard, "[t]he focus of federal court review is now on the state court decision that previously addressed the claims rather than the petitioner's free-standing claims themselves." McLee v. Angelone, 967 F. Supp. 152, 156 (E.D. Va. 1997), appeal dismissed, 139 F.3d 891 (4th Cir. 1998) (table).

Whether a state court decision is "contrary to" or "an unreasonable application of" federal law requires an independent review of each of these requirements. See Williams v. Taylor, 529 U.S. 362, 412-13 (2000). A state court determination runs afoul of the "contrary to" standard if it "arrives at a conclusion opposite to that reached by [the United States Supreme] Court on a question of law or if the state court decides a case differently than [the United States Supreme] Court has on a set of materially indistinguishable facts." Id. at 413. Under the "unreasonable application" clause, the writ should be granted if the federal court finds that the state court "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. Importantly, this standard of reasonableness is an objective one, id. at 410, and "is difficult to meet ... because it

was meant to be." Harrington, 526 U.S. at 102. "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable - a substantially higher threshold." Schriro v. Landrigan, 550 U.S. 465, 473 (2007). "[S]o long as 'fairminded jurists could disagree on the correctness of [a] state court's decision,' a state court's adjudication that a habeas claim fails on its merits cannot be overturned by a federal court." Harrington, 526 U.S. at 102 (quoting Yarborough v. Alvorada, 541 U.S. 652, 664 (2004)). Thus, "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id. (citing Lockyer v. Andrade, 538 U.S. 63, 75 (2003)). In short, the federal inquiry is not whether the trier of fact made the correct determination of a petitioner's guilt or innocence, but instead is concerned only with whether the trier of fact made a rational decision. Herrera v. Collins, 506 U.S. 390, 402 (1993); Wilson v. Greene, 155 F.3d 396, 405-06 (4th Cir. 1998) (citing Wright v. West, 505 U.S. 277, 292 (1992)).

In addition, on § 2254 review, a federal court is required to give deference to findings of fact made by state trial and appellate courts, 28 U.S.C. § 2254(d); Sumner v. Mata, 449 U.S. 539, 546-47 (1981), and "a determination on a factual issue made by a State court shall be presumed correct." Tucker v. Ozmint, 350 F.3d 433, 439 (4th Cir. 2003). A petitioner can rebut this presumption of correctness only by "clear and convincing evidence." Green v. Johnson, 515 F.3d 290, 299 (4th Cir. 2008); Hill v. Ozmint, 339 F.3d 187, 194 (4th Cir. 2003). Significantly, "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." Wood v. Allen, 558 U.S. 290, 3000 (2010).

## IV. Analysis

### Section I: Ineffective Assistance of Trial Counsel

8

In her first, compound federal claim, petitioner asserts that she received ineffective assistance of trial counsel for several reasons.[4] To establish ineffective assistance of counsel, a petitioner must show that (1) "counsel's performance was deficient" and (2) "the deficient performance prejudiced the defendant." Strickland v. Washington, 466 U.S. 668, 687 (1984). The AEDPA standard of review and the Strickland standard are dual and overlapping and are to be applied simultaneously rather than sequentially. Harrington, 526 U.S. at 105. This results in a very high burden for a petitioner to overcome, because these standards are each "highly deferential" to the state court's adjudication, and "when the two apply in tandem, review is doubly so." Id.

To prove that counsel's performance was deficient, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness," Strickland, 466 U.S. at 688, and that the "acts and omissions" of counsel were, in light of all the circumstances, "outside the range of professionally competent assistance." Id. at 690. Such a determination "must be highly deferential," with a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689; see also, Burket v. Angelone, 208 F.3d 172, 189 (4th Cir. 2000) (reviewing court "must be highly deferential in scrutinizing [counsel's] performance and must filter the distorting effects of hindsight from [its] analysis"); Spencer v. Murray, 18 F.3d 229, 233 (4th Cir. 1994) (court must "presume that challenged acts are likely the

---

[4]The first six pages of the "Summary of the Argument" portion of Munoz Rueda's petition are devoted to a discussion of scientific and scholarly findings that purport to undermine the existence or reality of shaken baby syndrome. Pet. at 6-12. These authorities were not introduced at trial; indeed, petitioner characterizes them here as the result of "post-conviction investigation." Id. at 12. The contention that SBS does not exist was not enumerated as a claim on direct appeal or in the state habeas proceeding, nor was it ruled on by the state courts in either action. Because the argument that SBS is not a valid condition or diagnosis received no scrutiny in the state forum, it is not properly before this court. Cullen, supra.

9

result of sound trial strategy").

To satisfy Strickland's prejudice prong, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id.; accord, Lovitt v. True, 403 F.3d 171, 181 (4th Cir. 2005). The burden is on the petitioner to establish not merely that counsel's errors created the possibility of prejudice, but rather "that they worked to his actual and substantial disadvantage, infecting his entire trial with errors of constitutional dimension." Murray v. Carrier, 477 U.S. 478, 494 (1986) (citations omitted). The two prongs of the Strickland test are "separate and distinct elements of an ineffective assistance claim," and a successful petition "must show both deficient performance and prejudice." Spencer, 18 F.3d at 233. Therefore, a court need not review the reasonableness of counsel's performance if a petitioner fails to show prejudice. Quesinberry v. Taylore, 162 F.3d 273, 278 (4th Cir. 1998).[5]

---

[5]Included among petitioner's exhibits is the four-page affidavit of James R. Kearney, Esquire, one of the two lawyers who represented petitioner at trial. Pet. App., Ex. B. Executed on November 12, 2012, two days before petitioner's application for a state writ of habeas corpus was filed, Mr. Kearney attests to several ways in which he "believes that [co-counsel] Mr. Uriarte and I provided ineffective representation to Trudy [Munoz Rueda]." Id., ¶ 6. Mr Kearney provided a second affidavit on March 8, 2013, declaring that he did not know until he was informed by petitioner's postconviction counsel that a plaque fell on N.W.'s head ten days prior to the incident at issue, and that had he known it would have been "a significant issue at trial." Pet. App. 333. Mr. Kearney's affidavits amount to "opinion testimony that state[] a legal standard or draw[] a legal conclusion by applying law to the facts" which generally is inadmissible. Accordingly, they are appropriately disregarded in this proceeding. See, e.g., Newland v. Hall, 527 F.3d 1162, 1207 (11th Cir. 2008) (affidavits from trial counsel and other attorneys regarding what constitutes ineffective assistance are not dispositive and have little weight); Archuleta v. Lemaster, 37 F. App'x 391, 393 (10th Cir. 2002) (expert testimony as to whether counsel provided ineffective assistance rejected as advising the court about proper application of law to facts); Jackson v. United States, 638 F. Supp. 2d 514, 527-28 (W.D.N.C. 2009) (affidavits from other attorneys opining that trial counsel rendered ineffective assistance excluded). That the affidavits provided by Mr. Kearney concern his opinion of his own efforts does not change that result. See Chandler v. United States, 218 F.3d 1305, 1315

In her first claim, petitioner contends that she received ineffective assistance when her lawyers failed to present the testimony of Dr. Patrick Barnes regarding the cause of N.W.'s symptoms. Dr. Barnes, a pediatric radiologist at Stanford University Medical Center, reviewed N.W.'s brain scans before trial and made notes for defense counsel that N.W.'s symptoms were non-traumatic in origin. Pet. App. 182 at ¶ 2. According to an affidavit provided in the state habeas action, Dr. Barnes described N.W.'s injuries as a result of a cortical venous thrombosis triggered by infection, dehydration, or something else. Pet. App. Ex. R. Dr. Barnes was unable to fly to Virginia to attend the trial as scheduled, and defense counsel did not request a continuance to secure the testimony. Pet. App. 8-9 at ¶¶ 10-11; Pet. App. 176-77 at ¶¶ 10-16. When petitioner raised this claim in the state habeas proceeding, the trial court discussed the requirements of Strickland, supra, and held:

> ... Munoz-Rueda alleges that counsel failed to present testimony from Dr. Barnes. As mentioned already there's a problem with presenting conflicting testimony of expert witnesses, in this case Dr. Uscinski's and Dr. Barnes' opinions relative to the significance of the venous cortical thrombosis. In contrast the Commonwealth presented consistent testimony through its expert that the injuries were caused by shaking the child. Moreover, Dr. Barnes' opinion does not explain the other injuries that were present. Thus Munoz-Rueda has failed to demonstrate that counsel's performance was deficient or that there is a reasonable probability that but for counsel's alleged errors the result of the proceeding would have been any different.

---

n. 16 (11th Cir. 2000) (because the ineffective assistance inquiry is objective, counsel's postconviction admission of deficient performance "matters little"); Walls v. Bowersox, 151 F.3d 827, 836 (8th Cir. 1998) (trial counsel's concession of ineffectiveness not dispositive); Marrero v. Horn, 505 Fed. App'x 174, 181 (3d Cir. 2012) (ineffective assistance claim properly denied where counsel's postconviction affidavit stating that he should have insisted on a competency hearing had "the earmarks of one attempting to fall on his sword to assist a former client").

Final Order, T. 9-10.[6]

Review of the foregoing holding in the context of the trial record demonstrates its factual reasonableness. At trial, the Commonwealth presented testimony from several medical professionals who uniformly opined that N.W.'s injuries were the result of shaking. Dr. Craig Futterman examined N.W. upon his arrival at the Pediatric Intensive Care Unit of INOVA Fairfax Hospital. At the time, N.W. was critically ill and having seizures. (T. 1/13/10 at 47) Dr. Futterman reviewed N.W.'s medical records, including CT scans and MRI's, and observed that N.W. had an acute subdural hematoma in the brain, deep brain injuries to the brain tissue itself, and a cortical venous thrombosis or blood clot in one of the veins in his head. Id. at 48-50. Dr. Futterman testified that the shearing of the nerves in the brain and the diffuse nerve injuries shown in the brain scans had been caused by acceleration forces. Id. at 63. He further testified that the injury he observed would have caused symptoms to occur immediately; it was not a slow-growing hematoma that would become symptomatic only after the passage of time. Id. at 68. Dr. Futterman stated to a reasonable degree of medical certainty that N.W.'s injuries were caused by SBS. Id. at 65.

Dr. William Hauda also examined N.W. in the hospital the day following his admission. Dr. Hauda is board certified in pediatric emergency medicine, general medicine, and forensic medicine. (T. 1/13/10 at 98). Dr. Hauda testified on behalf of the Commonwealth that N.W. had suffered a subdural hematoma and a deep brain injury. Id. at 131, 144. Dr. Hauda stated that there was no evidence of a re-bleed of a chronic subdural hematoma; rather, N.W.'s subdural

―――――――――――――――

[6]Because the foregoing order was the last reasoned state court decision on the claims at issue in this proceeding, its reasoning is imputed to the Supreme Court of Virginia, which refused further appeal without explanation. See Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).

hemorrhage and hematoma both were caused by accelerated/decelerated repetitive trauma to the head, or what is commonly thought of as a shaking episode. Id. at 152-53. He further testified that when a child is received at a hospital presenting subdural hematoma, deep brain injury, severe retinal hemorrhaging but no broken bones, the injuries resulted from shaking. Id. at 154.

Dr. Cindy Christian, a board certified pediatrician and expert on SBS from the Children's Hospital of Philadelphia, testified for the Commonwealth that N.W. had an acute brain injury. (T. 1/20/10 at 190-91) She concurred that there was no evidence of a re-bleed of a chronic subdural hematoma. Id. at 192-93. She stated that N.W. had no abnormal blood readings or coagulation values, and his head was not growing abnormally quickly. Id. at 207-08, 197-205. Dr. Christian testified that extensive retinal hemorrhages such as those suffered by N.W. are highly associated with repetitive rotational shaking and are not generally associated with blunt force injuries. Id. at 226.

Dr. Meghan Hulver, a board certified pediatrician, testified on behalf of the Commonwealth that N.W. was a healthy child prior to the incident at issue. (T. 1/1/2/10 at 74). He did not have sickle cell anemia, leukemia, brittle bone disease, or any sort of metabolic disorder. Id. at 74.

Dr. William Young, a board certified pediatric neurologist, testified for the Commonwealth that the injuries he saw in N.W.'s brain were caused by a major trauma, such as shaking. (T. 1/1/2/10 at 106). The injuries were acute and were not chronic. Id. at 107-08.

Dr. Christian Muller, a board certified radiologist, testified for the state that N.W.'s brain had no chronic hematomas. (T. 1/20/10 at 246, 253-55). Instead, Dr. Muller observed injuries in N.W.'s corpus callosum that are characteristic of traumatic injury, such as shearing and disruption of the axons, or nerves. Id. at 256, 258-59. Dr. Muller observed multiple injuries to N.W.'s brain,

13

including a thrombosed cortical vein, ischemic changes of the parietal lobe, and blood both above and below the tentorium. Id. at 270. He stated that taken together, the only thread linking all of these injuries was acute trauma. Id.

In rebuttal, Munoz called three medical experts. In contrast to the uniformity of opinion expressed by the Commonwealth's experts that the child's injuries were caused by shaking, each defense expert had a distinct theory. First, Dr. Thibault testified that Munoz lacked the physical capability to shake N.W. with sufficient force to cause the damage to his brain. (T. 1/13/10 at 227-74). Dr. Thibault told the jury that he arrived at that conclusion by using biomechanical models called CRABI dolls which emulate the body of a six-month-old child. He had adults shake the dolls and measured the acceleration the shaking generated on the doll's "brain." Id. at 252-53. The Court did not permit Dr. Thibault to testify as to what acceleration occurred in N.W.'s brain. Id. at 264-72. On cross examination, Dr. Thibault conceded that use of the biomechanical dolls had limitations, in that the dolls did not contain simulated brains and could not account for all the complexities of the human body, such as head movement, tensile strength of nerve fibers, and strength of blood vessels and brain tissue. Id. at 279.

Dr. Uscinski testified for the defense that the cause of N.W.'s injuries was a re-bleed from a chronic subdural hematoma. (T. 1/14/10 at 76-77; 1/13/10 at 166-81). According to Dr. Uscinski, N.W.'s head was molded during the birthing process, and he discounted the clinical significance of the thrombosed cortical vein to the hematoma, calling it an "ancillary finding." (T. 1/1/10 at 62-63; 89) In Dr. Uscinski's opinion, there was no injury to N.W.'s brain itself. Id. at 63. Further, Dr. Uscinski did not believe that N.W.'s retinal hemorrhages were caused by a traumatic event. (T. 1/1/4/10 at 82). Dr. Uscinski acknowledged that he had testified for the defense in over 110 cases of alleged child abuse, and had opined in every case without exception

14

that the cause of the child's injuries was accidental or non-inflicted trauma. Id. at 99.

Dr. Gardner also testified for the defense that N.W.'s injuries were the result of a re-bleed of a subdural hematoma, but he disagreed that the hematoma could have been caused at birth because such injuries generally resolve within four to six weeks. (T. 1/13/10 at 166-81, 190). Instead, Dr. Gardner stated that N.W.'s head was growing abnormally rapidly for a child his age, and the growth had caused the re-bleed. Id. at 167-68.

Against this backdrop, it is apparent that the state courts' determination that counsel did not provide constitutionally deficient assistance by failing to secure the testimony of Dr. Barnes was in accord with Strickland. In his postconviction affidavit, Dr. Barnes proffered that N.W. suffered a series of strokes due to venous thrombosis which caused the subdural hematoma. Pet. App. Ex. R ¶5. The venous thrombosis itself in turn could have been triggered by impact trauma, infection and/or dehydration, or a pre-existing condition. Pet. App., Ex. R ¶¶ 4-5, 7, 17. Dr. Barnes' proffered testimony that the venous thrombosis caused the subdural hematoma would have been entirely at odds with the opinion of defense expert Dr. Uscinski, who testified that cortical vein thrombosis was not significant to the subdural hematoma. (T. 1/14/10 at 89). Nor would the venous cortical thrombosis account for N.W.'s other injuries, such as the subdural and retinal hemorrhages. Pet. App. 269. Under such circumstances, the state court's view that the outcome of the trial was not affected by the absence of a fourth defense expert opinion that would have conflicted with those of the other defense experts cannot be deemed unreasonable. See generally, Holsey v. Warden, Ga. Diagnostic Prison, 694 F.3d 1230 (11th Cir. 2012) (effect of two experts' testimony "weakened" where contradicted by testimony of other experts). Further, it is well established in federal jurisprudence that decisions concerning the calling of witnesses are matters of strategy left to the attorney and ordinarily cannot constitute ineffective assistance. Jones

15

v. North Carolina, 547 F.2d 808 (4th Cir. 1977); see also, Waters v. Thomas, 46 F.3d 1506, 1512

(11th Cir. 1995) ("Which witnesses, if any, to call ...is the epitome of a strategic decision and it is

one that we will seldom, if ever, second guess."). Given the "doubly deferential" consideration

that must be applied to a claim of ineffective assistance in a § 2254 proceeding, Harrington, 526

U.S. at 105, the state court's determination that counsel's failure to obtain the expert testimony of

Dr. Barnes did not amount to a constitutional deprivation was reasonable. Accordingly, it will not

be disturbed here. Williams, 529 U.S. at 412-13.

    In her second claim, petitioner alleges that trial counsel provided ineffective assistance by

failing to request a continuance in view of the voluminous medical records in the action and

because potential defense expert Dr. Barnes was unavailable, as discussed above. The state court

on habeas review rejected this contention, holding that:

> ... Mr. James Kearney, counsel for Munoz-Rueda, is a very
> experienced attorney in Fairfax Circuit Courts with expertise in
> working with medical issues and personal injury cases.
>
> The parties had already received three continuances in this case due in
> part to the unavailability of witnesses: On July 24, 2009 continuing the
> case from August 12, 2009 to October 26, 2009; on September 10,
> 2009 continuing the case from October 26, 2009 to December 7th
> 2009; and again on October 22, 2009 continuing the case from
> December 7, 2009 to January 11, 2011. [sic] It was clear that counsel
> knew how to obtain a continuance when necessary. Moreover, in light
> of the other continuances it would be less likely that yet another would
> be granted.
>
> Counsel had three qualified medical experts to present their case and
> at trial Ms. Munoz-Rueda represented she was ready for trial.
> Although counsel would always prefer to have more time to review
> documents an[d] evidence for trial they did have sufficient time to
> review the medical records of this case.
>
> Counsel was not ineffective for failing to pursue yet another
> continuance for an additional expert. Moreover, based on the evidence
> presented the Court finds that counsel has failed to demonstrate there

> is a reasonable probability that even had they had a continuance the
> result of the proceedings would have been any different.

Final Order, T. 5-6.

The state court reasoning is sound. Counsel's failure to request a fourth continuance was not objectively unreasonable.  As to the unavailability of Dr. Barnes, three experts were prepared to testify for the defense at trial, and petitioner stated on the record that she had given counsel the names of all her witnesses, they were present, and she was "ready for trial."  (T. 1/11/10 at 8). The Fourth Circuit has held under indistinguishable circumstances that such an admission precludes a defendant's ability to challenge counsel's effectiveness based on the failure to call additional witnesses.  See Jones v. Taylor, 547 F.2d 808, 810 (4th Cir. 1977) (where defendant stated in court he did not wish to offer additional witnesses, he could not be permitted to argue that counsel was ineffective for failing to call additional witnesses in the absence of a cogent explanation of why he should not be held to his former statement).

In addition, petitioner has failed to show that the outcome of her trial would have been different had counsel sought a continuance based on Dr. Barnes' unavailability.  There is no indication that a fourth continuance would have been granted if requested.  But even if it had been, for the reasons discussed above in connection with petitioner's first claim, she cannot demonstrate a reasonable probability that she would have been acquitted had Dr. Barnes testified. Because the denial of this claim by the state court was factually reasonable and in accord with controlling federal authorities, Strickland, supra, it likewise is rejected here. Williams, 529 U.S. at 412-13.

In her third claim, petitioner contends that her trial counsel provided ineffective assistance by failing to review N.W.'s medical records.  On state habeas review, the court found no merit to

that argument, as follows:

... Munoz-Rueda argues that her counsel failed to review the medical records which would have revealed, one, that [N.W.] had an infection; two, [N.W.] was likely dehydrated and had pre-existing head trauma; three, that [N.W.] had a family history that was unexplored; four, that Inova Fairfax Hospital arrived at a diagnosis of Shaken Baby Syndrome almost instantaneously; and five, that Inova medical professionals conducted no reasonable diagnosis of possible alternative causes for his symptoms.

There was no evidence presented that counsel did not review the medical records. In fact it's clear to the Court on the direct and cross-examination of the witnesses that counsel had reviewed the records and were familiar with them. Although one of the attorneys may be more experienced in dealing with the medical records and was given the responsibility of developing medical issues at trial it does not amount to ineffective assistance of counsel.

As anticipated and appropriate they also relied on the expertise of their expert who testified that they had reviewed medical records. Furthermore, there is no credible evidence that [N.W.] suffered from any infection prior to this accident. The fact that [the] child was fussy does not in and of itself indicate there was a pre-existing infection. There was no reference to any fever or cough or admission in the records and there was testimony that the fever that occurred later was most likely the result of the intubation and ventilation.

None of Munoz-Rueda's experts even noted fever for being a factor in their opinions. Moreover, although it may have been Dr. Barnes' explanation for the venous cortical thrombosis there is no evidence that would have accounted for the other findings related to the injuries - the left paracortical contusion and injury to the corpus callosum. In fact Munoz-Rueda[] has presented conflicting testimony through her experts as to the significance of the thrombosis cortical vein. There was also no evidence that cross examination on the referenced family history would have made a difference in the diagnosis and the jury has been given the opinion that some of the bleeding could be associated and related to the trauma of childbirth.

The medical records and the attached affidavit from counsel also do not support Munoz-Rueda's conclusion that there was a rush to judgment that the injuries were Shaken Baby Syndrome, or that there was no reasonable differential diagnosis of possible alternative causes

> of the symptoms. Thus Munoz-Rueda has failed to demonstrate that
> counsel's performance was deficient or that there is a reasonable
> probability that but for counsel's alleged errors the result of the
> proceeding would have been different.

Final Order, T. 6-8.

The reasons expressed in the foregoing order establish that the state court reasonably

determined that petitioner's third claim fails to satisfy either prong of the Strickland test. The

judge who presided over the state habeas proceeding also was the trial judge, and her factual

determination that it was clear "on the direct and cross-examination of the witnesses that

[defense] counsel had reviewed the records and were familiar with them" is entitled to deference

on federal review. Tucker, 350 F.3d at 439; see Buxton v. Lynaugh, 879 F.2d 140, 146 (5th Cir.

1989) (state habeas judge who also conducted the trial is "in a different and better position to

make determinations regarding the facts and circumstances surrounding the trial than other courts

on direct or collateral review," and judge's personal recollection of the trial contributes to the

adequacy of a subsequent "paper" hearing). At trial, petitioner's counsel, Mr. Kearney, cross-

examined all of the prosecution's medical experts and handled the direct examination of all

defense experts. (Tr. 1/12/10 at 31, 76, 108; Tr. 1/13.10 at 70, 155, 227; Tr. 1/14/10 at 6, 146; Tr.

1/20/10 at 209). The petitioner's medical experts all testified that they had reviewed the medical

records before trial. (Tr. 1/14/10 at 18, 26, 28; Tr. 1/20/10 at 162-64). Under these

circumstances, there has been no showing that counsel's level of familiarity with the medical

evidence of N.W.'s condition "fell below an objective standard of reasonableness." Cf.

Strickland, 466 U.S. at 688.

Nor does the record suggest that petitioner suffered prejudice as the result of counsel's

representation in this regard. Petitioner has failed to show that she would have been acquitted if

her attorneys had had more time to review the medical records.  To the extent that petitioner

argues that a more thorough review of the available records would have informed counsel that

N.W. suffered from pre-existing conditions such as a fever, a cough, a family medical history of

chromosomal abnormality, or an injury from a falling plaque that could have caused his symptoms

on the day in question, her position is not borne out by the record.  Most tellingly, petitioner's

own medical expert, Dr. Uscinski, testified at trial that based on his review of N.W.'s medical

records he did not believe the thrombosed cortical vein was clinically significant to the subdural

hematoma, and he made no mention of a fever being even a contributing factor, much less the

cause, of N.W.'s condition.  (T. 1/14/10 at 18, 26, 78, 89).  If petitioner's medical expert failed to

glean from his review of N.W.'s medical records the information that petitioner now claims was

critical, it is unreasonable to expect that counsel would have done so even if they had had more

time to peruse the records. In fact, the trial testimony of the Commonwealth's experts, the

affidavits submitted by Dr. Hauda and N.W.'s mother in the state habeas proceeding, and the

medical records themselves, either fail to mention or outright deny that N.W. had any significant

pre-existing health problems that could have accounted for his symptoms on the day in question.[7]

Pet. App. at 260-63, 264-79; T. 1/12/10 at 74, 107-08; T. 1/13/10 at 68, 150; T. 1/20/10 at 192-93,

197-205, 246, 253-55.  Accordingly, the state court's rejection of this claim was both factually

---

[7]In the affidavit N.W.'s mother submitted in the state habeas action, she stated that before his
hospitalization for the injuries he suffered on April 20, 2009, N.W. appeared healthy, had "never
even had a cold," had no fever, and was not unusually fussy.  He had been diagnosed with no
bleeding disorders or genetic problems, and was "happy and alert" the morning of the day the
incident occurred.  As to a cough, N.W.'s mother had noted that he sometimes made a "wheezing"
sound and had mentioned this at his four-month check-up.  When he was nine months old after
consultation with a speech therapist she changed the type of nipples used on his bottles and the issue
disappeared.  Munoz Rueda had provided N.W.'s mother with notes detailing the time he spent in
her care, and in the days leading up to his injury there were no notations that he was sick or
unusually fussy; in fact, typically the notes indicated he was "happy."  Pet. App. at 260-62.

reasonable and was in accord with controlling federal principles, <u>Strickland</u>, <u>supra</u>, and that result will not be disturbed here. <u>Williams</u>, 529 U.S. at 412-13.

In her fourth claim, petitioner asserts that trial counsel provided ineffective assistance by (a) failing to challenge Joslyn Waldron's allegedly false report that Munoz Rueda had confessed to shaking N.W. and (b) failing to call petitioner's husband and her daycare assistant Eva Valley to confirm petitioner's description of events.  The state court dismissed the first portion of this claim on the following holding:

> ... Munoz-Rueda alleges that counsel were ineffective by failing to challenge Joslyn Waldron's testimony regarding Munoz-Rueda's confession. However, the records reveal considerable cross-examination on just this point.  There were multiple questions and demonstration during the trial regarding the action taken by Munoz-Rueda, both by her and Waldron in discussing the translation of the words used and how Munoz-Rueda handled the child.
>
> Munoz-Rueda fails to establish that more comprehensive cross-examination would have resulted in Waldron changing her unequivocal, uncontradicted testimony.  She failed to provide the Court with any evidence of an answer that would have changed her testimony in court or that there is a reasonable probability that but for counsel's alleged errors the result of the proceeding would have been different.

Final Order, T. 10-11.

The state court's order reflects a reasonable determination of the facts.  Joslyn Waldron, a Child Protective Services ("CPS") worker, interviewed petitioner at her home the day after N.W. was injured. At the outset petitioner declined Waldron's request for permission to record the interview and repeatedly denied that she had shaken N.W. (T. 1/12/10 at 155-58).  During the interview Dr. Hauda called and informed Waldron that N.W. had blood on his brain and his injuries were consistent with shaking. <u>Id.</u> at 161.  Waldron explained to Munoz Rueda at that point that it was important for the doctors to know exactly what happened to N.W., and Munoz

Rueda stated that she moved N.W. "hard." Id. at 162. When Waldron asked her to clarify, Munoz
Rueda said she thought she shook him about three times, with one hand under his butt and the
other on the base of his neck, and said either "Why are you crying?" or "Why won't you stop
crying?" Id. at 162-63. She denied shaking N.W. hard enough to cause his injuries, and said she
thought he had choked. Id. at 163. The interview concluded when petitioner's husband arrived
home from work around 2 o'clock. Id. at 164. After the foregoing direct examination, defense
counsel Uriarte cross-examined Waldron at some length. Waldron testified that she had passed a
proficiency test given by the Fairfax County Department of Family Services to be able to conduct
investigations in Spanish, and she and Munoz Rueda spoke in Spanish during the interview. Id. at
182-83. Waldron stated that petitioner first described her actions as moving N.W. hard, and then
used the verb "to shake." Id. at 183. Waldron denied knowing that the Spanish word she
described as meaning "to shake" also meant "to jiggle." Id. at 187. On redirect, Waldron stated
that she chose to interview petitioner at her home because it would be easier for petitioner to
describe the events that occurred there. Id. at 190-91. She expressly denied omitting any
information from her notes of the interview that would have been exculpatory or shown petitioner
to be innocent. Id. at 191. Given Waldron's testimony, the state court's finding that additional
cross-examination would not have altered Waldron's testimony in any material respect was
factually reasonable, as was its conclusion that counsel were not ineffective in how they examined
Waldron. Accordingly. this portion of the claim will be dismissed. Williams, 529 U.S. at 412-13.

　　　　As to the second portion of petitioner's claim, the state court found:

> Munoz-Rueda also claims her husband should have been called as well
> as Ms. Valley to confirm Munoz-Rueda's description of how she
> moved the child and what Ms. Valley was able to hear about the
> interview while in the basement. However, neither of these potential

22

> witnesses were actually present at the interview. Their testimony would likely not have been permitted as inadmissible hearsay.
>
> Considering their relationships with Munoz-Rueda and the reasonableness of not calling Ms. Valley for reasons discussed Munoz-Rueda has failed to demonstrate that counsel's performance was deficient or that there is a reasonable probability that but for counsel's alleged errors the result of the proceeding would have been different.

Final Order, T. 11.

The record again confirms that the state court's ruling was factually reasonable. Waldron's interview of petitioner terminated when her husband came home; he was not present during the conversation. T. 1/12/10 at 179. Petitioner's husband proffered that petitioner repeated for him the demonstration with the doll of how she had moved N.W., and either Waldron or a detective who was present said, "That's shaking." Pet. App. Ex. D.  As to Eva Valley, she remained in the basement of the home during both the interview and the demonstration, but allegedly told petitioner's husband afterward that she "listened to everything" because the basement had no door. Id., ¶ 7.

Under these circumstances, the state court's conclusion that the failure to present this testimony did not amount to ineffective assistance was in accord with Strickland. It is likely, as the state court found, that the testimony of both putative witnesses would have been disallowed as hearsay. Even were that not so, there would not have been sufficient substance in either witness' testimony to have resulted in the petitioner's acquittal. Moreover, the failure to call petitioner's daycare helper Eva Valley was apparently a not unreasonable trial tactic. Counsel argued in his closing statement that the Commonwealth had failed to eliminate Valley as a possible perpetrator and characterized it as "interesting" that she had since left the state. (T. 1/21/10 at 36) In his affidavit, defense counsel Kearney acknowledged that part of his strategy was "to insinuate that

23

[N.W.] might have been abused by someone other than" petitioner, Pet. App. Ex. B, and it is well established that such strategic choices by counsel cannot support a claim of ineffective assistance. Gray v. Branker, 529 F.3d 220, 229 (4th Cir. 2009) (lawyer's "'strategic choices made after thorough investigation ... are virtually unchallengeable'"). For these reasons, nothing in this fourth claim of ineffective assistance of counsel warrants federal relief. Williams, 529 U.S. at 412-13.

In her fifth claim, petitioner alleges that trial counsel rendered ineffective assistance by failing to challenge the integrity of the treating physicians' medical investigation into the cause of N.W.'s symptoms. Specifically, she contends that the physicians based their uniform conclusions that N.W.'s injuries had been caused by shaking solely on the statement obtained by the CPS caseworker, Joslyn Waldron. The state court on habeas review rejected this contention, as follows:

> ... Munoz-Rueda claims that defense counsel failed to bring forth testimony at trial that would reveal the treating physicians at Inova Fairfax took for granted Waldron and Cockrill's investigatory conclusion that Munoz-Rueda had shaken [N.W.] The evidence in this case does not support the petitioner's position. There is ample testimony from doctors who were treating [N.W.] on that day that they considered many of the alternative causes presented by defense counsel. They did blood and lab tests to rule out bleeding disorders and other diseases. They took CT and MRI scans and reviewed them. The fact that they were told of the investigation and noted that in the medical records indicated [sic] that they were including all information and everything was under consideration. There was no evidence proffered that would tend to show that the doctors jumped to any conclusions or discounted any causes until reviewed, only that it seemed that way to petitioner's counsel.
>
> Munoz-Rueda had [sic] failed to demonstrate that counsels' performance was deficient or there was reasonable probability that but for counsel's alleged errors the result of the proceedings would have been different.

Final Order, T. 11-12.

The state court determination reflected was factually reasonable, as the record contains ample testimony that the hospital physicians did not rush to judgment in diagnosing N.W.'s condition.  Dr. Young, a pediatric neurologist who examined N.W., testified that he considered the possibility of a bleeding disorder, but his clinical examination and the results of lab tests ruled out that finding.  He also stated that N.W.'s subfalcine hemorrhage could only have been caused by shaking, and he could find no other cause in the literature for such an injury.  (T. 1/12/10 at 100, 106-08, 114).  Dr. Jeffrey, an opthamologist who treated N.W., testified that the performance of CPR on the child would not have caused the extensive retinal hemorrhages the child suffered.  Id. at 133.  She explained that retinal hemorrhages can be caused by several things, such as increased intracranial pressure, but in those instances the hemorrhages appear different than what she observed in N.W.'s eyes.  Id. at 136.  Dr. Futterman, the pediatric intensivist who treated N.W., testified that blood tests performed on the child did not indicate any underlying medical disorder, and he testified that his diagnosis of abusive head trauma was based upon the presence of the subdural hematoma, the injury to the substance of N.W.'s brain, and the retinal hemorrhages.  (T. 11/13/10 at 65, 49, 50).  Perhaps most tellingly, Dr. Hauda testified that no one gave him a history that petitioner had shaken N.W.  (T.1/13/10 at 131, 144).  Nonetheless, based upon his observation of N.W.'s injuries - specifically the subdural hematoma and the deep brain injury - he also concluded that they were caused by SBS.  Id.

Clearly, then, it was reasonable for the state court to reject petitioner's contention that the physicians "simply accepted that N.W. had been shaken based on the alleged confession Waldron ... had obtained from petitioner."  The existence of a notation in N.W.'s r0ecords that the "CPS investigation had obtained confession from babysitter who shook baby" does not render unreasonable the court's decision to credit the testimony of the medical professionals who

25

examined and treated N.W. concerning the source of their diagnoses.  It follows that the

conclusion that counsel did not render ineffective assistance by failing to argue this point was in

accord with Strickland, and for these reasons the state court's rejection of this claim will not be

disturbed here.  Williams, 529 U.S. at 412-13.

In her sixth claim, petitioner contends that counsel rendered ineffective assistance by

failing to present testimony from lay witnesses regarding N.W.'s illness.  This argument was

found to be meritless in the state habeas proceeding for the following reasons:

> ...Munoz-Rueda claims that counsel were ineffective because they
> failed to present evidence from any witnesses regarding [N.W.]'s
> possible illness. She alleges that her daughter Renata Ames and her
> daycare helper Eva Valley would have testified that [N.W.] was
> unusually irritable and cranky in the week before the injury.  However,
> Mr. Kearney explained that counsel took two approaches in this case.
> One was that injuries did not support the Shaken Baby Syndrome, and
> two, if they did there was a possibility it was inflicted by someone
> else.
>
> Accordingly, there may have been good reason for not calling Eva
> Valley, who was with the baby while Ms. Munoz-Rueda was not.
> Moreover, it was not unreasonable to not call the daughter for the
> reasons she gives in her affidavit, namely that she would not have been
> a good witness and would cry under the pressure on the stand.
>
> As already stated the fact that the child was fussy and not playing does
> not mean that he was sick.  There are a myriad of reasons for fussiness
> aside from the illness depending on the age, diet, amount of sleep and
> circumstances. Munoz-Rueda never testified that the child felt feverish
> at any time while she was holding him prior to the episode.  Munoz-
> Rueda had [sic] failed to demonstrate that counsel's performance was
> deficient in not calling these two witnesses and if there is a reasonable
> probability – she failed to show that there was a reasonable probability
> that but for counsel's errors the result of the proceeding would have
> been different.

Final Order, T. 8-9.

This claim is largely repetitive of matters which have already been discussed.  Counsel's

26

decision not to call Eva Valley furthered his strategy of suggesting to the jury that N.W. may have

been shaken by someone other than petitioner, and such a tactical choice does not support a claim

of ineffective assistance. Gray, 529 F.3d at 229. In her affidavit, petitioner's daughter Renata

Ames stated, "My dad told me I was going to testify, but I think they decided not to have me

testify because I might break down and cry." Pet. App. C, ¶ 10. The state court's determination

that it was "not unreasonable" for counsel to decide not to call such a witness is patently true. It is

also apparent that the absence of Ms. Ames' testimony did not cause petitioner to suffer prejudice,

since in substance she proffered that she principally would have told the jury that N.W. was

uncharacteristically "cranky" for several days before he was injured. Id. ¶ 9. In light of the

overwhelming medical testimony that the only possible cause of N.W.'s injuries was SBS, there is

no reasonable probability that the jury would have acquitted petitioner had they heard Ms. Ames'

testimony. Therefore, the state court's denial of relief on this claim was based on a reasonable

interpretation of the facts and an appropriate application of the Strickland principles, and will be

allowed to stand. Williams, 529 U.S. at 412-13.

In her seventh claim, petitioner argues that she received ineffective assistance of trial

counsel because her attorney failed to call available character witnesses. The state habeas court

found no merit to this contention for the following reasons:

> ... Munoz-Rueda alleges that counsel failed to present character
> evidence in the form of other parents who gave glowing accounts of
> petitioner as a daycare provider. However, none of these parents were
> present on the day [N.W.] received his injury, and the fact that they
> believed her to be gentle and that her house was clean would not have
> assisted the jury in coming to its termination [sic] regarding how
> [N.W.] received his injuries. This character testimony would likely
> also not have been admissible. In fact [N.W.]'s parents appeared to be
> happy or content with the children's arrangement and trusted the
> petitioner with their child's safety up until the incident. In a case that
> is based primarily on medical evidence presented, counsels' failure to

> call more laudatory references does not demonstrate that counsel's
> performance was deficient or that there is a reasonable probability that
> if these witnesses had been called the result of the proceeding would
> have been different.

Final Order, T. 12-13.

Petitioner proffered the testimony of three parents in support of this claim. Rahul Dewan stated that he found petitioner to be a "very sweet lady" and that he was "satisfied" with petitioner's services as the daycare provider for his daughter. He also stated that "it was unbelievable to" him that petitioner could have harmed a child. Pet. Ex. H. Shruti Dewan stated that she interviewed over twenty day care providers for her child and selected petitioner because she was "soft spoken" and "gentle," and "her house was so clean." When she picked her child up on the day N.W. was injured, petitioner was "stunned and upset." Pet. Ex. I. Michele Shirey attested that she "believed in" petitioner and "could not believe what was happening" because petitioner was "so gentle," was "never stressed," and did not raise her voice. Pet. Ex. G. Assuming without deciding that this evidence would have been admissible,[8] the state court accurately discerned no reasonable probability that, given the strength of the Commonwealth's medical evidence and petitioner's own inculpatory statements, these generalized, non-specific opinions by three parents would have resulted in petitioner's acquittal. Because that conclusion was reasonable, the decision to deny relief on this claim will not be disturbed. Williams, 529 U.S. at 412-13.

In her eighth claim, petitioner faults trial counsel for failing to obtain a copy of Munoz Rueda's call to 911. The state habeas court rejected this argument, as follows:

---

[8]Respondent contends that these statements were not proper character evidence under Virginia law and hence would have been inadmissible because they were not based upon petitioner's general reputation in the community. Resp. Brief at 41-42.

28

> ...Munoz-Rueda alleges that counsel failed to obtain a copy of the 911
> tape to bolster her account of what happened. However, there is
> nothing in the record that contradicts her testimony that she called 911
> and that she attempted CPR with their help. The tape was repeated
> what she testified to at trial [sic] and was not refuted by the
> Commonwealth. The fact that the 911 tape did not address the real
> issues of the case, specifically how baby obtained his injuries and not
> what happened after [N.W.] went limp. Failure to obtain the tape in
> light of the other evidence and Munoz-Rueda's testimony does not
> equate to ineffective assistance of counsel. There was no evidence that
> having a tape of the 911 call would have changed the outcome of the
> case and her argument fails on that prong alone.

Final Order, T. 13-14.

As the state habeas court found, petitioner has made no showing that the absence of the

911 tape from the trial proceedings caused her to suffer prejudice. Petitioner testified at trial that

after N.W. went limp and stopped breathing she called 911 and began to perform CPR on him

with the assistance of the 911 operator. (T. 1/12/10 at 162-63) The Commonwealth did not

contest or refute that testimony. Petitioner's contention here that the 911 tape would somehow

have "bolstered" her own testimony in this regard is simply incorrect. She proffers that when

N.W. became limp she placed him on a table, called 911, and put the dispatcher on speaker phone

to assist her in counting for CPR purposes. Pet. at 72. This is the same account of events the jury

heard from petitioner herself, and the 911 tape thus at best would have been merely cumulative.

To the extent that petitioner argues that the tape would have shown that she "wanted to help

[N.W.], not injure him," id., her premise is faulty, because her performing CPR on the child after

he sustained his injuries is not probative of the cause of the injuries. Similarly, petitioner's

contention that the tape would have impeached CPS caseworker Waldron's testimony regarding

petitioner's confession of shaking N.W. is misplaced for two reasons. First, petitioner never

proffered in the state habeas proceeding that she told the 911 operator what had happened to

N.W., Pet. App. at 23, and at trial she testified only that after she called 911 the operator assisted her in performing CPR. (T. 1/20/10 at 145).   Second, even if she had told the 911 operator what had occurred,  she initially told the police, the emergency medical responders, and caseworker Waldron that N.W. had choked on milk,  a version of events which did not explain the child's physical injuries. Id. at 143, 145. Therefore, any "bolstering" of that testimony that the 911 tape could have provided could not reasonably have been expected to lead to a different result at trial. Accordingly, the state court's resolution of this issue was based on a reasonable determination of the facts and was consistent with controlling federal principles, and that result will not be disturbed. Williams, 529 U.S. at 412-13.

In her final federal claim of ineffective assistance, petitioner contends that counsel provided ineffective assistance by failing to object to an incorrect jury instruction on the "willful act" element of abuse and neglect of a child.  In the instruction at issue, the jury was told:

> A willful act is one done with a bad purpose, or without justifiable excuse, or without ground for believing it is lawful.  A willful act is intentional, or knowing, or voluntary as distinguished from accidental.

Petitioner argued that the instruction was incorrect for two reasons.  First, she contended that the phrase "**or** without ground for believing it is lawful" should have stated "**and** without ground for believing it was lawful."  In addition, she contended that the phrase "**or** voluntary" should have been omitted from the instruction.  As she did in the state tribunal, petitioner argues here that the instruction as given failed to comply with the interpretation of Va. Code § 18.2-371 set out by the Supreme Court of Virginia in Morris v. Commonwealth, 272 Va. 732, 636 S.E.2d 436 (2006). Pet. at 75-76.  The state habeas court held that "the instruction correctly stated the law applicable to this case," and petitioner's claim that counsel was ineffective consequently failed because she could not show either that counsel's performance was deficient or that but for the alleged error the

outcome of the proceedings would have been different.  Final Order, T. 15.

"When a claim of ineffective assistance of counsel raised in a habeas corpus petition involves an issue unique to state law, such as the availability of the [jury] instruction at issue here, a federal court should be especially deferential to a state post-conviction court's interpretation of its own state's law." Richardson, 668 F.3d at 141.  In fact, "[i]t is beyond the mandate of federal habeas courts [] to correct the interpretation by state courts of a state's own laws." Sharpe v. Bell, 593 F.3d 372, 383 (4th Cir. 2010).  Here, where petitioner challenged the jury instruction only on the basis of its alleged failure to comply with Virginia statutes and case law, this court must defer to the Virginia court's determination that the instruction "correctly stated the law."  That being so, petitioner's federal claim of ineffective assistance fails, because an attorney has no obligation to object to a jury instruction that correctly states the law. Moody v. Polk, 403 F.3d 141, 151 (4th Cir. 2005) (holding that counsel was not required to file frivolous motions).  Accordingly, as the state court's rejection of this claim was based on a reasonable interpretation of the facts and was in accord with the controlling federal principles outlined in Strickland, no federal relief is warranted. Williams, 529 U.S. at 412-13.

### Section II.  Prosecutorial misconduct

Petitioner first argues that her right to due process was violated when the Commonwealth failed to disclose the 911 recording.  The state habeas court rejected this assertion, as follows:

> ... [Munoz] alleges that the 911 call contained evidence favorable to her because it would bolster her account over that of Waldron's and because it would have supported the views of her experts.  She described the statements made on this call as exculpatory and therefore the failure to provide a statement was a violation under the decision in Brady vs. Maryland.  In this case the petitioner was aware that she had made the 911 call and knew what had been said.  Furthermore, she knew where to obtain a recording of the 911 call.

> Moreover, the same evidence came in both through the Petitioner's [sic] and the Commonwealth's witness Ms. Waldron. The fact that she called and was given directions for CPR does not automatically mean she was not responsible for the child's injuries.
>
> There is no additional evidence from which this Court could find there is a reasonable probability of a different result had the jury been provided the 911 tape in light of the other evidence presented.

Final Order, T. 16-17.

Under established federal law, a defendant must make a three-part showing to establish the existence of a <u>Brady</u>[9] violation: (1) the withheld evidence at issue is favorable to the accused either because it is exculpatory or impeaching; (2) the evidence was suppressed by the government, either willfully or inadvertently; and (3) the suppression was material. <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82 (1999). In order for a defendant to establish a <u>Brady</u> violation, he must demonstrate that the undisclosed evidence was exculpatory and material either to the issue of guilt or to the issue of punishment. "The mere possibility that undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." <u>United States v. Agurs</u>, 427 U.S. 97, 109-10 (1976). Instead, evidence is material only "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." <u>Kyles v. Whitley</u>, 514 U.S. 419, 433-34 (1995). In addition, there is no violation of <u>Brady</u> if the defense already possesses the evidence or if the evidence is available from sources other than the prosecution. <u>United States v. Roane</u>, 378 F.3d 382, 402 (4th Cir. 2004).

Here, it is readily apparent that the state court's denial of petitioner's <u>Brady</u> claim was in accord with these authorities. First, as petitioner herself made the 911 call she clearly was aware

---

[9]<u>See Brady v. Maryland</u>, 373 U.S. 83 (1963).

of the substance of the conversation, and obtaining the tape would have provided her with no new evidence. Cf. United States v. Roane, 378 F.3d 382, 402 (4th Cir. 2004) (since defendant knew who he was with the night of the murder, prosecution had no duty to provide him with that information). Second and perhaps more important, the evidence petitioner seeks plainly was not material. "There is never a real 'Brady violation' unless the nondisclosure was so serious that the suppressed evidence would have produced a different verdict." Strickler, 527 U.S. at 281-82. A "reasonable probability" of a different result is shown "when the government's evidentiary suppression undermines confidence in the outcome of the trial." Kyles, 514 U.S. at 434. Petitioner alleges here that the 911 tape would have shown that she attempted to perform CPR on N.W. with the operator's assistance, but the jury learned that same information from Joslyn Waldron, who testified that petitioner had said that she had performed CPR on N.W. while on the phone with the 911 operator. (T. 1/21/2010 at 160). The Commonwealth did not challenge that statement. Moreover, as discussed above, petitioner's performing CPR on the child after he was injured is essentially irrelevant to the issue of whether or not she caused the injuries. For both of these reasons, there is no evidence of a reasonable probability that the jury would have returned a different verdict had it heard the 911 tape. Therefore, the evidence allegedly suppressed was not constitutionally materia, cf. Agurs, 427 U.S. at 109-10, and the state court's decision on this issue was factually reasonable, in accord with controlling federal authorities, and will not be disturbed here. Williams, 529 U.S. at 412-13.

Petitioner also accuses the Commonwealth of presenting false evidence and argument regarding N.W.'s health in violation of Giglio v. United States, 405 U.S. 150 (1972), and Napue v. Illinois, 360 U.S. 264 (1959). On state habeas review, this claim was found to be procedurally defaulted:

33

> Munoz-Rueda alleges that the prosecution mislead the jury in its opening and closing arguments; that the Commonwealth allowed its medical experts, specifically Dr. William Hauda and Dr. Dawn Thornton, to mislead the jury regarding [N.W.]'s health without correcting the record; that the prosecution had many opportunities to correct the records and did not [and] such mischaracterization was material. These claims could have and should have been raised at trial and on direct appeal and are barred by the rule in Slayton v. Perrigrine. [sic][¹⁰]

Final Order, T. 17.  The court held in the alternative that the claim lacked merit because there was no evidence that statements that N.W. had been a healthy baby were false or that the Commonwealth knew that they were false. Id.

A state court's finding of procedural default is entitled to a presumption of correctness on federal habeas review if two foundational requirements are met. See 28 U.S.C. § 2254(d); Clanton v. Muncy, 845 F.2d 1238, 1241 (4th Cir. 1988). First, the state court must explicitly rely on the procedural ground to deny petitioner relief. See Ylst v. Nunnemaker, 501 U.S. 797, 802-03 (1991); Harris v. Reed, 489 U.S. 255, 259 (1989). Second, the state procedural rule used to default petitioner's claim must be an independent and adequate state ground for denying relief. See Harris, 489 U.S. at 260; Ford v. Georgia, 498 U.S. 411, 423-24 (1991). The Fourth Circuit has held consistently that "the procedural default rule set forth in Slayton constitutes an adequate and independent state law ground for decision." Fisher v. Angelone, 163 F.3d 835, 844 (4th Cir. 1998); Mu'Min v. Pruett, 125 F.3d 192, 196-97 (4th Cir. 1997). Therefore, the claim is procedurally defaulted in this federal proceeding.¹¹

---

¹⁰Slayton v. Parrigan, 215 Va. 27, 2005 S.E.2d 680, 682 (1974) (holding that "a non-jurisdictional issue [that] could have been raised at trial and on direct appeal ... is not cognizable in a petition for a writ of habeas corpus").

¹¹The state court ruling in the alternative does not alter this conclusion. When a state court holds that a claim is both procedurally defaulted and without merit, a federal court on habeas review

Federal courts may not review barred claims absent a showing of cause and prejudice or a fundamental miscarriage of justice, such as actual innocence. Harris v. Reed, 489 U.S. 255, 260 (1989). The existence of cause ordinarily turns upon a showing of (1) a denial of effective assistance of counsel, (2) a factor external to the defense which impeded compliance with the state procedural rule, or (3) the novelty of the claim. See Coleman v. Thompson, 501 U.S. 722, 753-54 (1991); Clozza v. Murray, 913 F.2d 1092, 1104 (4th Cir. 1990); Clanton v. Muncy, 845 F.2d 1238, 1241-42 (4th Cir. 1988). Importantly, a court need not consider the issue of prejudice in the absence of cause. See Kornahrens, 66 F.3d at 1359 (4th Cir. 1995).

Here, petitioner attempts to establish cause for her procedural default by asserting actual innocence, but she falls short of making the requisite showing. "In order to use an actual innocence claim as a procedural gateway to assert an otherwise defaulted claim, 'the petitioner must show that it is more likely that not that no reasonable juror would have convicted him in the light of the new evidence." Royal v. Taylor, 188 F.3d 239, 243-44 (4th Cir. 1999) (quoting Schlup v. Delo, 513 U.S. 298, 327 (1995)). An actual innocence claim "must be based on reliable

---

should apply the procedural bar. As the Supreme Court has explained, "[a] state court need not fear reaching the merits of a federal claim in an *alternative* holding. By its very definition, the adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law." Harris, 489 U.S. at 264, n. 10 (emphasis original), citing Fox Film Corp. v. Muller, 296 U.S. 207, 210 (1935). Applying this doctrine to habeas cases curtails reconsideration of the federal issue on federal review as long as the state court explicitly invokes a state procedural bar rule as a separate basis for its decision, and allows a state court to reach a federal question without sacrificing its interests in finality, federalism, and comity. Id.; see also, Alderman v. Zant, 22 F.3d 1541, 1549 (11th Cir. 1994) (holding that "where a state court has ruled in the alternative, addressing both the independent state procedural ground and the merits if the federal claim, the federal court should apply the state procedural bar and decline to reach the merits of the claim."); Ferguson v. Sec'y, Dep't of Corr., 580 F.3d 1183, 1211 (11th Cir. 2009) ("Additionally, although the court discussed the merits of Ferguson's ... claim, we can still apply the state procedural bar since it couched its discussion of the procedural bar in the alternative.").

evidence not presented at trial." Calderon v. Thompson, 523 U.S. 538, 558 (1998) (citing Schlup, 513 U.S. at 324).  "A reviewing court must evaluate the new evidence alongside any other admissible evidence of the defendant's guilt, and may grant relief only where a constitutional violation has probably resulted in the conviction of one who is actually innocent." Wilson v. Greene, 155 F.3d 396, 404-05 (4th Cir.), cert. denied, 525 U.S. 1012 (1998). Given the medical testimony presented during the trial, as discussed at length in connection with petitioner's ineffective assistance claims, as well as petitioner's own statements, petitioner fails to meet this burden.  Nor can her default be excused based on ineffective assistance of counsel, because petitioner has failed to establish a credible claim that her representation in this case was constitutionally deficient. Accordingly, petitioner's claim that the Commonwealth's evidence was false and its arguments were misleading is procedurally barred from consideration on the merits.

In her final claim, petitioner argues that the cumulative effect of trial counsels' errors and the Commonwealth's misconduct undermines confidence in the jury's verdict.  The state habeas court found no merit to this contention, as follows:

> [In] Claim 3, the Petitioner alleges that the cumulative effort [sic] of the claimed errors undermines the confidence and [sic] outcome of the trial. She claims that but for the errors of her counsel at trial and the prosecutor's failure to present accurate information to the jury the result would have been different.  Having already ruled that the individual claims do not amount to ineffective assistance of counsel and that there was no evidence that the prosecutor knowingly misled the jury with misinformation, or that any of the alleged errors would have affected the outcome of this case, this claim is also not supported by the evidence and is dismissed.

Final Order, T. 18.

It is settled under federal law that  the cumulative effect of non-errors does not amount to error. See Fisher v. Angelone, 163 F.2d 835, 852 (4th Cir. 1998) (observing that, where it is

determined that none of counsel's actions amounted to constitutional error, "it would be odd, to

say the least, to conclude that those same actions, when considered collectively," deprived

defendant of a fair trial); Mueller v. Angelone, 181 F.3d 557, 586 n. 22 (4th Cir. 1999) (same).

Here, then, where none of counsel's challenged actions standing alone amounted to ineffective

assistance, and where no prosecutorial misconduct occurred, the Virginia courts' determination

that the aggregate effect of these alleged errors likewise did not amount to constitutional error was

squarely in line with federal authorities. Accordingly, that decision is entitled to deference here.

Williams, 529 U.S. at 412–13.

## V.  Conclusion

For the foregoing reasons, respondent's Motion to Dismiss this petition will be granted,

and the petition will be dismissed with prejudice by an appropriate Order issued with this opinion.

Entered this ___17th___ day of ___March___ 2015.

Alexandria, Virginia                                        /s/

                                          Leonie M. Brinkema
                                          United States District Judge

37